## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MARGERY NEWMAN, and all others similarly situated | |
| Plaintiff, | |
| v. | Court No. |
| METROPOLITAN LIFE INSURANCE COMPANY, | *JURY TRIAL DEMANDED* |
| Defendant. | |

## COMPLAINT AT LAW

Plaintiff, Margery Newman ("Plaintiff"), by and through her attorneys, DUNCAN LAW GROUP, LLC, CRONIN & CO., Ltd., and TOMLINSON LAW, LLC, complaining of the Defendant, METROPOLITAN LIFE INSURANCE COMPANY (hereinafter "MET LIFE"), for her Complaint at Law, pleading in the alternative, on behalf of herself and all others similarly situated, states:

### Nature of the Action

1.      Since 1986, MET LIFE has been in the business of pricing and selling individual long-term care insurance policies.

2.      MET LIFE knew and understood that people purchase long-term care insurance for many reasons, including wanting to avoid exhausting assets for long-term care, to exercise choices regarding the type of care received, to protect family members from having to pay for care, and to decrease the chances of going on Medicaid.

3. MET LIFE further knew and understood that many people seeking long-term care insurance coverage either were or were going to be on fixed incomes and of limited financial means.

4. MET LIFE offered multiple incentives—including riders and premium payment options—to those applying for long-term care insurance. The incentives were intended to alleviate applicants/policyholders' concerns regarding future premium increases and coverage benefits.

5. One such incentive was the "Reduced-Pay at 65 Option." MET LIFE—in a "Long-Term Care (LTC) Facts" marketing brochure (a copy of which is attached as "Exhibit A") MET LIFE used to market long-term care insurance to prospective buyers—described the "Reduced-Pay at 65 Option" as follows:

> Premium Payment Options[:] You can choose how you want to pay for your Policy. In addition to standard premium payment methods, we offer 4 premium payment options which help you pay off your policy sooner and/or ease financial obligations down the road, when you might be on a fixed income.
> ...
> **Reduced Pay at 65 Option:** By paying more than the regular premium amount you would pay each year up to the Policy Anniversary on or after your 65th birthday, you pay half the amount of your pre-age 65 premiums **thereafter**.

Exhibit A at 9 (**emphasis added**).

6. Another such incentive was the "5% Automatic Compound Inflation Protection Rider." MET LIFE—in the "Long-Term Care (LTC) Facts" marketing brochure—described the "5% Automatic Compound Inflation Protection Rider" as follows:

> 5% Automatic Compound Inflation Protection:
> Your current Daily Benefit Amount and the balance of your lifetime benefit amount will automatically increase annually by 5% **with NO corresponding increase to your premium**.

Exhibit A at 8 (**emphasis added**).

**Jurisdiction and Venue**

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than defendants, there are more than 100 members of the Class, and upon information and belief the aggregate amount in controversy exceeds $5,000,000.00 exclusive of interest and costs.

8.      Venue is appropriate because Plaintiff is a resident of the State of Illinois.  Venue is also proper in this Court because Defendant systematically transacts business in the State of Illinois and the causes of action set forth in this Complaint, in part, arose in the State of Illinois. MET LIFE sold Plaintiff an individual long-term care insurance policy in the State of Illinois.

**The Parties**

9.      At all times mentioned herein, Plaintiff resided at 1930 Strenger Lane, Riverwoods, Illinois, 60015, and is the owner of a MET LIFE "LTC PREMIER" long-term care insurance policy number 04856-20065 ("MET LIFE Policy 04856-20065").

10.      At all times mentioned herein Defendant, MET LIFE, was a corporation organized under the laws of the State of New York, with its principal place of business in New York, New York. MET LIFE, therefore, is a citizen of New York. MET LIFE is licensed to do business in the State of Illinois and regularly conducts business in Illinois.

**Factual Allegations**

11.      Plaintiff was 56 years old at the time she applied for and purchased MET LIFE Policy 04856-20065, with an effective date of coverage of September 1, 2004.

