**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| MARGERY NEWMAN, and all others similarly situated, | |
| Plaintiff, | Case No. 1:16-CV-03530 |
| v. | |
| METROPOLITAN LIFE INSURANCE COMPANY, | Hon. Thomas M. Durkin |
| Defendant. | |

**DEFENDANT METLIFE'S MEMORANDUM IN SUPPORT OF
ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Terri L. Ahrens
Drinker Biddle & Reath LLP
191 North Wacker Drive, Suite 3700
Chicago, Illinois 60606-1698
(312) 569-1416
Terri.Ahrens@dbr.com

Michael D. Rafalko, *pro hac vice*
Stephen A. Serfass, *pro hac vice*
Drinker Biddle & Reath LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
(215) 988-1186
Michael.Rafalko@dbr.com
Stephen.Serfass@dbr.com

Sheldon Eisenberg, *pro hac vice*
Drinker Biddle & Reath LLP
1800 Century Park East, Ste. 1500
Los Angeles, CA 90067
(310) 203-4035
Sheldon.Eisenberg@dbr.com

**TABLE OF CONTENTS**

I.      INTRODUCTION ...........................................................................................................1

II.     STATEMENT OF FACTS ...........................................................................................3

III.    LEGAL STANDARD.....................................................................................................7

IV.     DISCUSSION .................................................................................................................8

        A.      Newman Has Failed to State a Breach of Contract Claim......................................8

                1.      Newman Does Not Plead the Elements of a Breach of Contract
                        Claim...........................................................................................................8

                2.      Newman Cannot Use an Extrinsic Marketing Brochure to Construe
                        the Policy or Create a Contractual Duty that Does Not Exist in the
                        Policy Itself ...............................................................................................9

                        a.      Illinois Follows the "Four-Corners" Rule of Contract
                                Construction....................................................................................9

                        b.      The Policy is a Fully-Integrated Contract.....................................11

                        c.      The Policy's Reduced Pay Option is Clear on its Face ................12

                        d.      MetLife was Within Its Contractual Rights to Change
                                Newman's Premium Rate After She Turned 65 ...........................13

                        e.      Newman's Breach of Contract Claim Must be Dismissed ............15

        B.      Newman's Fraud-Based Claims Fail Because MetLife has not
                Misrepresented any Fact, Newman was Given Notice that Her Rate Could
                Increase and MetLife had No Duty to Give Newman Additional
                Information About the Possibility that Her Rate Could Increase .........................15

                1.      Newman's Common Law Fraud Claim and Consumer Fraud Claim
                        Under the ICFA Fail Because MetLife's Brochure Contained No
                        False Statement of Fact and Newman was Advised that Her
                        Premium Rate Could Increase ...................................................................15

                        a.      MetLife's Marketing Brochure Contained No False
                                Statement.......................................................................................16

                        b.      MetLife did not Intend for Newman to Rely on the
                                Language of the Brochure, Which Provided Only a
                                "General Overview".....................................................................17

                        c.      Newman's Common Law and Consumer Fraud Claims Fail
                                Because MetLife Advised Newman that Her Premium
                                Could Go Up Without Respect to Age ...........................................18

                2.      MetLife's Marketing Brochure Cannot Form the Basis of an
                        "Unfair Acts or Practices" Claim Under the ICFA.....................................22

a.     MetLife's Marketing Brochure Does Not Violate Public
       Policy .............................................................................22

b.     Newman Has Not Plausibly Alleged that MetLife's
       Conduct was "Immoral, Unethical, Oppressive or
       Unscrupulous".................................................................24

c.     Newman Has Not Suffered a "Substantial Injury" as a
       Result of Representations in the Brochure.....................25

3.  Newman's Fraudulent Concealment Claim Fails Because Newman
    Was Given Notice That Her Premium Rate Could Increase and
    MetLife had No Duty to Disclose Additional Information.......................27

V.   CONCLUSION......................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                         **Page(s)**

*Abazari v. Rosalind Franklin Univ. of Med. & Sci.*,
  40 N.E.3d 264 (Ill. App. 2015) ...................................................................................27

*Air Safety, Inc. v. Teachers Realty Corp.*,
  706 N.E.2d 882 ( Ill. 1999) ........................................................................................10

*Alvarez v. Ins. Co. of N. Am.*,
  313 Fed. App'x. 465 (3d Cir. 2008)............................................................................29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................................................7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................................7

*Bercoon, Weiner, Glick & Brook v. Mfrs. Hanover Trust Co.*,
  818 F. Supp. 1152 (N.D. Ill. 1993) ............................................................................17

*Carroll v. Butterfield Health Care, Inc.*,
  No. 02 C 4903, 2003 WL 22462604 (N.D. Ill. Oct. 29, 2003) .................................23

*Cohen v. Am. Sec. Ins. Co.*,
  735 F.3d 601 (7th Cir. 2013) .......................................................................19, 24, 25

*Commonwealth Ins. Co. v. Stone Container Corp.*,
  351 F.3d 774 (7th Cir. 2003) .....................................................................................17

*Connick v. Suzuki Motor Co., Ltd.*,
  675 N.E. 2d 554 (Ill.1996) ...................................................................................16, 17

*Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*,
  250 F.3d 570 (7th Cir. 2001) .....................................................................................18

*Cress v. Recreation Servs., Inc.*,
  795 N.E.2d 817 (Ill. App. 2003) ..................................................................................9

*Crichton v. Golden Rule Ins. Co.*,
  576 F.3d 392 (7th Cir. 2009) ...............................................................................28, 29

*Crichton v. Golden Rule Ins. Co.*,
  832 N.E.2d 843 (Ill App. 2005) ...........................................................................24, 28

*Davis v. G.N. Mortgage Corp.*,
  396 F.3d 869 (7th Cir. 2005) ..........................................................10, 15, 18, 21

*Delta Min. Corp. v. Big Rivers Elec. Corp.*,
   18 F.3d 1398 (7th Cir. 1994) ...............................................................11

*Doe v. Dilling*,
   888 N.E.2d 24 (Ill. 2008) ..............................................................15, 17

*Drobny v. J.P. Morgan Chase Bank, N.A.*,
   929 F.Supp.2d 839 (N.D. Ill. 2013) ......................................................7

*Flora Bank & Trust v. Czyzewski*,
   583 N.E.2d 720 (Ill App. 1991) ...........................................................11

*Garrett v. RentGrow, Inc.*,
   No. 04 C 8309, 2005 WL 1563162 (N.D. Ill. July 1, 2005) ...................24

*Gen. Elec. Capital Corp. v. Lease Resolution Corp.*,
   128 F.3d 1074 (7th Cir. 1997) .............................................................30

*Geoquest Prods., Ltd. v. Embassy Home Entm't*,
   593 N.E.2d 727 ( Ill. App. 1992) .........................................................10

*Greenberger v. GEICO Gen. Ins. Co.*,
   631 F.3d 392 (7th Cir. 2011) .........................................................27, 28

*Home Ins. Co. v. Chicago & Nw. Transp. Co.*,
   56 F.3d 763,767 (7th Cir. 1995) ..........................................................11

*IFC Credit Corp. v. Burton Indus., Inc.*,
   536 F.3d 610 (7th Cir. 2008) ...............................................................10

*Lake County Grading Co., Inc. v. Advance Mech. Contractors, Inc.*,
   654 N.E.2d 1109 (Ill. App. 1995) ........................................................24

*Martin v. State Farm Mut. Auto.Inc. Co.*,
   808 N.E.2d 47 (Ill. App. 2004) ...............................................27, 28, 29

*N. Trust Co. v. MS Sec. Servs., Inc.*,
   No. 05 C 3370, 2006 WL 695668 (N.D. Ill. Mar. 15, 2006) ...............9, 10

*N. Trust Co. v. VIII S. Mich. Assoc.*,
   657 N.E.2d 1095 (Ill. App. 1995) ........................................................18

*Old Town Pizza of Lombard, Inc. v. Corfu-Tasty Gyros, Inc.*,
   No. 11-CV-6959, 2012 WL 638765 (N.D. Ill. Feb. 23, 2012) ...............22

*Randazzo v. Harris Bank Palatine, N.A.*,
   104 F.Supp.2d 949 (N.D. Ill. 2000), *aff'd*, 262 F.3d 663 (7th Cir. 2001) ...............17, 23