12.      When Plaintiff purchased MET LIFE Policy 04856-20065, Plaintiff selected the "Reduced-Pay at 65 Option."

13.     MET LIFE described the "Reduced-Pay at 65 Option" in the following manner:

> By paying more than the regular premium amount you would pay each year up to the Policy Anniversary on or after your 65th birthday, **you pay half the amount of your pre-age 65 premiums thereafter.**

Exhibit A at 9 **(emphasis added).**

14.     Plaintiff paid an additional annual premium in exchange for the benefit of the "Reduced-Pay at 65 Option."

15.     Immediately before Plaintiff turned 65 years old on May 14, 2012, her semi-annual premium for MET LIFE Policy 04856-20065 was $3,813.68.

16.     Because Plaintiff selected the "Reduced-Pay at 65 Option," Plaintiff's semi-annual premium was reduced from $3,813.68 to $1,906.84 on September 1, 2012.

17.     On March 1, 2015, MET LIFE increased Plaintiff's semi-annual premium 102% to $3,851.81—$38.13 more than Plaintiff's pre-age 65 semi-annual premium.

18.     When Plaintiff purchased MET LIFE Policy 04856-20065, Plaintiff also purchased the "5% Automatic Compound Inflation Protection Rider."

19.     In a "Long-Term Care Insurance Outline of Coverage" document (a copy of which is attached as "Exhibit B") MET LIFE gave to Plaintiff, MET LIFE described the "5% Automatic Compound Inflation Protection Rider" as follows:

> INFLATION PROTECTION: You will have the opportunity to purchase one of two (2) Inflation Protection Riders. If You choose one of these Riders, the following increases are made without regard to Your age, claim status, claim history, health, or the length of time You have been covered under the policy. We reserve the right to adjust premium rates, on a class basis, for these Inflation Protection options. You have the choice of:
>
> — 5% Automatic Compound Inflation Protection Rider. **This Rider will provide You with an automatic increase in Your benefits amounts each year with no corresponding increase in premium.** If no Benefits

4

have been paid, the amounts of the increases are equal to five percent (5%) of the benefit amounts in effect at the end of the prior Policy year …

Exhibit B at 8, 17, 24-25, 34 (**emphasis added**).

20.     Plaintiff paid an additional annual premium/charge (that more than doubled the price of her total annual premium) in exchange for the benefit of the "5% Automatic Compound Inflation Protection Rider."

21.     On March 1, 2015, MET LIFE increased: (1) Plaintiff's base annual premium by 102%; and (2) the annual premium/charge Plaintiff paid for the "5% Automatic Compound Inflation Protection Rider" by 102%.

22.     After announcing the 102% premium increase, MET LIFE told Plaintiff she could do one of the following:

   a.  Continue her existing long-term care coverage by paying the new premium amount(s) when due;

   b.  Pay lower premiums and reduce her long-term care coverage; or

   c.  Cancel her coverage entirely.

23.     MET LIFE never gave Plaintiff a copy of MET LIFE Policy 04856-20065.

24.     Plaintiff requested a copy of MET LIFE Policy 04856-20065 in February 2016. MET LIFE responded that it could not give Plaintiff a copy of MET LIFE Policy 04856-20065 because MET LIFE no longer had a copy of it.

## Class Allegations

25.     Plaintiff brings this action on behalf of herself, and all others similarly situated, pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Classes:

   1.  All persons age 65 and older in the United States who purchased an

individual long-term care insurance policy from MET LIFE (or a subsidiary or affiliate thereof) and selected the "Reduced-Pay at 65 Option" at any time during the period from January 1, 1986 to the present and have been subjected to a class-wide rate increase that increased their premiums above and beyond the promised 50% of their pre-age 65 premiums ("Subclass 1").

2.      All persons in the United States who purchased an individual long-term care insurance policy from MET LIFE (or a subsidiary or affiliate thereof) and selected the "5% Automatic Compound Inflation Protection Rider" at any time during the period from January 1, 1986 to the present and have been subjected to a class-wide rate increase that increased their base premium and the premium/charge paid for the "5% Automatic Compound Inflation Protection Rider" ("Subclass 2").