*Robinson v. Toyota Motor Credit Corp.*,
   775 N.E. 2d 951 (Ill. 2002) ..............................................22, 23, 24, 25, 26

*Servpro Indus., Inc. v. Schmidt*,
  905 F. Supp. 475 (N.D. Ill. 1995) ........................................................................8

*Siegel v. Shell Oil Co.*,
  612 F.3d 932 (7th Cir. 2010) ...............................................................................26

*Swanson v. Citibank*, N.A.,
  614 F.3d 400 (7th Cir.2010) ...................................................................................7

*Toulon v. Cont'l Cas. Co.*,
  No. 15 CV 138, 2015 WL 4932255 (N.D. Ill. Aug. 18, 2015) ............19, 20, 21, 25, 26, 27, 28

*Toulon v. Continental Cas. Co.*,
  No. 15 CV 138, 2016 WL 561909 (N.D. Ill. Feb. 12, 2016) ...........................19, 20, 24, 25, 26

*Univ. of Illinois v. Cont'l Cas. Co.*,
  599 N.E.2d 1338 (Ill App. 1992) .........................................................................11

*W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co., Inc.*,
  794 F.3d 666 (7th Cir. 2015) ...............................................................................11

## STATUTES, RULES & REGULATIONS

815 ILCS § 505/1 *et seq.* ...................................................................................15

FRCP Rule 9(b) ......................................................................................................7

FRCP Rule 12(b)(6) ..............................................................................................30

Ill. Admin. Code Title 50, § 2012.122(b)(4) ..................................................22, 23

I.    **INTRODUCTION**

Defendant Metropolitan Life Insurance Company ("MetLife") issued a long-term care insurance policy to plaintiff Margery Newman ("Newman") in 2004 (the "Policy"). In her application for the Policy, Newman, a lawyer, selected a premium payment plan called the Reduced Pay at 65 Option ("Reduced Pay Option"). The Reduced Pay Option required MetLife to reduce Newman's premium by half when she turned 65.

Newman admits that, when she turned 65, MetLife fulfilled its obligation and reduced her premium by half under the Reduced Pay Option – from $3,813.68 to $1,906.84. Several years later, MetLife applied to the Illinois Department of Insurance for a class-wide premium rate increase. The rate increase was approved, meaning Newman and other Illinois policyholders in her rating class experienced a premium rate increase.

In her First Amended Complaint (the "Complaint"), Newman now erroneously contends that the Reduced Pay Option required MetLife to not only reduce her premium by half at age 65, but also to permanently freeze her premium at that reduced rate for the life of the Policy. Newman, however, conspicuously fails to point to any language in the Policy for the proposition that MetLife was required to permanently fix her rate because no such language exists. With no language in the Policy to support her claim, Newman relies instead on a single blurb in a single marketing brochure which, she erroneously contends, obligates MetLife to permanently fix her rate at age 65.

This theory of liability fails for at least two fundamental reasons. First, the rights and obligations of the parties are governed by Policy – not the brochure – and Newman fails to plead how the Policy itself was breached. In fact, she admits that all the Policy actually required was for MetLife to reduce her premium by half when she turned 65 and that MetLife fully performed that obligation.

Second, the Policy is a fully-integrated contract that is clear on its face. Both the Policy

1

and brochure specifically advise that the brochure is not part of the Policy. Illinois courts strictly follow the "four-corners" rule of contract construction, meaning this Court may not look to extrinsic sources of information like the brochure to construe the Policy or create ambiguity. The fully-integrated, unambiguous Policy advised Newman in four places that premiums could be increased, including one instance where MetLife specifically illustrated the possibility of a "Substantial Premium Increase" after Newman turned 65. The Court should hold Newman to the language of her Policy and should dismiss the breach of contract claim with prejudice.

Newman's array of fraud-based claims, including violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), common law fraud in connection with the brochure and fraudulent concealment claim similarly fail as a matter of law. First, Newman's interpretation of the language in the marketing brochure is inappropriately strained and unreasonable. The language of the cited brochure does not support the contention that MetLife was required to permanently fix Newman's rate at age 65, particularly because the brochure contains a disclaimer cautioning that it offers only a general overview of coverage options and does not govern the rights and obligations of the parties. In fact, the brochure states that only the Policy governs the rights and obligations of the parties; and, as discussed above, the Policy advised repeatedly that rates could go up without respect to age.

Relatedly, even assuming, *arguendo*, that the brochure could be read in the manner urged by Newman, she still cannot have reasonably relied on it as a matter of law. Both the Policy and brochure state that the brochure is not part of the Policy and identify the Policy as the sole source of the parties' rights and obligations. And the Policy says, in four different places, that MetLife could raise Newman's rate. Moreover, the Policy included a 30-day "free-look" provision, meaning if Newman – who is admitted to practice in Illinois – reviewed the Policy and was dissatisfied with the absence of language that would require MetLife to permanently fix her premium rate at age 65, she had 30 days to void the Policy and to receive a full return of

2

premium. She never did so.

Finally, Newman's fraudulent concealment claim fails because (1) Newman was on notice that her premiums could go up after age 65 (*i.e.*, there was no failure to disclose); and (2) Illinois law is clear that there is no fiduciary duty or special relationship between an insurer and insured that would require MetLife to disclose technical information about Newman's rating class. Further, the Policy states that rates can go up on "all policies in the same class as Yours," meaning no matter how Newman's class was defined, she was on notice that her rate could go up. Thus, all of Newman's fraud-based claims fail as a matter of law and should be dismissed with prejudice.

## II.     STATEMENT OF FACTS[1]

Newman purchased the Policy on September 1, 2004. Complaint ¶ 15; Policy, Schedule of Benefits. The Policy includes a Reduced Pay at 65 Option. *See* Policy, Schedule of Benefits. The Reduced Pay Option illustrates that Newman's premium would be reduced by half when she turned 65:

> **[Y]ou have selected the following flexible premium payment option: Reduced Pay at 65**
>
> **Semi-Annual Premium Amount []:**
> Before Policy Anniversary at age 65:          $3231.93
> On and after Policy Anniversary at age 65:     $1615.97

*See id*. Newman admits that the Policy illustrated that her premiums would be reduced by half when she turned 65. Complaint ¶ 19.

Notably, the Policy does not place any other qualification or condition on the Reduced Pay Option. In particular, the Policy contains no requirement that MetLife permanently fix Newman's premium rate at age 65 when the Reduced Pay Option took effect, and the Complaint

---

[1]     MetLife treats all well-pleaded facts in the Complaint as true, as it must, for the sake of this motion only. MetLife makes no admission based on any fact stated in this motion and expressly reserves all rights, claims, defenses and arguments pertaining to this and all other disputes.

cites to none.  In fact, Newman admits that the Policy contains no statement addressing whether

MetLife would "permanently fix" her premium rate at age 65:

> MetLife Policy 04856-20065 reflects that Plaintiff's premiums would be cut in
> half when she turned 65 years old…  MetLife Policy 04856-20065 contains no
> other statements regarding the "Reduced-Pay at 65 Option."

Complaint ¶ 19.  Newman also admits that MetLife fulfilled its obligation to reduce her premium

by half when she turned 65:

> Immediately before Plaintiff turned 65 years old…her semi-annual
> premium…was $3,813.68 [but]…[b]ecause Plaintiff selected the "Reduced-Pay at
> 65 Option," Plaintiff's semi-annual premium was reduced from $3,813.68 to
> $1,906.84…

Complaint ¶¶ 22-23 (citing Complaint, Exhibit C).

On March 1, 2015 – nearly three years after Newman's Reduced Pay Option took effect

and her premium was reduced by half – her premium increased due to MetLife's implementation

of a class-wide premium rate increase that affected Newman and other Illinois insureds.

Complaint ¶ 24.  Newman filed this putative class action against MetLife alleging breach of

contract, violations of the ICFA, fraud and fraudulent concealment on behalf of herself and other

insureds.  *See* Complaint.

The allegations in Newman's Complaint relate not to the terms and conditions of her

Policy, but to a blurb that gives a general overview of the Reduced Pay Option in one of

MetLife's informational brochures.  *Id*.  The blurb states that:

> **Reduced-Pay at 65 Option:**  By paying more than the regular premium amount
> you would pay each year up to the Policy Anniversary on or after your 65th
> birthday, you pay half the amount of your pre-age 65 premiums thereafter.