26.      The Classes are so numerous that joinder of all members is impracticable. Due to the nature of the trade and commerce involved, the members of both Classes are geographically dispersed throughout the United States. While only MET LIFE knows the exact number of Subclass 1 and Subclass 2 members, Plaintiff believes there are thousands of members in each Class.

27.      Plaintiff's claims are typical of the claims of the other members of both Classes she seeks to represent because Plaintiff and all Subclass 1 and Subclass 2 members purchased an individual long-term care insurance policy from MET LIFE and purchased the "Reduced-Pay at 65 Option," the "5% Automatic Compound Inflation Protection Rider," or both.

28.      Plaintiff will fully and adequately protect the interests of all members of Subclass 1 and Subclass 2. Plaintiff has retained counsel experienced in complex class action and insurance litigation. Plaintiff has no interests which are adverse to or in conflict with other members of Subclass 1 or Subclass 2.

29.      The questions of law and fact common to the members of Subclass 1 and Subclass 2 predominate over any questions that may affect only individual members.

30.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.   The prosecution of separate actions by individual members of Subclass 1 and Subclass 2 would impose heavy burdens upon the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to Subclass 1 and Subclass 2. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

31.     The interest of the members of Subclass 1 and Subclass 2 in individually controlling the prosecution of separate actions is theoretical rather than practical. The Classes have a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.   The damages suffered by the individual Subclass 1 and Subclass 2 members are uniform, and the expense and burden of individual litigation might make it virtually impossible for them to redress the wrongs done to them. Plaintiff anticipates no difficulty in the management of this action as a class action.

### <u>COUNT I – Breach of Contract ("Reduced-Pay at 65 Option")</u>

32.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 24 as if fully set forth herein.

33.     Plaintiff brings this count on behalf of Subclass 1.

34.     By selecting the "Reduced-Pay at 65 Option," Plaintiff executed a contract with MET LIFE (hereinafter the "Reduced-Pay at 65 Contract") and/or modified the terms of MET LIFE Policy 04856-20065.

35.     Under the terms of the Reduced-Pay at 65 Contract, Plaintiff agreed to pay more than the regular premium amount she would have otherwise paid each year up to September 1, 2012. In exchange, MET LIFE promised to permanently cut Plaintiff's pre-age 65 premiums in half starting September 1, 2012.

36.     MET LIFE breached the Reduced-Pay at 65 Contract by increasing Plaintiff's annual premiums 102% (to an amount greater than Plaintiff's pre-age 65 annual premiums) in March 2015, when Plaintiff was 67 years old.

37.     As a result of MET LIFE's breach, Plaintiff was forced to pay increased premiums to maintain her existing benefits. Thus, Plaintiff has been damaged.

### COUNT II – Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Reduced-Pay at 65 Option")

38.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 24 as if fully set forth herein.

39.     Plaintiff brings this count on behalf of Subclass 1.

40.     MET LIFE violated Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §501/1 *et seq.* ("ICFA"), in one or more of the following respects:

**Deceptive Acts or Practices**

41.     When marketing the "Reduced-Pay at 65 Option," MET LIFE told Plaintiff that if Plaintiff paid more than the regular premium amount Plaintiff would otherwise pay each year up to the Policy Anniversary on or after Plaintiff's 65th birthday, Plaintiff would "**pay half the amount of [Plaintiff's] pre-age 65 premiums <u>thereafter</u>**." Exhibit A at 9 (**emphasis added**).

42.     The foregoing statement was deceptive because MET LIFE knew it could only increase premiums on a class-wide basis.

43.     Thus, if MET LIFE had to increase premiums after Plaintiff turned 65 years old, MET LIFE would be unable to deliver on the "Reduced-Pay at 65 Option's" promise of reduced post-age 65 premiums.