*See* Brochure at 9.  Newman contends that the inclusion of the word "thereafter" at the end of the

this extrinsic blurb required MetLife to permanently fix her premium rate at age 65.  *See, e.g.*,

Complaint ¶¶ 8-9.

The very same page of the brochure that contains this blurb also contains a disclaimer

4

which states that the brochure provides only a "general overview" of the Reduced Pay Option.

*Id*. The disclaimer further explains that the rights and obligations of the parties are to be governed by the actual policy language, if and when a policy is issued:

> **Note:** This brochure is intended to provide a general overview, and highlight some of the provisions and optional benefits of MetLife's Individual Long-Term Care Insurance policies. *All rights and obligations will be governed by the actual policy language, if and when issued.*

Brochure at 9 (emphasis added). Newman failed to mention this critical disclaimer in the Complaint. *See* Complaint.

Importantly, the Policy is a fully-integrated contract due to its integration clause:

> **The Contract.** This policy, with any Riders, endorsements and written application attached, *make up the entire contract.*
>
> The provisions of this policy must be read as a whole. For example, the Limitations and Exclusions apply to all **Benefits** in the policy.

Policy at 18 (bold in original; italics added). The brochure Newman seeks to rely on is not among the specifically-identified "policy, [] Riders, endorsements and written application" that make up the Policy. *Id*. And Newman has not pleaded that the brochure is, in fact, a part of the Policy. *See* Complaint.

The Policy discloses repeatedly that MetLife is permitted to raise premium rates on a class-wide basis. In fact, the very first provision on the very first page of the Policy states:

> **RENEWABILITY: THIS POLICY IS GUARANTEED RENEWABLE FOR LIFE.** *PREMIUM RATES ARE SUBJECT TO CHANGE.* This means You have the right, subject to the terms of the terms of the policy, to continue this policy as long as You pay Your premium on time. We cannot change any of the terms of this policy without Your consent*, except that We may change the premium rates, subject to applicable state Insurance Department approval. Any such change in premium rates will apply to all policies in the same class as Yours in the state where this policy was issued.*

Policy at 1 (bold in original; italics added). Similarly, the Premium Payment provision of the Policy states:

> *We reserve the right to change premium rates on a class basis.* The premium will not increase because You get older or Your health changes. Your premium will change if We change your benefit amounts as a result of Your request *or as a result of an increase provided under the terms of this policy.*

Policy at 14 (emphasis added).

The Policy also includes a 5% Automatic Compound Inflation Protection Rider and a Contingent Benefits Upon Lapse Rider, both of which speak to MetLife's right to increase Newman's rate.[2] The 5% Automatic Compound Inflation Protection Rider states:

> **Your premium is not expected to increase as a result of the benefit amount increases provided in this Rider. However, We reserve the right to adjust premiums on a class basis.**

*See* 5% Automatic Compound Inflation Protection Rider (emphasis in original).

The language of Newman's Contingent Benefits Upon Lapse Rider is even more compelling. The purpose of this rider is to provide Newman with an available benefit equal to the total amount of premium she paid over the life of the Policy, should she have allowed the Policy to lapse due to a "Substantial Premium Increase." *See* Contingent Benefits Upon Lapse Rider. Substantial Premium Increase is a defined term:

> **"Substantial Premium Increase"** means a cumulative increase in Your **Initial Annual Premium** which equals or exceeds a given percentage increase over your **Initial Annual Premium** as shown in the following table…

*Id.* (emphasis in original). In the table directly below the definition of Substantial Premium Increase, the Policy specifically illustrates the possibility that Newman's premium rate could go up – that she could experience a Substantial Premium Increase – at age 65 or above.[3] *See id.*

Newman admits that the premium rate increase that forms the basis of her claims against MetLife was precisely the kind of class-wide increase that is contemplated and expressly permitted in the Policy. *See e.g.,* Complaint ¶¶ 27 (seeking class certification for policyholders

---

[2] As discussed above, riders attached to the Policy are specifically integrated into the Policy under the Policy's integration clause. Policy at 18.

[3] In fact, the Contingent Benefits Upon Lapse Rider illustrates the possibility of a Substantial Premium Increase through age 90 and above. *Id.*

who "have been subjected to a class-wide rate increase."); 45 ("MetLife knew it could only and would only increase premiums on a class-wide basis."); 63 ("if a class-wide premium increase was implemented after Plaintiff turned 65 years old, [MetLife] would be unable to fulfill its promise…"); 72 (same).

Finally, the Policy includes a 30-day "free-look" provision, which states:

**30-Day Right to Examine Policy. Please read this policy carefully. It is a legal contract between You and MetLife. If You are not satisfied for any reason, You may return this policy to Us or to the sales representative from whom You bought it within thirty (30) days from the date You receive it. If You return it within the thirty (30) day period, this policy will be void from the beginning. We will refund any premium paid within thirty (30) days after We receive the returned policy.**

Policy at 1 (emphasis in original). If Newman reviewed her Policy at the time of purchase and was dissatisfied in any way with the Policy's language (including the absence of language for the proposition that MetLife was obligated to permanently fix her premium at age 65), she had the right to void the policy with a full return of premium. *Id.* She never exercised that right.

### III. <u>LEGAL STANDARD</u>

A complaint must contain "sufficient factual matter" to state a claim for relief that is both actionable as a matter of law and "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The factual allegations in a complaint must "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-56 (2007); *see also Swanson v. Citibank*, N.A., 614 F.3d 400, 404 (7th Cir.2010). Moreover, under the heightened pleading standard of Rule 9(b), a plaintiff alleging fraud must state with particularity the circumstances of the alleged fraud. *Drobny v. J.P. Morgan Chase Bank, N.A.*, 929 F.Supp.2d 839, 844 (N.D. Ill. 2013).

## IV.  DISCUSSION

### A.  Newman Has Failed to State a Breach of Contract Claim

Newman's breach of contract claim fails in two case-dispositive respects.  First, she fails to plead the elements of a breach of contract claim in that she does not and cannot claim that any term of the Policy was breached.  In fact, she admits that the Policy required only that MetLife reduce her premium by half when she turned 65 and that MetLife fully performed that obligation. Second, no matter how she reads the brochure, she cannot use an extrinsic document to construe or supplant the Policy.

#### 1.  Newman Does Not Plead the Elements of a Breach of Contract Claim

Newman's Complaint is facially deficient in the most fundamental respect.  It fails to set forth the seminal element of a breach of contract claim: a breach by MetLife.  In order to state a breach of contract claim that will withstand a motion to dismiss, Newman must plead specific facts to plausibly establish that the Policy was, in fact, breached.  *See, e.g.*, *Servpro Indus., Inc. v. Schmidt*, 905 F. Supp. 475, 479 (N.D. Ill. 1995).  Newman has failed to do so.

Newman correctly asserts that her Policy included a Reduced Pay Option and that the Reduced Pay Option required MetLife to reduce her premium by half when she turned 65.  *See, e.g.*, Complaint ¶¶ 16, 17, 19, 20, 37, 38.  She admits that the Schedule of Benefits for "MetLife Policy 04856-20065 reflects that [her] premiums would be cut in half once she turned 65 years old."  Complaint ¶ 19.  Critically, she also admits that "MetLife Policy 04856-20065 **contains no other statements regarding the 'Reduced-Pay at 65 Option**.'"  *Id.* (emphasis added).  In other words, Newman concedes that MetLife's only contractually-prescribed duty under the Reduced Pay Option was to reduce her premium by half when she turned 65.  *Id.*  She admits, however, that there is no additional language in the Policy that would require MetLife to permanently lock in the reduced rate or otherwise forego its express contractual right to raise premiums in accordance with the terms and conditions of the Policy.  *Id.*

As a consequence, Newman cannot and does not allege that MetLife failed to comply with its contractual duty to reduce her premium by half when she turned 65. To the contrary, Newman admits that MetLife fully performed this duty. Complaint ¶¶ 22-23. And there is simply nothing in the Policy that prohibits the subsequent class-wide premium increase that Newman experienced after she turned 65. Indeed, the Policy specifically provides MetLife the express right to do so. *See, e.g.*, Policy at 1. Because Newman has failed to plead facts which plausibly establish that MetLife breached any contractual obligation, she has failed to state a cognizable breach of contract claim and the claim should be dismissed.