44.     MET LIFE intended that Plaintiff rely on the foregoing deceptive statement when deciding to purchase an individual long-term care insurance policy and/or the "Reduced-Pay at 65 Option."

45.     MET LIFE made the foregoing deceptive statement in the conduct of trade or commerce—namely the sale of individual long-term care insurance policies and/or the "Reduced-Pay at 65 Option."

46.     Plaintiff relied on the foregoing deceptive statement when deciding to purchase the "Reduced-Pay at 65 Option."

47.     Plaintiff would not have purchased the "Reduced-Pay at 65 Option" and/or MET LIFE Policy 04856-20065 had she known MET LIFE planned to increase her premiums after she turned 65 years old.

48.     As a direct and proximate result of the foregoing deceptive statement, Plaintiff has incurred damages in the form of additional premiums paid for the "Reduced-Pay at 65 Option."

**Bait and Switch**

49.     MET LIFE's aforementioned conduct also constitutes a bait and switch in violation of the ICFA.

50.     Plaintiff paid an additional premium for the "Reduced-Pay at 65 Option's" benefit.

51.     MET LIFE has never provided Plaintiff with a copy of MET LIFE Policy 04856-20065, even though Plaintiff has formally requested one.

52.     In a September 10, 2014 letter to Plaintiff, MET LIFE claimed the first page of MET LIFE Policy 04856-20065 states, "MetLife has the right to increase rates in the future" (or something to that effect).

53.     MET LIFE never intended to sell Plaintiff an individual long-term care insurance policy under which MET LIFE agreed to permanently cut Plaintiff's annual premium in half when Plaintiff turned 65 years old if Plaintiff selected the "Reduced-Pay at 65 Option."

**Unfair Acts or Practices**

54.     MET LIFE's conduct regarding the "Reduced-Pay at 65 Option" violated Illinois public policy—including standards of conduct set out in 215 ILCS 5/351A-9.1, 215 ILCS 5/351A-9.2, 215 ILCS 5/351A-7, 215 ILCS 5/351A-10, and Ill. Admin. Code tit. 50, § 2012.122(b)(4), as well as Illinois common law doctrines governing insurance policies and breach of contract.

55.     MET LIFE's conduct regarding the "Reduced-Pay at 65 Option" was "immoral, unethical, oppressive, or unscrupulous" because it forced Plaintiff to do one of the following: (1) pay a premium more than two times greater than the premium Plaintiff originally agreed to pay; (2) reduce the coverage for which she had previously contracted; (3) or cancel her coverage altogether.

56.     If Plaintiff canceled her coverage, she would not have been able to obtain individual long-term care insurance from another insurer at the price MET LIFE charged. Thus, to maintain the long-term care insurance coverage MET LIFE promised her, Plaintiff had no choice but to pay the increased premiums starting March 1, 2015.

57. Plaintiff suffered substantial injury because she was forced to pay a premium more than two times greater than the premium Plaintiff initially agreed to pay.

## COUNT III – Fraud ("Reduced-Pay at 65 Option")

58. Plaintiff repeats and realleges the allegations of paragraphs 1 through 24 as if fully set forth herein.

59. Plaintiff brings this count on behalf of Subclass 1.

60. MET LIFE represented to Plaintiff that her premiums would be reduced by 50% when Plaintiff turned 65 years old if Plaintiff purchased the "Reduced-Pay at 65 Option."

61. However, MET LIFE knew there would be certain and significant class-wide premium increases after Plaintiff turned 65 years old. Such increases would obviate any premium savings anticipated by Plaintiff.

62. MET LIFE intended that Plaintiff rely on the foregoing misrepresentation when deciding to purchase MET LIFE Policy 04856-20065 and/or the "Reduced-Pay at 65 Option."

63. Plaintiff relied on the foregoing misrepresentation when deciding to purchase MET LIFE Policy 04856-20065 and/or the "Reduced-Pay at 65 Option."

64. Plaintiff would not have purchased the "Reduced-Pay at 65 Option" had she known MET LIFE planned to increase her premiums after she turned 65 years old.