### 2. Newman Cannot Use an Extrinsic Marketing Brochure to Construe the Policy or Create a Contractual Duty that Does Not Exist in the Policy Itself

Despite the absence of language in the Policy that would require MetLife to permanently fix Newman's premium rate at age 65, Newman attempts to create such a duty by pleading that MetLife should be held to language in its extrinsic marketing brochure which, she erroneously contends, stands for the proposition that her rate could never go up after age 65. This contention fails because the Policy is a fully-integrated contract that is clear on its face and advised Newman in four places that MetLife could raise her rate at any time so long as rates were increased on a class-wide basis.[4]

#### a. Illinois Follows the "Four-Corners" Rule of Contract Construction

Illinois courts follow the four-corners rule of contract law and will not look outside the contract when interpreting the terms of a contract. *N. Trust Co. v. MS Sec. Servs., Inc.*, No. 05 C 3370, 2006 WL 695668, at *4 (N.D. Ill. Mar. 15, 2006); *Cress v. Recreation Servs., Inc.*, 795 N.E.2d 817, 852 (Ill. App. 2003) ("[A] court must give meaning and effect to every part of the contract."). Further, extrinsic evidence cannot be used to create an ambiguity in a breach of

---

[4]     In one instance, MetLife even specifically advised Newman that she could undergo a "Substantial Premium Increase" after age 65. *See* Contingent Benefits Upon Lapse Rider.

9

contract action. *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 878 (7th Cir. 2005) ("Illinois adheres to a 'four corners rule' of contract interpretation, which provides that '[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used.  It is not to be changed by extrinsic evidence.'").  The Illinois Supreme Court has specifically rejected the introduction of extrinsic evidence where, as here, the contract contains an integration clause. *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 885 ( Ill. 1999).

Further, Illinois courts have not permitted plaintiffs to point to extrinsic evidence to create an ambiguity when the contract is facially unambiguous. *N. Trust Co.*, 2006 WL 695668, at *9; *see also Davis*, 396 F.3d at 879 ("The introduction of parol evidence to establish ambiguity in a facially unambiguous, signed, dated and fully integrated contract is a practice which the Illinois Supreme Court has, to this date, neither condoned nor sanctioned, and accordingly we refuse to do so today."); *Air Safety, Inc.*, 706 N.E.2d at 885 ("[c]onsidering extrinsic evidence of prior negotiations to create an 'extrinsic ambiguity' where both parties explicitly agree that such evidence will not be considered ignores the express intentions of the parties and renders integration clauses null.").

The threshold question for Illinois courts is whether the contract in question is a fully integrated document. *Davis*, 396 F.3d at 878-79.  That is a question of law for the trial judge to decide.  *Id*.  An integrated writing is one intended by the parties "to be a final and complete expression of the entire agreement."  *IFC Credit Corp. v. Burton Indus., Inc.*, 536 F.3d 610, 614 (7th Cir. 2008) (internal citations omitted).  Importantly, "only the subject writing may be considered to determine the integration question."  *Davis*, 396 F.3d at 878-79 (internal citation omitted).  In other words, "[u]nder the four corners test, the court must find from the contract itself that the document is incomplete before it will allow the admission of extrinsic evidence." *Geoquest Prods., Ltd. v. Embassy Home Entm't*, 593 N.E.2d 727, 730 ( Ill. App. 1992).  "[I]f a

10

contract is clear on its face and the text contains no clue that the contract might mean something different from what it says, then the inquiry is over – no evidence outside the contract may be considered." *Home Ins. Co. v. Chicago & Nw. Transp. Co.*, 56 F.3d 763,767 (7th Cir. 1995).

A contract is ambiguous only if the language used is reasonably susceptible to more than one meaning. *Flora Bank & Trust v. Czyzewski*, 583 N.E.2d 720, 725 (Ill App. 1991). "When interpreting an insurance contract, the court should neither distort the meaning of words so as to reach a desired result, nor search for or invent ambiguities where none exist. Rather, the court should examine the policy as a whole and interpret words according to their plain and ordinary meanings." *Univ. of Illinois v. Cont'l Cas. Co.*, 599 N.E.2d 1338, 1345 (Ill App. 1992). A contract is not ambiguous "simply because the parties do not agree on the meaning of its terms." *Flora Bank*, 583 N.E.2d at 725.

### b.    The Policy is a Fully-Integrated Contract

There can be no question that the Policy is, in fact, a fully-integrated contract due to the inclusion of this integration clause:

> **The Contract.**  This policy, with any Riders, endorsements and written application attached, *make up the entire contract*.

Policy at 18 (emphasis added). An insurance contract that contains standardized language limiting the terms of the contract to those contained in the policy is fully-integrated. *W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co., Inc.*, 794 F.3d 666, 673-75 (7th Cir. 2015).

Marketing brochures and other extrinsic documents are conspicuously absent from the specifically-identified "policy, [] Riders, endorsements and written application" that comprise the Policy under the integration clause (Policy at 18), meaning the marketing materials Newman seeks to rely on are not a part of her Policy. *See Delta Min. Corp. v. Big Rivers Elec. Corp.*, 18 F.3d 1398, 1405 (7th Cir. 1994) ("[W]hen certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded."). This point is conclusively

11

established by the fact that the brochure itself states that it is not a part of the Policy.  On the very same page containing the blurb upon which Newman seeks to rely for the proposition that MetLife was obligated to permanently fix her premium rate at age 65, the brochure cautions:

> **Note:**  This brochure is intended to provide a general overview, and highlight some of the provisions and optional benefits of MetLife's Individual Long-Term Care Insurance policies.  *All rights and obligations will be governed by the actual policy language, if and when issued.*

Brochure at 9 (emphasis added).  The Policy is a fully-integrated contract and the brochure is not a part of that contract.

### c.    The Policy's Reduced Pay Option is Clear on its Face

The Policy is also clear on its face.  As discussed, Newman admits that the operation of the Reduced Pay Option was clear in the Policy, stating:

> MetLife Policy 04856-20065 reflects that Plaintiff's premiums would be cut in half when she turned 65 years old…  MetLife Policy 04856-20065 contains no other statements regarding the "Reduced-Pay at 65 Option."

Complaint ¶ 19.  In other words, the Policy called for Newman's premium to be reduced by half when she turned 65, and nothing more.[5]  The Policy contains no requirement that MetLife permanently fix Newman's premium at age 65.

Newman's reading of the Policy at Paragraph 19 of the Complaint is consistent with a plain reading of the Policy.  The Policy's Schedule of Benefits describes the Reduced Pay Option as follows:

> **[Y]ou have selected the following flexible premium payment option: Reduced Pay at 65**

---

[5]    Though not a material fact for the sake of this motion, MetLife notes for the sake of clarity that Newman got the full benefit of her bargain in connection with the Reduced pay Option because she continues to pay just half the premium amount of other Illinois insureds that did not purchase the Reduced Pay Option.  This is because Newman's premium was reduced by half at age 65, then underwent the rate increase years later that forms the basis of her Complaint.  Insureds without the Reduced Pay Option, by contrast, never had their premium reduced by half but still underwent the very same rate increase, meaning they pay a substantially higher premium rate than Newman does because their premium was never reduced by half at age 65.

**Semi-Annual Premium Amount []:**
Before Policy Anniversary at age 65:            $3231.93
On and after Policy Anniversary at age 65:      $1615.97

*See* Policy, Schedule of Benefits.  The operation of the reduced Pay Option is not susceptible to more than one meaning.  Indeed, it could not be clearer on its face – when Newman turned 65, the Schedule of Benefits illustrated that her premium rate would be reduced by half.  That is what Newman understood the Schedule of Benefits to mean.  Complaint ¶ 19.

The additional inference Newman seeks – language that would purport to require MetLife to permanently fix her premium rate at age 65 – is absent from the Policy.  Newman baldly concludes that "[b]ased on the terms and conditions of the 'Reduced-Pay at 65 Option,' [her] premium should have remained permanently fixed at 50% of her pre-age 65 premium."  Complaint ¶ 26.  Notably, however, Newman fails to state what "terms and conditions" of the Policy she is referring to.  That is because no such "terms and conditions" exist.