65. As a direct result of the foregoing misrepresentation, Plaintiff suffered damages in the form of additional premiums paid for the "Reduced-Pay at 65 Option" and ongoing heightened premiums.

## COUNT IV – Breach of Contract ("5% Automatic Compound Inflation Protection Rider")

66. Plaintiff repeats and realleges the allegations of paragraphs 1 through 24 as if fully set forth herein.

67. Plaintiff brings this count on behalf of Subclass 2.

68. By purchasing the "5% Automatic Compound Inflation Protection Rider," Plaintiff executed a contract with MET LIFE (hereinafter the "5% Automatic Compound Inflation Protection Rider Contract").

69. MET LIFE breached the 5% Automatic Compound Inflation Protection Rider Contract in one or more of the following ways:

**ONE**

70. The 5% Automatic Compound Inflation Protection Rider Contract was to provide Plaintiff with:

> **an automatic increase in [Plaintiff's] benefits amounts each year with no corresponding increase in premium.** If no Benefits have been paid, the amounts of the increases are equal to five percent (5%) of the benefit amounts in effect at the end of the prior Policy year.

71. Thus, under the terms of the 5% Automatic Compound Inflation Protection Rider Contract, Plaintiff agreed to pay an additional premium/charge exceeding 100% of her base premium. In exchange, MET LIFE promised to increase Plaintiff's Daily Benefit Amount by 5% annually "with no corresponding increase in premium."

72. On March 1, 2015, MET LIFE increased: (1) Plaintiff's base annual premium by 102%; and (2) the annual premium Plaintiff paid for the "5% Automatic Compound Inflation Protection Rider" by 102%.

73. After announcing the 102% premium increase, MET LIFE told Plaintiff she could do one of the following:

    a. Continue her existing long-term care coverage by paying the new premium amount when due;

    b.  Reduce her long-term care coverage (that is, (1) reduce her daily benefit amount from $387.84 to $195.48; or (2) reduce her benefit duration from 5 to 3 years); or

    c.  Cancel her coverage entirely.

74.    MET LIFE's 102% premium increase constituted a "corresponding increase in premium"—in violation of the 5% Automatic Inflation Protection Rider Contract—for one or more of the following reasons:

    d.  the only way Plaintiff could maintain the increased daily benefit amount she had already paid for (by purchasing the "5% Automatic Compound Inflation Protection Rider") was to pay the increased premium; and/or

    e.  the only way Plaintiff could maintain the increased daily benefit amount she had already paid for (by purchasing the "5% Automatic Compound Inflation Protection Rider") and continue receiving the annual 5% increase in benefits, was to pay the increased base premium and  the increased premium for the "5% Automatic Compound Inflation Protection Rider."

**TWO**

75.    Under the terms of the 5% Automatic Compound Inflation Protection Rider Contract, Plaintiff agreed to pay an additional premium exceeding 100% of her base premium. In exchange, MET LIFE promised to increase Plaintiff's Daily Benefit Amount by 5% annually without increasing the premium Plaintiff paid for the "5% Automatic Compound Inflation Protection Rider."

76.    Under the terms of the 5% Automatic Compound Inflation Protection Rider Contract, MET LIFE reserved the right to increase premiums on a "class basis" (that is, MET

LIFE reserved the right to uniformly increase base premiums on all individual long-term care insurance policies it sold in Illinois), but did not reserve the right to increase the annual premium Plaintiff paid for the "5% Automatic Compound Inflation Protection Rider."

77.     MET LIFE breached the 5% Automatic Compound Inflation Protection Rider Contract by increasing the premium Plaintiff paid for the "5% Automatic Compound Inflation Protection Rider" 102% in March 2015.

78.     As a result of MET LIFE's breach, Plaintiff was forced to pay more than the previously agreed-upon premium to continue receiving the "5% Automatic Compound Inflation Protection Rider's" benefit.

## COUNT V – Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("5% Automatic Compound Inflation Protection Rider")

79.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 24 as if fully set forth herein.