### d.      MetLife was Within Its Contractual Rights to Change Newman's Premium Rate After She Turned 65

In stark contrast to the absence of Policy language requiring MetLife to permanently fix Newman's rate at age 65, the Policy is replete with provisions that expressly reserve the right of the company to increase Newman's rate.  Case in point: the *very first provision* on the *very first page* of the Policy states:

> **RENEWABILITY: THIS POLICY IS GUARANTEED RENEWABLE FOR LIFE.  *PREMIUM RATES ARE SUBJECT TO CHANGE.***  This means You have the right, subject to the terms of the terms of the policy, to continue this policy as long as You pay Your premium on time.  We cannot change any of the terms of this policy without Your consent*, except that We may change the premium rates, subject to applicable state Insurance Department approval.  Any such change in premium rates will apply to all policies in the same class as Yours in the state where this policy was issued.*

Policy at 1 (bold in original; italics added).  Similarly, the Premium Payment provision of the Policy advises:

*We reserve the right to change premium rates on a class basis.* The premium will not increase because You get older or Your health changes. Your premium will change if We change your benefit amounts as a result of Your request *or as a result of an increase provided under the terms of this policy.*

Policy at 14 (emphasis added).

In addition to the language in her base Policy, Newman's coverage includes a 5% Automatic Compound Inflation Protection Rider and a Contingent Benefits Upon Lapse Rider, both of which speak to MetLife's right to increase Newman's rate.[6] The 5% Automatic Compound Inflation Protection Rider states:

> **Your premium is not expected to increase as a result of the benefit amount increases provided in this Rider. However, We reserve the right to adjust premiums on a class basis.**

*See* 5% Automatic Compound Inflation Protection Rider (emphasis in original). Even more significantly, the Policy includes a Contingent Benefits Upon Lapse Rider. The purpose of this rider is to provide Newman with an available benefit equal to the total amount of premium she paid over the life of the Policy in the event she allows the Policy to lapse due to a "Substantial Premium Increase." *See id.* Substantial Premium Increase is a defined term:

> **"Substantial Premium Increase"** means a cumulative increase in Your **Initial Annual Premium** which equals or exceeds a given percentage increase over your **Initial Annual Premium** as shown in the following table…

*See* Contingent Benefits Upon Lapse Rider (emphasis in original). In the table directly below the definition of Substantial Premium Increase, the rider specifically illustrates the possibility that Newman's premium rate can go up – that she may experience a Substantial Premium Increase – at age 65 or above. *See id.* In fact, the rider illustrates the possibility that Newman may undergo a Substantial Premium Increase at age 90 or above. *Id.* Newman was clearly on notice that rate increases were possible at any time, including after age 65.

---

[6]     As discussed above, riders attached to the Policy are integrated under the Policy's integration clause. Policy at 18.

### e. Newman's Breach of Contract Claim Must be Dismissed

In short, Newman has not alleged a breach of the Policy; she has alleged a breach of MetLife's marketing brochure. That brochure, however, is extrinsic to the fully-integrated Policy, does not govern the rights and obligation of the parties, and may not be used by Newman to construe the Policy, create an ambiguity or impose duties on MetLife that do not exist in the Policy itself. *See Davis*, 396 F.3d at 878 ("[U]nder the parol evidence rule, extrinsic or parol evidence concerning a prior or contemporaneous agreement is not admissible to vary or contradict a fully integrated writing."). Newman's breach of contract claim should be dismissed.

### B. Newman's Fraud-Based Claims Fail Because MetLife has not Misrepresented any Fact, Newman was Given Notice that Her Rate Could Increase and MetLife had No Duty to Give Newman Additional Information About the Possibility that Her Rate Could Increase

Newman's three fraud-based claims sounding in violations of the ICFA, common law fraud and fraudulent concealment also fail as a matter of law.

### 1. Newman's Common Law Fraud Claim and Consumer Fraud Claim Under the ICFA Fail Because MetLife's Brochure Contained No False Statement of Fact and Newman was Advised that Her Premium Rate Could Increase

Newman contends that MetLife is liable for common law fraud and consumer fraud under the ICFA at 815 ILCS § 505/1 *et seq.* because MetLife allegedly advised Newman in its marketing brochure that her premium rate would be permanently fixed at age 65. Common law fraud requires Newman to establish "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Doe v. Dilling*, 888 N.E.2d 24, 35-6 (Ill. 2008). Similarly, the elements of a consumer fraud claim under the ICFA are "(1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) that the deception

occurred in the course of conduct involving trade and commerce." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E. 2d 554, 593 (Ill.1996). For the sake of this motion, the key difference between common law fraud and consumer fraud is that consumer fraud appears not to include "justifiable reliance" as an element; though, as discussed below, giving a plaintiff notice of the conduct complained of – in this case, the fact that Newman's premium rate could go up after she turned 65 – is an absolute defense to both common law and consumer fraud claims. Newman's common law and consumer fraud claims fail because (1) MetLife's brochure did not contain a false statement of fact; (2) MetLife did not intend for Newman to rely on the language in its marketing brochure; and (3) MetLife gave Newman notice that her premium rate could go up at any time.

### a. MetLife's Marketing Brochure Contained No False Statement

Newman points only to language in MetLife's brochure for the proposition that a false statement was made:

> **Reduced-Pay at 65 Option:** By paying more than the regular premium amount you would pay each year up to the Policy Anniversary on or after your 65th birthday, you pay half the amount of your pre-age 65 premiums *thereafter*.

*See* Complaint ¶ 44; Brochure at 9 (emphasis added). Newman claims that the inclusion of the word "thereafter" at the end of this blurb required MetLife to permanently fix her premium rate at age 65 which, according to Newman, MetLife never intended to do.

If the blurb is to be considered at all (despite its accompanying disclaimer), it must be read subject to the terms and conditions of the Policy because the brochure specifically advises that "[a]ll rights and obligations will be governed by the actual policy language, if and when issued." Brochure at 9. And the terms and conditions of the Policy permitted MetLife to raise rates on a class-wide basis. *See e.g.,* Policy at 1. Newman admits that MetLife applied the Reduced Pay Option in precisely this way – it reduced her premium rate by half when she turned

65 and she paid the reduced rate until MetLife implemented a class-wide rate increase years later. *See* Complaint ¶¶ 22-23. Thus, MetLife's brochure contains no false statement because, when read together with the Policy, MetLife never stated that it would permanently fix her premium rate at age 65. *See Randazzo v. Harris Bank Palatine, N.A.*, 104 F.Supp.2d 949, 954 (N.D. Ill. 2000), *aff'd*, 262 F.3d 663 (7th Cir. 2001) (At a minimum, a complaint under the ICFA requires a misrepresentation of fact); *Bercoon, Weiner, Glick & Brook v. Mfrs. Hanover Trust Co.*, 818 F. Supp. 1152, 1158 (N.D. Ill. 1993) ("[T]o state a cause of action for common law fraud in Illinois, the plaintiff must allege . . . that a false statement of material fact was made.").

### b. MetLife did not Intend for Newman to Rely on the Language of the Brochure, Which Provided Only a "General Overview"

As with the requirement that some fact have actually been misrepresented, common law and consumer fraud claims both require that the defendant have intended for the plaintiff to rely on the allegedly false representation. *See Connick*, 675 N.E.2d at 591, 593 (holding that a common law fraud claim requires that the defendant have intended "that the statement induce the plaintiff to act" and that a consumer fraud claims requires that the defendant intend "that [the] plaintiff rely on the deception . . . ."); *Doe*, 888 N.E.2d at 35 (holding that "to prevail on a claim of fraudulent misrepresentation, [a plaintiff] must establish . . . an intent to induce the plaintiff to act . . . ."). In this case, MetLife never intended for Newman (or any insured) to rely on the specific wording of its marketing brochure as though that language governed the rights and obligations of the parties. We know this because MetLife cautioned Newman that she could not and should not rely on the brochure by advising Newman that the brochure gave only a "general overview" of the Reduced Pay Option and that the rights and obligations of the parties were not governed by the brochure, but by the Policy if and when it was issued. Brochure at 9; *See Commonwealth Ins. Co. v. Stone Container Corp.*, 351 F.3d 774, 779 (7th Cir. 2003) (finding that defendant insurer did not intend for plaintiff to rely on marketing materials in connection

17

with ICFA claim where insurer did not advise insured to depend on the publication).