80.     Plaintiff brings this count on behalf of Subclass 2.

81.     MET LIFE violated Section 2 of the ICFA, in one or more of the following respects:

## Deceptive Acts or Practices

82.     When marketing the "5% Automatic Compound Inflation Protection Rider," MET LIFE stated the following:

> 5% Automatic Compound Inflation Protection:
> Your current Daily Benefit Amount and the balance of your lifetime benefit amount will automatically increase annually by 5% **with NO corresponding increase to your premium**.

AND

> INFLATION PROTECTION: You will have the opportunity to purchase one of two (2) Inflation Protection Riders. If You choose one of these Riders, the

14

following increases are made without regard to Your age, claim status, claim history, health, or the length of time You have been covered under the policy. We reserve the right to adjust premium rates, on a class basis, for these Inflation Protection options. You have the choice of:

— 5% Automatic Compound Inflation Protection Rider. **This Rider will provide You with an automatic increase in Your benefits amounts each year with no corresponding increase in premium.** If no Benefits have been paid, the amounts of the increases are equal to five percent (5%) of the benefit amounts in effect at the end of the prior Policy year …

(**Emphasis Added**).

83. The foregoing statements were "deceptive" for one or more of the following reasons:

f. The foregoing statements had the capacity to deceive consumers, including Plaintiff, into thinking MET LIFE could not increase the premiums individuals paid for individual long-term care insurance policies and/or the "5% Automatic Compound Inflation Protection Rider."

g. The foregoing statements had the capacity to deceive consumers, including Plaintiff, into thinking MET LIFE would provide increased benefits with no corresponding increase in base premium and the premium paid for the "5% Automatic Compound Inflation Protection Rider."

84. MET LIFE intended that Plaintiff rely on the foregoing deceptive statements when deciding to purchase an individual long-term care insurance policy and/or the "5% Automatic Compound Inflation Protection Rider."

85. MET LIFE made the foregoing deceptive statements in the conduct of trade or commerce—namely the sale of individual long-term care insurance policies and/or the "5% Automatic Compound Inflation Protection Rider."

86.     Plaintiff relied on the foregoing deceptive statements when deciding to purchase the "5% Automatic Compound Inflation Protection Rider."

87.     Plaintiff would not have purchased the "5% Automatic Compound Inflation Protection Rider" if she knew its associated premiums were subject to increase.

88.     As a direct result of the foregoing misrepresentation, Plaintiff suffered damages in the form of increased premiums paid to maintain her existing long-term care coverage.

**Unfair Acts or Practices**

89.     MET LIFE's decision to increase the premium Plaintiff paid for the "5% Automatic Compound Inflation Protection Rider" violated Illinois public policy—particularly the standards of conduct set out in Ill. Admin. Code tit. 50, § 2012.80, Ill. Admin. Code tit. 50, § 2012.122, and 215 Ill. Comp. Stat. Ann. 5/351A-10, among other provisions of the Illinois Insurance Code, as well as Illinois common law doctrines governing insurance policies and breaches of contract.

90.     MET LIFE's decision to increase the premiums Plaintiff paid for the "5% Automatic Compound Inflation Protection Rider" was "immoral, unethical, oppressive, or unscrupulous" because it forced Plaintiff to do one of the following: (1) pay a premium more than two times greater than the premium Plaintiff agreed to pay; (2) reduce the coverage for which she had previously contracted; (3) or cancel her coverage altogether.

91.     If Plaintiff canceled her coverage, she would not have been able to obtain individual long-term care insurance from another insurer at the price she had been paying. Thus, to maintain the long-term care insurance coverage MET LIFE promised her, Plaintiff had no choice but to pay the increased premiums starting March 1, 2015.

92.     Plaintiff suffered substantial injury because she was forced to pay a premium more than two times greater than the premium Plaintiff agreed to pay.

### COUNT VI– Fraud ("5% Automatic Compound Inflation Protection Rider")

93.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 24 as if fully set forth herein.