> c. **Newman's Common Law and Consumer Fraud Claims Fail Because MetLife Advised Newman that Her Premium Could Go Up Without Respect to Age**

Finally, the Policy advised Newman that her premium rate could go up without regard to age, which acts as a complete defense to her common law and consumer fraud claims. As discussed, a plaintiff's *justifiable* reliance on an alleged misrepresentation is an essential element of a common law fraud claim. *See Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001) (dismissing common law fraud claim because reliance was implausible). In other words, it is not enough that the plaintiff relied on the defendant's alleged misrepresentation; rather, she must demonstrate that she was justified in doing so. *Davis*, 396 F.3d at 882. It is well-established in Illinois that:

> A party is not justified in relying on representations made when [s]he has ample opportunity to ascertain the truth of the representations before [s]he acts. When [s]he is afforded the opportunity of knowing the truth, [s]he cannot be heard to say [s]he was deceived by misrepresentations.

*Id.* Significantly, "[t]his rule applies with equal force in instances where fraud is alleged with respect to the execution of a written contract." *Id.*; *N. Trust Co. v. VIII S. Mich. Assoc.*, 657 N.E.2d 1095, 1103 (Ill. App. 1995) ("[A] party cannot close his eyes to the contents of a document and then claim that the other party committed fraud merely because it followed [its] contract.").

Similarly, when analyzing a deceptive practices claim under the ICFA, "the allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff." *Davis*, 396 F.3d at 884. The defendant's conduct will not be found to be deceptive if the plaintiff was explicitly warned of the complained of result. *See id.* (affirming district court's dismissal of borrowers' ICFA claim and holding that a lender did not deceive a borrowers, where lender's agreement plainly alerted borrowers about the complained of conduct in a number of

18

ways, including disclaimers appearing in addenda signed by borrowers); *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 608-09 (7th Cir. 2013) (holding that plaintiff failed to demonstrate that defendant's conduct was deceptive within the meaning of the ICFA, where defendant's "agreement[,] . . . disclosures, notices and correspondence conclusively defeat any claim of fraud, false promise, concealment, or misrepresentation."); *Toulon v. Cont'l Cas. Co.*, No. 15 CV 138, 2015 WL 4932255, at *5 (N.D. Ill. Aug. 18, 2015) ("An act will not be said to be deceptive when the plaintiff is explicitly alerted to the complained of result.").

This Court's recent decisions granting an insurer's two motions to dismiss in *Toulon v. Continental Casualty Company* are instructive because *Toulon* involved a similar rate increase challenge filed against a long-term care insurer on behalf of a putative class of insureds.[7] *See Toulon*, No. 15 CV 138, 2015 WL 4932255 ("*Toulon I*") (granting Continental's motion to dismiss complaint); *Toulon v. Continental Cas. Co.*, No. 15 CV 138, 2016 WL 561909 (N.D. Ill. Feb. 12, 2016) ("*Toulon II*") (granting Continental's motion to dismiss amended complaint). Stephanie Toulon bought a long-term care insurance policy from Continental. At the point of sale, she received a suitability worksheet that was extraneous to her contract and which, she claimed, led her to believe that any premium rate increase implemented by Continental would be in the range of 20%. That belief proved wrong, however, when Continental increased her premium rate by 75%. Toulon alleged that Continental omitted to disclose the allegedly dubious actuarial assumptions it relied upon to price her policy. She also alleged the suitability worksheet gave her the false impression that any rate increase would be modest in size. She brought claims against Continental for fraud and consumer fraud (among other claims).

This Court granted Continental's motions to dismiss in full. Toulon's common law fraud claim was dismissed in pertinent part because "[d]efendant advised plaintiff that it had the ability

---

[7]     In fact, *Toulon* was filed by the same three plaintiffs' attorneys that represent Newman and included the same kinds of claims Newman has raised in the case at bar.

to raise premium (without any qualification)." *Toulon I* at *2. Similarly, in considering and rejecting Toulon's consumer fraud claim, this Court held that:

> When analyzing a claim under the ICFA, the allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff. An act will not be said to be deceptive when the plaintiff is explicitly alerted to the complained of result.

*Toulon I* at *5 (citation omitted). In other words, this very Court held in *Toulon I* that Continental's disclosure of the fact that it could raise premium rates without additional qualification was a complete defense to Toulon's fraud and consumer fraud claims. *Id.* Notably, the Court granted Toulon an opportunity to amend the complaint, which she did. Continental moved to dismiss a second time and successfully defeated the amended complaint in full, this time with prejudice, for the same reasons it defeated the complaint in *Toulon I*. The Court further held in *Toulon II* that Toulon's fraud claims failed "because none of the statements can be considered false." *Toulon II* at *3.

Newman's common law and consumer fraud claims should be dismissed on similar grounds. Importantly, as discussed above, no statement in MetLife's marketing brochure was false. Beyond that fact, however, Newman's claims fail because she was given notice that her premium rate could increase (without qualification). *See, e.g.*, Policy at 1. She therefore could not have justifiably relied on the specific wording of the brochure. This conclusion is undergirded by several important disclosures. First, as discussed, the brochure advised Newman – a lawyer – that it provides a general overview of benefits only, but does not govern the rights and obligations of the parties. Brochure at 9. Only the Policy does that. *Id.* This disclosure alone was sufficient to put Newman on notice that she could not rely on the specific wording of the marketing brochure as though it were a part of her contract.

But there were additional disclosures as well. The Policy is a fully-integrated contract with an integration clause. Policy at 18. The Policy is deemed under the integration clause to

include only "[t]his policy, with any Riders, endorsements and written application attached." *Id.* The Policy does not include the marketing brochure. This fact is further clarified by language in the brochure stating that it is not a part of the Policy. Brochure at 9. In other words, there is absolutely no basis for Newman to contend that she was justified in relying on the specific wording of the brochure as though it were her Policy, because the brochure is not a part of her Policy and only the Policy governs the parties' rights and obligations.

Finally, Newman was given notice that her premium could increase without regard to age. The Policy states in four places that MetLife can raise rates. Policy at 1; 14; 5% Automatic Compound Inflation Protection Rider; Contingent Benefits Upon Lapse Rider. None of these provisions (or any other provision of the Policy) limits MetLife's right to raise premium rates on a class-wide basis to the time period before Newman turned 65. *See id.* MetLife even illustrated the fact that Newman could undergo a "Substantial Premium Increase" at age 90 or above (*i.e.*, well over the age of 65). *See* Contingent Benefits Upon Lapse Rider. Newman's fraud and consumer fraud claims should be dismissed because she was "expressly alerted to the complained of result" that her premium could go up at any time. *Toulon I* at *5 (dismissing ICFA claim); *Davis*, 396 F.3d at 881-84 (dismissing fraud and ICFA claims where plaintiff was given notice of complained of result).

Newman's position is further undercut by the fact that the Policy includes a 30-day "free-look" provision, which states:

> **30-Day Right to Examine Policy. Please read this policy carefully. It is a legal contract between You and MetLife. If You are not satisfied for any reason, You may return this policy to Us or to the sales representative from whom You bought it within thirty (30) days from the date You receive it. If You return it within the thirty (30) day period, this policy will be void from the beginning. We will refund any premium paid within thirty (30) days after We receive the returned policy.**

Policy at 1 (emphasis in original). When Newman's Policy was issued, she had 30 days to review the Policy to determine whether she wanted to keep it. If she was dissatisfied with the absence of language requiring MetLife to permanently fix her premium rate at age 65, she had the right to void the Policy *ab initio* and to receive a full return of premium. She never did so and should now be held to the terms of the contract she entered after a 30-day review period.

### 2. MetLife's Marketing Brochure Cannot Form the Basis of an "Unfair Acts or Practices" Claim Under the ICFA

In addition to consumer fraud, Newman attempts to bring a second claim under the ICFA in which she alleges that the "misrepresentation" in MetLife's marketing brochure constituted an unfair act or practice. Newman is once again mistaken. An unfair acts or practices claim requires this Court to consider the so-called *Robinson* factors: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive or unscrupulous; and (3) whether it causes substantial injury to consumers. *Old Town Pizza of Lombard, Inc. v. Corfu-Tasty Gyros, Inc.*, No. 11-CV-6959, 2012 WL 638765, at *4 (N.D. Ill. Feb. 23, 2012) (citing *Robinson v. Toyota Motor Credit Corp.*, 775 N.E. 2d 951, 959-61 (Ill. 2002)). "A practice may be unfair because of the degree to which it meets one of these three criteria or because to a lesser extent it meets all three." *Id*. In this case, all three factors weigh decisively in favor of MetLife.