94.     Plaintiff brings this count on behalf of Subclass 2.

95.     MET LIFE's conduct was fraudulent in one or more of the following ways:

### ONE

96.     MET LIFE, marketed and sold the "5% Automatic Compound Inflation Protection Rider" in connection with its sales of individual long-term care insurance policies.

97.     MET LIFE offered the "5% Automatic Compound Inflation Protection Rider" as follows:

> This Rider will provide You with an automatic increase in Your benefit amounts each year **with no corresponding increase in premium**.  If no Benefits have been paid, the amounts of the increases are equal to five percent (5%) of the benefit amounts in effect at the end of the prior Policy Year.

(**Emphasis added**).

98.     MET LIFE, marketed and sold the "5% Automatic Compound Inflation Protection Rider" as a rider that provided insureds increased benefits with no corresponding increases in premiums.

99.     MET LIFE, at the time it sold individual long-term care policies with the "5% Automatic Compound Inflation Protection Rider" knew that it would levy a significant, future, class-wide premium increase.

100.    On March 1, 2015, MET LIFE levied a 102% class-wide premium rate increase.

17

101.    On March 1, 2015, MET LIFE increased the annual cost of the "5% Automatic Compound Inflation Protection Rider" by 102%.

102.    After announcing the 102% premium increases, MET LIFE told insureds who purchased the "5% Automatic Compound Inflation Protection Rider," including Plaintiff, that they could do one of the following:

> a.  Continue her existing long-term care coverage by paying the new premium amount when due;
>
> b.  Reduce her long-term care coverage (that is, (1) reduce her daily benefit amount from $387.84 to $195.48; or (2) reduce her benefit duration from 5 to 3 years); or
>
> c.  Cancel her coverage entirely.

103.    MET LIFE falsely represented that insureds who purchased the "5% Automatic Compound Inflation Protection Rider" would receive an increase in benefits with "no corresponding increase in premium."

104.    MET LIFE's representation that there would be "no corresponding increase in premium" was false for one or more of the following reasons:

> a.  The March 1, 2015 102% premium increase constituted a "corresponding increase in premium" because the only way insureds, like Plaintiff, could maintain the increased daily benefit amount they had already paid for (by purchasing the "5% Automatic Compound Inflation Protection Rider") was to pay the increased premium; and/or
>
> b.  The March 1, 2015 102% premium increase constituted a "corresponding increase in premium" because the only way insureds, including Plaintiff,

could maintain the increased daily benefit amount they had already paid for (by purchasing the "5% Automatic Compound Inflation Protection Rider") and continue receiving the annual 5% increase in benefits, was to pay the increased base premium and the increased premium for the "5% Automatic Compound Inflation Protection Rider."

**TWO**

105.     MET LIFE falsely represented that if Plaintiff paid an additional annual premium for the "5% Automatic Compound Inflation Protection Rider" Plaintiff's annual benefit amount would increase by 5% each year with no corresponding increase in the premium Plaintiff paid for the "5% Automatic Compound Inflation Protection Rider."

106.     However, MET LIFE—at the time it sold MET LIFE Policy 04856-20065 to Plaintiff—knew it would levy a significant, future, class-wide premium increase that would increase the premium Plaintiff paid for the "5% Automatic Compound Inflation Protection Rider."

107.     MET LIFE, at the time it sold long-term care policies with the "5% Automatic Compound Inflation Protection Rider," including MET LIFE Policy 04856-20065, further knew that the class of policies subject to class-wide premium increases included policies purchased by insureds that included and excluded the "5% Automatic Compound Inflation Protection Rider."

108.     MET LIFE, at the time it sold individual long-term care policies offering the "5% Automatic Compound Inflation Protection Rider," further knew that the group of insureds electing to purchase the "5% Automatic Compound Inflation Protection Rider" would make fewer claims than the group of insureds electing not to purchase the "5% Automatic Compound Inflation Protection Rider."