### a. MetLife's Marketing Brochure Does Not Violate Public Policy

Newman alleges that the "misrepresentation" in MetLife's brochure "violated Illinois public policy – including standards of conduct set out in Ill. Admin. Code tit. 50, § 2012.122(b)(4), as well as Illinois common law doctrines governing insurance policies and breach of contract." Complaint ¶ 55. Section 2012.122(b)(4) relates to the marketing of long-term care insurance products and states that it is prohibited for insurers to "misrepresent[] a material fact in selling or offering to sell a long-term care insurance policy." This provision cannot form the basis of a claim by Newman that the brochure violated public policy under the

first *Robinson* factor. That is because Section 2012.122(b)(4) governs the rights and obligations arising between MetLife and a regulatory body, the Illinois Department of Insurance, not MetLife and Newman. Section 2012.122(b)(4) does not provide Newman with a private right of action and, where a code provision does not include a private right of action, it cannot be used as the basis of an ICFA claim. *See Carroll v. Butterfield Health Care, Inc.*, No. 02 C 4903, 2003 WL 22462604 at *3 (N.D. Ill. Oct. 29, 2003) (finding no offense to public policy in nursing home's personal guarantee of payment for admission requirement despite the prohibition of such payment by Medicaid Act because Medicaid Act did not include a private right of action). This result makes sense because, if a plaintiff were able to use code provisions for which no private right of action exists as a basis to assert ICFA claims, plaintiffs would, in effect, be able to privately litigate and recover under any and all code provisions, including those such as Section 2012.122(b)(4) where the legislature never intended there to be a private right of action.

Second, even if Newman could rely on Section 2012.122(b)(4), the provision would not apply to this case because, as discussed, the brochure contained no misrepresentation of fact. *See Randazzo*, 104 F.Supp.2d at 954 (At a minimum, a complaint under the ICFA requires a misrepresentation of fact). But even assuming, *arguendo*, that the brochure contained a misrepresentation, that misrepresentation could not have been a *material* misrepresentation because the brochure stated that only the Policy governed the rights and obligations of the parties, and the Policy states in four places that MetLife could raise Newman's premium rate without regard to age. Newman knew or should have known she could not rely on the specific wording of the brochure as though it were part of her Policy.

Finally, Newman may not use a bald and conclusory general reference to "Illinois common law doctrines governing insurance policies and breach of contract" as a basis to allege that MetLife has violated the public policy prong of the *Robinson* test. *See* Complaint at ¶ 55.

23

She cannot claim that an otherwise standard breach of contract claim offends public policy. *See Lake County Grading Co., Inc. v. Advance Mech. Contractors, Inc.*, 654 N.E.2d 1109, 1116 (Ill. App. 1995) ("This conclusory allegation is insufficient to transform what is otherwise a garden-variety breach of contract claim into a cause of action under the [ICFA]. To hold otherwise would permit plaintiffs to supplement or replace every breach of contract claim with an additional and redundant remedy under the Act, a result unintended by the legislature."). Having failed to cite to an established statute or common law doctrine, Newman is left with nothing more than conclusory allegations regarding "common law doctrines governing insurance policies" that are insufficient as a matter of law to establish the first *Robinson* factor. *See Garrett v. RentGrow, Inc.*, No. 04 C 8309, 2005 WL 1563162, at *3 (N.D. Ill. July 1, 2005) (holding that the alleged conduct failed to satisfy the first of the Robinson factors because Plaintiff failed to point to any established statute or common law doctrine).

> **b.    Newman Has Not Plausibly Alleged that MetLife's Conduct was "Immoral, Unethical, Oppressive or Unscrupulous"**

To be considered immoral, unethical, oppressive, or unscrupulous under the second *Robinson* factor, a practice must be "so oppressive as to leave the consumer with little alternative except to submit to it." *Toulon II*, at *7 (internal citation omitted); *Robinson*, 775 N.E. 2d at 961; *Cohen*, 735 F.3d at 610; *Crichton v. Golden Rule Ins. Co.*, 832 N.E.2d 843, 852 (Ill App. 2005). In an attempt to meet this heavy burden, Newman has pleaded that:

> MetLife's misrepresentations regarding the benefits provided by the 'Reduced Pay at 65 Option' were 'immoral, unethical, oppressive, or unscrupulous' because it forced Plaintiff to do one of the following: (1) pay a premium more than two times greater than the premium Plaintiff originally agreed to pay; (2) reduce the coverage for which she had previously contracted; (3) or cancel her coverage altogether.

> Plaintiff suffered a substantial injury because she was forced to pay a premium more than two times greater than the premium Plaintiff initially agreed to pay.

Complaint at ¶¶ 56-58. Ironically, this Court has already considered and rejected these very same allegations from the very same plaintiffs' attorneys in support of an ICFA claim. In *Toulon*, plaintiff alleged that Continental's decision to raise premiums on a class-wide basis "imposed the unreasonable burden of having to choose between three options: (1) pay a substantially higher premium; (2) accept diminished benefits; or (3) lose her coverage. She adds that these choices constitute her injury, as well, although she cites to no allegation under this count." *Toulon II*, at *7. In dismissing the plaintiff's ICFA claim, this Court relied on the Seventh Circuit's decision in *Cohen*, 735 F.3d at 610, holding that "there is nothing oppressive or unscrupulous about giving a counterparty the choice to fulfill his contractual duties or be declared in default for failing to do so." *Toulon II*, at *7. Further, the Illinois Supreme Court has held that unfairness cannot be proved if plaintiff was provided a meaningful choice and could have decided to purchase a product from a different company. *See Robinson*, 775 N.E. 2d at 961 - 62 (rejecting plaintiff's claim of unfairness under ICFA, where "there was a total absence of the type of oppressiveness and lack of meaningful choice necessary to establish unfairness [because] plaintiffs could have gone elsewhere to lease a car."). As discussed, Newman was advised repeatedly that her premium could go up without regard to age. If she were dissatisfied with the language of her Policy, she could have voided the contract *ab initio* under the "free-look" provision and taken her business elsewhere. *See* Policy at 1.

### c.   Newman Has Not Suffered a "Substantial Injury" as a Result of Representations in the Brochure

Lastly, Newman contends that she "suffered substantial injury because she was forced to pay a premium more than two times greater than the premium [she] initially agreed to pay." Complaint ¶ 58. Under the third *Robinson* factor, an injury will not be considered substantial if (1) the plaintiff was not injured, or (2) the plaintiff could have avoided the injury. *See Toulon II*, at *7 (finding that the plaintiff was not injured by her insurer's decision to raise premiums as it

25

was contractually entitled to do); *Siegel v. Shell Oil Co.*, 612 F.3d 932, 936 (7th Cir. 2010) (holding that plaintiff could not establish that he suffered substantial injury because he could have avoided the injury by taking his business elsewhere).  In this case, Newman was not injured; or, in the alternative, to the extent she was injured, she could have avoided the injury.

This Court held in *Toulon II,* that plaintiff had suffered no injury, finding it informative that the plaintiff had not alleged that the contract between herself and Continental was unconscionable "or that Continental attempted to do anything other than which it was contractually entitled to do."  *Id* at *7.; *see also Siegel*, 612 F.3d at 936 (plaintiff purchaser of gasoline could not establish that he suffered substantial harm as a result of gasoline seller's allegedly unfair acts because purchaser could simply have purchased gasoline elsewhere).  As with plaintiff in *Toulon*, Newman has not alleged that the terms of the Policy were unconscionable.  And, as discussed, MetLife had the right to raise premiums on a class-wide basis.  Newman has not been injured by MetLife's decision to invoke a contractual right.

On the other hand, even if Newman had been injured, she still has not plausibly stated a "substantial injury" under the third *Robinson* factor (*i.e.*, because the injury was avoidable). Newman was advised that the brochure did not govern the parties' rights; she was advised that only the Policy governed the parties' rights; she was advised four times in the Policy that MetLife could raise rates; and she was advised that she had 30-days after issuance to void the Policy *ab initio* and take her business elsewhere if she was dissatisfied with its terms.  *See Robinson*, 775 N.E.2d at 962 (oppression not proved because plaintiffs could have "gone elsewhere" to lease a car and avoid defendant's penalty provisions); *Siegel*, 612 F.3d at 936. Newman had ample opportunity to avoid the alleged injury she now claims.