109.    MET LIFE, at the time it sold long-term care policies offering the "5% Automatic Compound Inflation Protection Rider," further knew that the group of insureds electing to purchase the "5% Automatic Compound Inflation Protection Rider" would pay significantly more in premiums than the group of insureds electing not to purchase the "5% Automatic Compound Inflation Protection Rider."

110.    MET LIFE, at the time it sold long-term care policies offering the "5% Automatic Compound Inflation Protection Rider" therefore knew that the claims rate for the group of insureds that purchased long term care policies with the "5% Automatic Compound Inflation Protection Rider" would be significantly lower than the claims rate for the group of insureds that did not select the "5% Automatic Compound Inflation Protection Rider."

111.    MET LIFE, at the time it sold long-term care policies offering the "5% Automatic Compound Inflation Protection Rider," therefore knew that insureds who selected the "5% Automatic Compound Inflation Protection Rider" would make fewer claims, and pay more in premiums.

112.    MET LIFE, at the time it sold long-term care policies offering the "5% Automatic Compound Inflation Protection Rider," further knew that if it offered an affordable and stable "5% Automatic Compound Inflation Protection Rider" that when it did significantly increase premiums, insureds would need to cancel their coverage, accept reduced benefits, or pay the significantly increased premium, all to the financial gain and benefit of MET LIFE.

113.    Thus, the more individuals who purchased the "5% Automatic Compound Inflation Protection Rider" the greater MET LIFE's profits.

114.    MET LIFE had an overwhelming incentive to maximize the number of individuals purchasing the "5% Automatic Compound Inflation Protection Rider" before MET LIFE instituted a 102% class-wide premium rate increase in 2015.

115.    MET LIFE intended that Plaintiff rely on the foregoing misrepresentation when deciding to purchase an individual long-term care insurance policy and/or the "5% Automatic Compound Inflation Protection Rider."

116.    Plaintiff relied on the foregoing misrepresentation when deciding to purchase MET LIFE Policy 04856-20065 and/or the "5% Automatic Compound Inflation Protection Rider."

117.    Plaintiff would not have purchased the "5% Automatic Compound Inflation Protection Rider" had she known MET LIFE planned to increase the "5% Automatic Compound Inflation Protection Rider's" associated premium any amount, let alone 102%.

118.    As a direct result of the foregoing misrepresentation, Plaintiff suffered damages in the form of heightened premiums paid to maintain long-term care coverage she had already paid for.

## **Request for Relief**

WHEREFORE, Plaintiff demands the following relief on behalf of herself and all others similarly situated:

A.      That an Order be entered certifying this action as a Plaintiff Class action under Federal Rule of Civil Procedure 23;

B.      Compensatory damages in such amount as demonstrated by the proofs at trial and that the Court deems just and proper;

21

C.  Punitive damages as to Counts for which such damages are available under applicable law and in an amount that the Court deems just and proper;

D.  Imposition of a constructive trust, an order granting recessionary and injunctive relief and other such equitable relief that the Court deems just and proper;

E.  An appropriate claims resolution facility, funded by Defendant, to administer relief to the Class in this case;

F.  All statutory damages including all exemplary damages available under any applicable statutory provision;

G.  Costs of litigation and attorneys' fees; and

H.  All other appropriate relief.

Dated:  March 23, 2016                    Respectfully submitted,

                                          **MARGERY NEWMAN,**
                                          **and all others similarly situated,**

                                          By:    /s/ Thomas C. Cronin
                                              One of her Attorneys

Robert R. Duncan                Thomas C. Cronin            Frank H. Tomlinson
DUNCAN LAW GROUP, LLC           CRONIN & CO., LTD.          TOMLINSON LAW, LLC
161 North Clark Street          161 North Clark Street      2100 First Avenue North
Suite 2550                      Suite 2550                  Suite 600
Chicago, IL 60601               Chicago, Illinois 60601     Birmingham, Alabama
T:  312.202.3283                T: 312.201.7100             T: 205.328.9445
F:  312.202.3284                F: 312.201.7101             F: 800.856.9028