### 3. Newman's Fraudulent Concealment Claim Fails Because Newman Was Given Notice That Her Premium Rate Could Increase and MetLife had No Duty to Disclose Additional Information

Finally, Newman brings a fraudulent concealment claim in which she contends that MetLife fraudulently concealed (1) that if a class-wide rate increase were implemented after she turned 65, MetLife would not be able to honor its "promise" to permanently fix her rate at age 65; and (2) that Newman was included in a rating "class" that could result in her premium going up after she turned 65. *See* Complaint ¶¶ 72; 75-77. A fraudulent concealment claim requires Newman to plead specific facts with particularity to plausibly establish: (1) the defendant concealed a material fact under circumstances that created a duty to speak; (2) the defendant intended to induce a false belief; (3) the plaintiff could not have discovered the truth through reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and justifiably relied upon the defendant's silence as a representation that the fact did not exist; (4) the concealed information was such that the plaintiff would have acted differently had he or she been aware of it; and (5) the plaintiff's reliance resulted in damages." *Abazari v. Rosalind Franklin Univ. of Med. & Sci.*, 40 N.E.3d 264, 275 (Ill. App. 2015). At a minimum, Newman has not established and cannot plausibly establish factors (1), (2) and (3) of this test.

With respect to factor (1), "a plaintiff must allege the defendant concealed a material fact *he was under a duty to disclose*."[8] *Toulon I*, at *3 (emphasis added). The Court's analysis should end here. Newman has failed to plead the existence of any duty at all, let alone a duty that would require MetLife to disclose the information she claims was fraudulently withheld. *See* Complaint ¶¶ 68-79. That failure alone requires the Court to dismiss her claim.

Yet even if Newman had pleaded the existence of a duty, her claim would still fail

---

[8]     To carry her burden, Newman must also "plead with specificity and prove by clear and convincing evidence the existence of a fiduciary or special relationship." *Greenberger*, 631 F.3d at 401 (citing *Martin*, 808 N.E.2d at 52).

because no duty exists as a matter of law. A duty may arise in one of three ways. "First, a duty arises if the parties have a fiduciary or confidential relationship as a matter of law, as with attorneys and clients." *Toulon I*, at *3. In Illinois, however, it is well-settled that an insurer owes no fiduciary duty to an insured as a matter of law. *See Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 401 (7th Cir. 2011); *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 397 (7th Cir. 2009); *Toulon I*, at *3.

In the alternative, a duty to disclose may arise "from a relationship in which the defendant is placed in a position of influence and superiority over [the] plaintiff by reason of friendship, agency, or experience." *Toulon I*, at *3 (internal quotations and citations omitted). Again, Newman has failed to plead the existence of a duty to disclose arising from such a relationship. Had she attempted to do so, the effort would have been unavailing. The fact that Newman entered into a contractual relationship with MetLife cannot, without more, create a fiduciary relationship. *Crichton*, 832 N.E.2d at 854 (internal citation omitted); *see also Greenberger*, 631 F.3d at 401 ("the mere fact that a contract of insurance . . . existed between the parties is insufficient to support a finding of a fiduciary relationship."); *Martin v. State Farm Mut. Auto.Inc. Co.*, 808 N.E.2d 47, 52 (Ill. App. 2004) (motor-vehicle insurance contract alone did not create fiduciary relationship between insured and insurer). This Court recently rejected a similar argument from the same plaintiffs' attorneys in *Toulon*, holding:

> These allegations do not state a duty to disclose. If a fiduciary or special relationship were to arise from these allegations [that insurer was in a position of influence and superiority over plaintiff insured], it would also arise anytime an established insurer sold a policy to an elderly person who was not sophisticated in the ways of insurance… Such a holding would contradict Illinois's rule against insurers being fiduciaries as a matter of law. Further, the Seventh Circuit has previously rejected a materially similar argument.

Toulon I, at *3.

Finally, "if no fiduciary or confidential relationship exists at all, a duty arises when a

defendant presents half-truths as the full truth." *Id*. Newman has not pleaded the existence of such a duty. Nor could she. The marketing brochure does not purport to provide complete information about the operation of the Reduced Pay Option. The brochure specifically discloses that it contains only "general information" about the Reduced Pay Option but the Policy governs the rights and obligations of the parties. Brochure at 9. The Seventh Circuit recently affirmed the dismissal of a fraudulent omission claim where, as here, "the allegations [did] not remotely suggest that any of [the insurer's communications] purported to be an explanation of all of the…factors that might affect [the insured's] insurance premiums." *Crichton*, 576 F.3d at 398.

In addition to the fact that MetLife had no duty to disclose additional information to Newman, she fails to plausibly plead elements (1), (2) and (3) of a fraudulent concealment claim for reasons discussed earlier in this brief. For the sake of brevity, MetLife does not restate those arguments in full here, but notes the following. First, MetLife did not conceal the fact that it could raise rates; the Policy advised Newman that her rate could go up. Second, MetLife never intended to induce a false belief that rates would be fixed at age 65 because its brochure advised that only the Policy governed the parties' rights. Finally, Newman could have "discovered" that she was potentially subject to rate increases after age 65 by simply reading her Policy.

Relatedly, Newman's allegation that MetLife fraudulently concealed her rating "class" is a red herring. *See* Complaint at ¶¶ 75-77. As discussed above, MetLife had no duty to disclose her rating class because no fiduciary or special relationship existed. Further, courts that have looked at this issue have granted insurers motions to dismiss, irrespective of the existence of a fiduciary or special relationship, because insurers are not required to disclose highly-technical information to insureds regarding their rating practices. *See Alvarez v. Ins. Co. of N. Am.*, 313 Fed. App'x. 465, 468 (3d Cir. 2008) ("Neither the policy nor the promotional materials contained any false or misleading representations, and INA did not have any duty to disclose the possibility

29

of future premium increases or the underlying actuarial assumptions for that possibility."). Newman has pleaded that, due to MetLife's fraudulent concealment of her "class," she "could not have discovered that she was potentially subject to premium increases once she turned 65 years old through reasonable inquiry or inspection." Complaint ¶ 77. This allegation fails because he Policy states that any "change in premium rates will apply to *all policies in the same class as Yours*," and the Policy does not qualify MetLife's right to raise rates due to the age of the insured. Policy at 1 (emphasis added). Thus, Newman was advised that she was part of a class of policyholders ("the same class as **Yours**") whose rate could be increased without respect to age, regardless of how that class was defined.

## V.   CONCLUSION

For the reasons set forth herein, MetLife respectfully asks that the Complaint be dismissed with prejudice.[9]

Dated: July 29, 2016

Respectfully Submitted,

Metropolitan Life Insurance Company

By: /s/ Terri L. Ahrens
        One of its Attorneys

Terri L. Ahrens
Drinker Biddle & Reath LLP
191 North Wacker Drive, Suite 3700
Chicago, Illinois 60606-1698
(312) 569-1416
Terri.Ahrens@dbr.com

---

[9] When a court dismisses a complaint, it should not grant leave to amend if it is apparent, as in this case, that the complaint cannot be saved by amendment. *See Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1085 (7th Cir. 1997) (The opportunity to amend a complaint is futile if the complaint, as amended, would fail to state a claim upon which relief could be granted – the same standard that applies under FRCP Rule 12(b)(6)).

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 29, 2016, I provided service to the person or persons listed

below by filing the same with the Court's ECF system:

**Robert R. Duncan**
Duncan Law Group, LLC
161 N. Clark, Suite 2550
Chicago, IL 60601
(312) 202-3283
Email: rrd@duncanlawgroup.com
*Lead Attorney for Plaintiff*

**Thomas Cusack Cronin**
Cronin & Co., Ltd.
161 N. Clark Street
Suite 2550
Chicago, IL 60606
312 201 7100
Email: tcc@cronincoltd.com
*Attorney for Plaintiff*

**Frank H Tomlinson**
Tomlinson Law, LLC
2100 First Avenue North, Suite 600
Birmingham, AL 35203
(205) 326-6626
Email: Hilton@tomlawllc.com
*Attorney for Plaintiff*