## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MARGERY NEWMAN, and all others similarly situated | |
| Plaintiff, | Court No. 1:16-cv-03530 |
| v. | Hon. Thomas M. Durkin |
| METROPOLITAN LIFE INSURANCE COMPANY, | |
| Defendant. | |

### PLAINTIFF'S RESPONSE TO DEFENDANT'S
### MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

Plaintiff, MARGERY NEWMAN, by and through her attorneys, DUNCAN LAW GROUP, LLC, CRONIN & CO, LTD., and TOMLINSON LAW, LLC, responds to the Motion to Dismiss filed by Defendant, METROPOLITAN LIFE INSURANCE COMPANY, (hereinafter "MetLife"), and states the following:

## TABLE OF CONTENTS

I.   **INTRODUCTION** ............................................................................................1

II.   **STANDARD** .................................................................................................3

III.  **ARGUMENT** ................................................................................................4

   A.  **Newman's First Amended Complaint sufficiently alleges a cause of action for breach of contract**...............................................................................................4

      i.   The language of the Policy alone supports Newman's breach of contract claim and requires that MetLife's motion to dismiss be denied ............................................5

      ii.   The marketing materials related to the "Reduced Pay at 65 Option" can and should be considered by this Court to decide whether Newman has or can state a claim for breach of contract .....................................................................................10

      iii.   Newman properly plead a breach of contract claim ...................................13

   B.  **The First Amended Complaint sufficiently alleges multiple violations of the Illinois Consumer Fraud and Deceptive Business Practices Act** ...................................15

      i.   Newman alleges that MetLife violated the Illinois Consumer Fraud Act by engaging in deceptive acts and practices...................................................................15

      ii.   Newman alleges that MetLife's actions are unfair under Section 2 of the Illinois Consumer Fraud Act ..........................................................................22

   C.  **The First Amended Complaint adequately alleges a cause of action for common law fraud**..........................................................................................27

      i.   Newman alleges a false statement of material fact..........................................28

      ii.   Newman alleges MetLife intended to induce Newman to act.......................29

   D.  **The First Amended Complaint adequately alleges a cause of action for fraudulent concealment**..................................................................................31

      i.   Newman alleges MetLife concealed a material fact when it was under a duty to disclose. ...................................................................................................31

      ii.   Newman sufficiently alleges MetLife intended to induce a false belief .......................32

      iii.   Newman alleges that she could not have discovered the truth through reasonable inquiry or inspection ............................................................................33

**IV.** **<u>CONCLUSION</u>** ...........................................................................................................33

## TABLE OF AUTHORITIES

**CASES**

*Adams v. City of Indianapolis*, 743 F.3d 720 (7th Cir. 2014) ........................................3

*Aeroground, Inc. v. CenterPoint Properties Trust*, 738 F.3d 810 (7th Cir. 2013) ........................9

*Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882 (Ill. 1999).........................................11

*Aliano v. Ferriss*, 988 N.E.2d 168 (Ill. App. Ct. 2013) ....................................................16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..........................................................................3

*Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801 (Ill. 2005) ...........................................15

*Axiom Ins. Managers, LLC v. Capitol Specialty Ins. Corp.*, 876 F. Supp. 2d 1005 (N.D. Ill. 2012) ..................................................................................................4

*Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910 (Ill. 2007)....................................................20

*Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827 (7th Cir. 2014)..........................................22, 23

*Bauer v. Giannis*, 834 N.E.2d 952 (Ill. App. Ct. 2005)....................................................31

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..........................................................3

*Bober v. Glaxo Wellcome PLC*, 246 F.3d 934 (7th Cir. 2001)..........................................15

*Buechin v. Ogden Chrysler-Plymouth, Inc.*, 511 N.E.2d 1330 (Ill. App. Ct. 1987)....................31

*Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989 (7th Cir. 2007)..........................................11

*Capiccioni v. Brennan Naperville, Inc.*, 791 N.E.2d 553 (Ill. App. Ct. 2003).............................21

*Celex Group, Inc. v. Executive Gallery, Inc.*, 877 F.Supp. 1114 (N.D. Ill. 1995) ........................15

*Connick v. Suzuki Motor Co.*, 675 N.E.2d 584 (Ill. 1996) ....................................................15, 21

*Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392 (7th Cir. 2009) ...................................................31

*Cuculich v. Thomson Consumer Elecs., Inc.*, 739 N.E.2d 934 (Ill. App. Ct. 2000)....................21

*Davis v. G.N. Mortgage Corp.*, 396 F.3d 869 (7th Cir. 2005) ....................................................16

*Demitro v. Gen. Motors Acceptance Corp.*, 902 N.E.2d 1163 (Ill. App. Ct. 2009)...............22, 25

*Doctors Direct Ins., Inc. v. Bochenek*, 38 N.E.3d 116 (Ill App. Ct. 2015).....................................18

*F.D.I.C. v. Masarsky*, 968 F. Supp. 2d 915 (N.D. Ill. 2013) ............................................................4

*Gainer Bank, N.A. v. Jenkins*, 672 N.E.2d 317 (Ill. App. Ct. 1996)...............................................24

*Gallagher v. Lenart*, 874 N.E.2d 43 (Ill. 2007)..............................................................................11

*Galvan v. Nw. Mem'l Hosp.*, 888 N.E.2d 529 (Ill. App. Ct. 2008)..................................................23

*Gen. Motors Acceptance Corp. v. Cent. Nat. Bank of Mattoon*, 773 F.2d 771 (7th Cir. 1985) ....31

*Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 538 N.E.2d 530 (Ill. 1989) ...............................27

*Grevas v. U.S. Fidelity & Guar. Co.,* 604 N.E.2d 942 (Ill. 1992)....................................................9

*Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561 (Ill. 2005) .........................................4

*Jackson v. Payday Fin., LLC*, 79 F. Supp. 3d 779 (N.D. Ill. 2015) ................................................24

*Lapham–Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 655 N.E.2d 842 (Ill.1995)............................11

*Lindy Lu LLC v. Ill. Cent. R.R. Co.*, 984 N.E.2d 1171 (Ill. App. Ct. 2013) .....................................4

*McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873 (7th Cir. 2012) ........................................3

*Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1 (Ill. App. Ct. 2001), *as modified on denial of reh'g* (Nov. 27, 2001) .......................................................................................................21, 28

*Muehlbauer v. Gen. Motors Corp.*, 431 F. Supp. 2d 847 (N.D. Ill. 2006)......................................15

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1161 (2016)...........................................................................................................................................20

*Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560 (7th Cir.1995)..................................................6

*Nat'l Fid. Life Ins. Co. v. Karaganis*, 811 F.2d 357 (7th Cir. 1987) ...............................................8

*Nautilus Ins. Co. v. Vuk Builders, Inc.*, 406 F. Supp. 2d 899 (N.D. Ill. 2005) .............................26

*Nepomonceno v. Knights of Columbus*, No. CIV. A. 96 C 4789, 1999 WL 66570 (N.D. Ill. Feb. 8, 1999)........................................................................................................................................20

*Petrakopoulou v. DHR Int'l, Inc.*, 626 F. Supp. 2d 866 (N.D. Ill. 2009) ......................................27

*PharMerica Chicago, Inc. v. Meisels*, 772 F. Supp. 2d 938 (N.D. Ill. 2011)................................20

*PPM Fin., Inc. v. Norandal USA, Inc.,* 392 F.3d 889 (7th Cir. 2004)...........................................11

*Rakowski v. Lucente,* 472 N.E.2d 791 (Ill. 1984).........................................................................10

*Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403 (Ill. 2002)............................................23

*Siegel v. Levy Org. Dev. Co.*, 607 N.E.2d 194 (Ill. 1992)............................................................29

*Stonecrafters, Inc. v. Foxfire Printing & Packaging, Inc.*, 633 F. Supp. 2d 610 (N.D. Ill. 2009) ....................................................................................................................................................25, 26

*Toulon v. Cont'l Cas. Co.*, No. 15 CV 138, 2016 WL 561909 (N.D. Ill. Feb. 12, 2016)..............19

*United Nat'l Ins. Co. v. Fasteel, Inc.,* 550 F. Supp. 2d 814 (N.D. Ill. 2008)..................................8

*Vigortone AG Products, Inc. v. PM AG Products, Inc.*, 316 F.3d 641 (7th Cir. 2002).................20

*W. Ry. Devices Corp. v. Lusida Rubber Products, Inc.*, No. 06 C 0052, 2006 WL 1697119 (N.D. Ill. June 13, 2006) ............................................................................................................................23

*Wigod v. Wells Fargo Bank, NA,* 673 F.3d 547 (7th Cir. 2012).....................................................3

*William Blair and Co., LLC v. FI Liquidation Corp.*, 830 N.E.2d 760 (Ill. App. Ct. 2005)...........8

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663 (7th Cir. 2008)...................................................................................................................................................23

**STATUTES**

815 ILCS 505/1 *et seq* ...................................................................................................................15

215 ILCS 5/149 .......................................................................................................................23, 24

**OTHER AUTHORITIES**

Black's Law Dictionary (10th ed. 2014)..........................................................................................16

Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/thereafter ...........................................................................................16

**RULES**

Fed. R. Civ. P. 9(b)................................................................................................4, 21, 29, 32

Fed. R. Civ. P. 8(a) ...........................................................................................................................3

**REGULATIONS**

Ill. Admin. Code tit. 50, § 2012.122(b)(4) ...................................................................24

## I.       INTRODUCTION

Margery Newman entered into a contract with MetLife by purchasing a long-term care insurance policy (hereinafter "MetLife Policy 04856-20065" or the "Policy") with an effective date of coverage of September 1, 2004. First Am. Compl. at ¶ 15. She purchased a premium payment option, created, marketed and sold by MetLife, named the "Reduced-Pay at 65 Option." *Id.* at ¶ 16. The limited marketing materials related to the "Reduced-Pay at 65 Option," which are the first and only information Newman reviewed when deciding to purchase long-term care coverage through MetLife, stated the following, and only the following:

> *By paying more than the regular premium amount you would pay each year up to the Policy Anniversary on or after your 65th birthday, you pay half the amount of your pre-age 65 premiums thereafter.*

*Id.* at ¶ 17. *See also* First Am. Compl., Ex. A at 9.

MetLife's use of the word "thereafter" to describe the length of the benefit, in the absence of any qualifying language, gave Newman and all other insureds the impression that if they purchased the "Reduced-Pay at 65 Option," their policy premium rates would be reduced and fixed after they reached age 65.

The language of the Policy itself reinforced Newman's initial understanding from the marketing materials, stating on the face of the "Schedule of Benefits" that "On and after Policy Anniversary at age 65" Newman would pay a semi-annual premium of $1,615.97, equal to 50% of her pre-age 65 semi-annual premiums. First Am. Compl., Ex. B.; First Am. Compl. at ¶ 19. Again, the only language of the Policy that specifically related to the "Reduced-Pay at 65 Option," like the marketing materials, did not expressly qualify or limit the length of time Newman would receive the reduced premium.

Newman purchased MetLife Policy 04856-20065 when she was 56. First Am. Compl at ¶

15. She paid an increased premium for 9 years, until she reached age 65, believing that her premium would then be permanently reduced by 50%. *Id.* at ¶ 21. At the time she turned 65, her semi-annual premium was $3,813.38. *Id.* at ¶ 22. Pursuant to the "Reduced-Pay at 65 Option," on the policy anniversary following her 65th birthday, Newman's semi-annual premium was decreased to $1,906.84, the rate stated on her "Schedule of Benefits." *Id.* at ¶ 23. Newman reasonably believed that based on the terms of the contract she entered into with MetLife that her semi-annual premium was fixed at $1,906.84, *thereafter*.  However, on March 1, 2015, when Newman was 67, MetLife breached the terms of the contract and levied a 102% "class-wide" rate increase on Newman, increasing her semi-annual premium to $3,851.80.  First Am. Compl. at ¶ 24. While this came as an utter shock to Newman who rightfully believed that by purchasing the "Reduced-Pay at 65 Option" she had extinguished her exposure to rate increases following her 65th birthday, it did not come as a surprise to MetLife.

At the time that MetLife marketed and sold the "Reduced-Pay at 65 Option" it knew three critical pieces of information that it did not share with Newman or other insureds.  First, it (and only it) knew the definition of the "class" that would be subjected to "class-wide" rate increases. Nowhere in the marketing materials or the Policy itself did MetLife define the "class" to which Newman belonged. *Id.* at ¶ 46. In fact, unbeknownst to Newman, the "class" subjected to any and all, future "class-wide" rate increases included all purchasers of the "LTC-IDEAL" policy-line, regardless of whether an insured purchased the "Reduced-Pay at 65 Option" or any other rider. *Id.* at ¶ 47. Second, MetLife knew that it would have to significantly increase premium rates in the future and that it would have to do so (and could only do so) on a class-wide basis.  *See Id.* at ¶¶ 45, 72. As a result, MetLife knew that future premiums for Newman and other insureds that purchased the "Reduced-Pay at 65 Option" were subject to immediate

2

and significant increase, yet informed insureds in the marketing materials ("thereafter") and on the face of the Policy ("*on and after*") that the post-age 65 rates would be permanently reduced. *See Id.* at ¶¶ 71-72 and 62-63. And, third, MetLife knew that when it increased premiums on a class-wide basis, those individuals who purchased the "Reduced-Pay at 65 Option," who reasonably believed their premiums to be fixed "on and after" they reached the age of 65, would be forced to either pay the significantly increased premium, accept reduced benefits, or forfeit their coverage entirely – all to the enormous financial gain of MetLife.

Newman now seeks compensation for MetLife's breach of contract and for the fraud perpetrated on her and other insureds.

## II.    STANDARD

### Rule 12(b)(6)

Under the federal rules' notice pleading standard, a complaint must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Wigod v. Wells Fargo Bank, NA*, 673 F.3d 547, 555 (7th Cir. 2012). *See also* Fed. R. Civ. P. 8(a). To defeat a motion to dismiss under Rule 12(b)(6), a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wigod*, 673 F.3d at 555 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). *Accord Adams v. City of Indianapolis*, 743 F.3d 720 (7th Cir. 2014). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Factual allegations are accepted as true at the pleading stage, but should offer more than mere conclusions to defeat Rule 12(b)(6) motion. *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678). Substantive allegations of fact—as opposed to "[t]hreadbare recitals of the elements of a cause of action"—are required. *Iqbal*, 556

3

U.S. at 678. Indeed, in connection with pleading fraud and related claims, Rule 9(b) of the Federal Rules of Civil Procedure requires a party to state "with particularity" the circumstances constituting fraud or mistake. Nonetheless, malice, intent, knowledge, and other conditions of a person's mind may still be alleged generally. Fed. R. Civ. P. 9(b).

## III.    ARGUMENT

### A.    Newman's First Amended Complaint sufficiently alleges a cause of action for breach of contract

To state a cause of action for breach of contract under Illinois law, a plaintiff must allege: "(1) the existence of a valid and enforceable contract; (2) plaintiff's performance of all required contractual conditions; (3) defendant's breach of the terms of the contract; and (4) damages resulting from the breach." *Lindy Lu LLC v. Ill. Cent. R.R. Co.,* 984 N.E.2d 1171, 1175 (Ill. App. Ct. 2013). *See also F.D.I.C. v. Masarsky*, 968 F. Supp. 2d 915, 922 (N.D. Ill. 2013). In Illinois, insurance policies are contracts; the general rules governing the interpretation and construction of contracts govern the interpretation and construction of insurance policies. *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005); *Axiom Ins. Managers, LLC v. Capitol Specialty Ins. Corp.,* 876 F. Supp. 2d 1005, 1008 (N.D. Ill. 2012).

MetLife does not dispute that there was a valid contract, that Newman performed (and continues to perform) all of her obligations under the contract, that it increased Newman's premiums by 102% on March 1, 2015 (after Newman had reached the age of 65), or that Newman now pays $3,889.94 in increased premiums every year. The only question this Court needs to answer is whether Newman's allegation that the 102% premium rate increase was a breach of the terms and conditions of the Policy sufficient to support her breach of contract claim.

i.    <u>The language of the Policy alone supports Newman's breach of contract claim and requires that MetLife's motion to dismiss be denied</u>

The only language related to the "Reduced-Pay at 65 Option" contained within the Policy itself is on the "Schedule of Benefits," which states the following:

**In addition, you have selected the following flexible premium payment option: Reduced Pay at 65 Semi-Annual Premium Amount\*:**

| | |
|---|---|
| Before Policy Anniversary at age 65 | $3231.93 |
| On and after Policy Anniversary at age 65 | $1615.97 |

\*If you pay premiums more frequently than annually, an additional cost has been included.

First Am. Compl., Ex. B.

Newman's interpretation of the terms of the Policy, and the only reasonable interpretation of the Policy, specifically "On and after Policy Anniversary at age 65," is that the premium rates would be fixed "on and after" reaching age 65. Newman based her understanding on the plain language of the Policy, the fact that the "Reduced-Pay at 65 Option" was not further defined or explained within the Policy, the language was not expressly qualified or limited, no time limit for the benefit was stated, either generally or specifically, and there was no footnote or other small print alerting Newman that the duration of the "Reduced-Pay at 65 Option" benefit was limited or that the once-reduced premiums were subject to either immediate or eventual increase.

Based on the language of the Policy alone, Newman had ample reason to believe that a Rider or payment option that she purchased could limit or eliminate her exposure to future rate increases. The Riders cited by MetLife contain specific language advising purchasers of those specific Riders that despite purchasing those additional benefits, the premiums were subject to future, "class-wide" rate increases. The information MetLife chose to include in the Policy regarding the "Reduced-Pay at 65 Option" contained no such limitation or, for that matter, explanation.  Further, the language related to the "5% Automatic Compound Inflation Protection

Rider," cited by MetLife in its motion ("*Your Premium is not expected to increase as a result of the benefit amount increases provided in this Rider*") falsely implied that there was a correlation between purchasing this Rider and limiting the likelihood of future rate increases and is wholly in line with Newman's belief that an insured could limit or eliminate exposure to future rate increases by purchasing Riders or premium payment options. *See* Mem. Supp. Mot. Dismiss First Am. Compl. at 6. MetLife has made it abundantly clear, now that it has implemented a "class-wide" 102% rate increase and is defending itself in this litigation, that it did not matter what Riders or premium payment options an insured purchased (and paid for!); there was no way to limit or eliminate the possibility of future rate increases. However, Newman had no way of knowing that when she purchased the Policy, reasonably believing that "on and after" confirmed a lasting and permanent reduction of her premiums.

MetLife's position is that "On and after Policy Anniversary at age 65" can only mean that premiums, once reduced by 50% were then subject to immediate and "class-wide" increase. MetLife's interpretation of the Policy language, setting aside the marketing materials for a moment, is completely unreasonable. It is unreasonable because it takes away all meaning from MetLife's inclusion of the words "and after." A contractual interpretation that gives reasonable meaning to all of the terms in an agreement is preferable to an interpretation which gives no effect to some terms. *See Murphy v. Keystone Steel & Wire Co.,* 61 F.3d 560, 564–65 (7th Cir.1995). MetLife's inclusion of the words "and after" signifies a length of time. Without any express qualification, the plain language interpretation is that the premium reduction is for an unlimited, never-ending length of time. MetLife claims that general cautionary statements in other parts of the Policy, including completely unrelated riders, alerted Newman to the "possibility" of class-wide rate increases. But, MetLife never informed Newman of what "class"

6

she belonged to, nor was it intuitive or obvious from the face of the Policy. Moreover, MetLife did not include any qualifying language directly in relation to the "Reduced-Pay at 65 Option" (in either the marketing materials or Policy itself). But now MetLife bootstraps its general warnings of "class-wide" rate increases to the language of the "Reduced-Pay at 65 Option" to argue that the Policy and "Long-Term Care (LTC) Facts" brochure should have clearly indicated to Newman that the "Reduced-Pay at 65 Option" provided for only a one-time premium reduction that was subject to immediate or future increases.

MetLife cites to four specific locations in the Policy that it claims alerted Newman that even though she purchased a premium reducing payment option that assured her of a fixed reduction in her premium she should have been aware that the premium payments were still subject to immediate increase. Specifically, MetLife cites to the first page of MetLife Policy 04856-20065, the Policy's Premium Payment provision, and the language of two specific Riders: the "5% Automatic Compound Interest Protection Rider" and the "Contingent Benefits Upon Lapse Rider." Mem. Supp. Mot. Dismiss First Am. Compl. at 21.  Each of the cited passages is general and vague, contains no expressly stated relationship to the "Reduced Pay at 65 Option" or any other premium payment option, and is located nowhere near the single reference to the "Reduced Pay at 65 Option" on the "Schedule of Benefits."

Moreover, why should Newman have obviously understood, as MetLife argues, that language contained within and related solely and specifically to separate riders apply equally to the "Reduced-Pay at 65 Option"?  In fact, it was the opposite. Newman believed, and reasonably so, that since the "5% Automatic Compound Inflation Protection Rider" and the "Contingent Benefits Upon Lapse Rider" contained specific, qualifying language and the "Reduced-Pay at 65 Option" did not, that her reduced premium benefit accorded by the "Reduced-Pay at 65 Option"

7

was not subject to increase after reaching age 65, and would remain fixed at the stated and specific rate.

Newman reasonably thought that by purchasing the "Reduced-Pay at 65 Option," she was self-segregating herself into a "class" of policyholders that had extinguished the possibility of post-age 65 rate increases. Newman did not know, and could not have known, that regardless of what Riders and payment options she purchased to protect her future financial liabilities, she would always be exposed to future exorbitant rate increases. MetLife's unreasonable interpretation of the relevant Policy language should be summarily rejected by this Court.

Alternatively, this Court should find that the language "On and after" combined with a specific premium amount and no other qualifying language is subject to more than one reasonable interpretation and is therefore ambiguous. "[I]f a provision of an insurance policy is ambiguous, the provision must be construed in favor of the insured." *United Nat'l Ins. Co. v. Fasteel, Inc.,* 550 F. Supp. 2d 814, 821 (N.D. Ill. 2008) (quoting *Nat'l Fid. Life Ins. Co. v. Karaganis*, 811 F.2d 357, 361 (7th Cir. 1987)). "A term is ambiguous if it is subject to more than one reasonable interpretation." *United Nat'l Ins. Co.,* 550 F. Supp. 2d at 821 (internal citations omitted). "Ambiguous language is strictly construed against the insurance company because the insurer is the drafter of the policy." *Id*. "Thus, the insured's interpretation of an unclear provision must prevail in order to effectuate the predominate purpose of the contract which is to indemnify the insured." *Id*.

If this Court accepts that both Newman's and MetLife's interpretations of the clause "on and after" are reasonable, then it must find that an ambiguity exists. *See William Blair and Co., LLC v. FI Liquidation Corp.*, 830 N.E.2d 760, 769 (Ill. App. Ct. 2005) ("A contract term is ambiguous if it can reasonably be interpreted in more than one way due to the indefiniteness of

the language or due to the term having a double or multiple meaning"). If an ambiguity exists, long-standing case law requires that it be interpreted in favor of the insured. If Newman's understanding that "on and after" reduced and fixed her future premiums is accepted, Newman has properly pled her breach of contract claim, and MetLife's Motion to Dismiss must be denied.

Finally, well-established principles of contract interpretation state that if a general provision regarding future rate increases conflicts with a more specific provision, the more specific provision controls. *Aeroground, Inc. v. CenterPoint Properties Trust*, 738 F.3d 810, 813 (7th Cir. 2013) ("The more specific provision of a contract governs where it arguably conflicts with a more general provision") (citing *Grevas v. U.S. Fidelity & Guar. Co.,* 604 N.E.2d 942 (Ill. 1992)). The language of the general admonitions of "class-wide" rate increases cited by MetLife does not specifically mention the "Reduced-Pay at 65 Option" or any other premium payment option or Rider. However, the language on the "Schedule of Benefits," the only language related to the "Reduced-Pay at 65 Option" in the Policy itself, states a specific event (the policy anniversary at age 65), a specific dollar amount, and a specific time period (on and after), and makes no reference to being subject to future rate increases.

This Court should consider Newman's position in light of the alternatives available to MetLife when drafting MetLife Policy 04856-20065 and describing the "Reduced-Pay at 65 Option." Had MetLife simply stated on the "Schedule of Benefits" that "On and after Policy Anniversary at age 65, *subject to class-wide rate increases*" it would have succinctly and unambiguously informed Newman (and all other purchasers) of the limits of the bargain they were making. It did not. As a result, based on the Policy—and only the Policy—Newman has properly pled a cause of action for breach of contract.

9

ii.   The marketing materials related to the "Reduced Pay at 65 Option" can and should be considered by this Court to decide whether Newman has or can state a claim for breach of contract

The related marketing materials should be considered by this Court for two reasons. First, the Policy is not fully integrated. As a practical matter, Newman reviewed the marketing materials, made a decision to purchase coverage, elected to purchase the "Reduced-Pay at 65 Option" based on the representations contained within the marketing materials, filled out her application, drafted a check, and mailed it in to MetLife. MetLife then sent Newman the Policy (purportedly) and correspondence indicating that coverage was in place. Excluding the only language that was provided to and relied upon by Newman to accept the offer and purchase the coverage runs afoul of logic and public policy. Further, it is impossible that the Policy could be considered "fully integrated" when the "Reduced-Pay at 65 Option" is left wholly undefined and unexplained within the Policy itself. *Rakowski v. Lucente,* 472 N.E.2d 791, 794 (Ill. 1984) (Where a written agreement is clear and explicit, a court must enforce the agreement as written. Both the meaning of the instrument and the intention of the parties must be gathered from the face of the document without the assistance of parol evidence or any other extrinsic aids). A review of only the Policy and other documents identified in the "integration clause" cited by MetLife, sheds no light on the meaning of the "Reduced-Pay at 65 Option," nor the intention of the parties. The long-term care Policy MetLife wrote is neither clear nor explicit. Under these specific circumstances, the marketing materials are part-and-parcel of the contract negotiations and cannot be excluded from consideration simply because of a purported "integration clause" included in a contract that, on its face, cannot be considered fully integrated. It simply does not make practical or legal sense.

Second, even if the Court were to initially determine that the integration clause could exclude the consideration of the marketing materials, the existence of the previously discussed

facial ambiguities in the Policy ("class" and "on and after") requires the Court to examine extrinsic or parol evidence to evaluate the terms in question. "If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999). Only if the contract language is ambiguous is extrinsic evidence admissible to aid in resolving the ambiguity and ascertaining the intent of the parties. *Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 993 (7th Cir. 2007); *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). A contract provision is ambiguous only if it is susceptible to more than one reasonable interpretation. *PPM Fin., Inc. v. Norandal USA, Inc.,* 392 F.3d 889, 893 (7th Cir. 2004); *Air Safety, Inc.*, 706 N.E.2d at 884; *Lapham–Hickey Steel Corp. v. Prot. Mut. Ins. Co.,* 655 N.E.2d 842, 846 (Ill.1995).

This Court should consider the "Long-Term Care (LTC) Facts" marketing brochure attached to Newman's First Amended Complaint, in its entirety. First Am. Compl., Ex. A. One of the brochure's very first passages instructs readers to "Use this handy chart to compare key benefits and choose the plan that fits your needs and budget." *Id.* at 5. This passage is one of many examples that MetLife intended long-term care insureds to read, consider and rely on the information contained within the marketing materials when purchasing long-term care coverage.

The totality of the information provided regarding "Premium Payment Options" was limited to the following:

## Premium Payment Options

*You can choose how you want to pay for your Policy. In addition to standard premium payment methods, we offer 4 premium payment options which help you pay off your policy sooner and/or ease financial obligations down the road, when you might be on a fixed income.*

**Double-Pay First Year Option:**
You pay double the premium amount (twice your regular premium amount) for the first policy year in return for 10% or 13% (depending on age) off the regular premium amount each year to follow.

**Reduced-Pay at 65 Option:**
By paying more than the regular premium amount you would pay each year up to the Policy Anniversary on or after your 65th birthday, you pay half the amount of your pre-age 65 premiums thereafter.

**10-Year Premium Payment Rider:**
Your policy is paid-up after 10 years of premium payments after the rider is in effect.

**Paid-Up Premium Rider:**
Your policy is paid-up at the later of the Policy Anniversary on or after your 65th birthday or 10 years after the rider is in effect.

**NOTE:** *Choosing any of these premium payment options may impact the tax deductibility of your premium. Please consult your tax advisor for further clarification.*

*Id.* at 9.

Of the four premium payment options available, "Double-Pay First Year Option" appeared to promise a fixed percentage discount on future premiums if double the premium amount was paid the first year. The "10 Year Premium Payment Rider" and "Paid Up Premium Rider" both appeared to promise the benefit of completely paying off policy premiums and

12

extinguishing any future premiums. And, finally, the "Reduced-Pay at 65 Option" promised that purchasers would pay "half the amount of your pre-age 65 premiums thereafter." In the context of four options, one of which offers a fixed discount for a limited cost, and two that offer an opportunity to extinguish premiums all together, it was entirely reasonable that Newman believed the "Reduced-Pay at 65 Option" permanently fixed her post-age 65 premiums at half of her pre-age 65 premiums. Further, the marketing materials offer absolutely no qualifying language that alerted Newman that purchasing the "Reduced-Pay at 65 Option" did not extinguish the possibility of post-age 65 rate increases. The marketing materials provide no clarification of the ambiguous terms. Consequently, Newman requests that, in addition to denying MetLife's motion to dismiss, this Court find that "on and after," as used on the "Schedule of Benefits" is ambiguous.

iii.   <u>Newman properly plead a breach of contract claim</u>

 Newman properly states a claim for breach of contract. Newman has pled each of the required elements:

1) The existence of a valid and enforceable contract:

 Paragraph 15:  Plaintiff was 56 years old at the time she applied for and purchased MetLife Policy 04856-20065, with an effective date of coverage of September 1, 2004. First Am. Compl. at ¶ 15.

 Paragraph 36:  By purchasing MetLife Policy 04856-20065, Plaintiff entered into a contract with MetLife. *Id.* at ¶ 36.

2) Newman's performance of all required contractual conditions:

 Paragraph 20: When Plaintiff purchased MetLife Policy 04856-20065, Plaintiff's "Total Annual Premium with discounts applied" was $5,010.74, and her "Semi-Annual Premium Amount" was $2,505.37. Exhibit B, "Schedule of Benefits."  *Id.* at ¶ 20.

 Paragraph 21:  Between when MetLife Policy 04856-20065 was first issued and the Policy Anniversary on or after Plaintiff's 65th Birthday, Plaintiff paid an additional annual premium of $1,453.12 in exchange for the benefit of the "Reduced-Pay at 65

Option." *Id.* at ¶ 21.

Paragraph 22: Immediately before Plaintiff turned 65 years old on May 14, 2012, her semi-annual premium for MetLife Policy 04856-20065 was $3,813.68. *Id.* at ¶ 22.

Paragraph 23: Because Plaintiff selected the "Reduced-Pay at 65 Option," Plaintiff's semi-annual premium was reduced from $3,813.68 to $1,906.84 on September 1, 2012. (A copy of the "Schedule of Benefits" effective September 1, 2012 is attached hereto as "Exhibit C"). *Id.* at ¶ 23

Paragraph 24: On March 1, 2015, MetLife increased Plaintiff's semi-annual premium 102% to $3,851.81—$38.13 more than Plaintiff's pre-age 65 semi-annual premiums. (A copy of the Schedule of Benefits effective September 1, 2015 is attached hereto as "Exhibit D"). *Id.* at ¶ 24.

3) MetLife's breach of the terms of the contract:

Paragraph 24: On March 1, 2015, MetLife increased Plaintiff's semi-annual premium 102% to $3,851.81—$38.13 more than Plaintiff's pre-age 65 semi-annual premiums. (A copy of the Schedule of Benefits effective September 1, 2015 is attached hereto as "Exhibit D"). *Id.*

Paragraph 37: By selecting the "Reduced-Pay at 65 Option," Plaintiff modified the terms and conditions of MetLife Policy 04856-20065, permanently fixing post-age 65 premiums at 50% of her pre-age 65 premiums. *Id.* at ¶ 37.

Paragraph 39: MetLife breached the its contract with Plaintiff by increasing Plaintiff's annual premiums 102% (to an amount greater than Plaintiff's pre-age 65 annual premiums) in March 2015, when Plaintiff was 67 years old. *Id.* at ¶ 39.

4) And, damages resulting from the breach.

Paragraph 25: Plaintiff now pays $3,851.81 in semi-annual premiums, which is $1,944.97 more than the $1,906.84 semi-annual premium she was promised in exchange for purchasing the "Reduced-Pay at 65 Option." Plaintiff's annual premium is $3,889.94 more than what she was promised in exchange for purchasing the "Reduced-Pay at 65 Option." *Id.* at ¶ 25.

Paragraph 40: As a result of MetLife's breach, Plaintiff was forced to pay an additional $3,889.94 in increased annual premiums. Therefore, Plaintiff has been damaged and continues to incur damages. *Id.* at ¶ 40.

MetLife's Motion to Dismiss Newman's breach of contract claim should be denied. Or,

in the alternative, Newman should be granted leave to file an amended breach of contract claim

addressing any deficiencies identified by the Court.

**B.     The First Amended Complaint sufficiently alleges multiple violations of the Illinois Consumer Fraud and Deceptive Business Practices Act**

i.      Newman alleges that MetLife violated the Illinois Consumer Fraud Act by engaging in deceptive acts and practices

Newman sufficiently alleges that MetLife violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("ICFA") by engaging in deceptive acts and practices. "[T]o state a claim under the [ICFA], a plaintiff must allege (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Muehlbauer v. Gen. Motors Corp.*, 431 F. Supp. 2d 847, 867 (N.D. Ill. 2006) (internal citations and quotation marks omitted). "Consumers raising ICFA claims are afforded 'far broader' protection than those who bring common law fraud claims." *Id.* (citing *Celex Group, Inc. v. Executive Gallery, Inc.,* 877 F.Supp. 1114, 1128–29 (N.D. Ill. 1995)). Moreover, courts liberally construe the ICFA. *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 594 (Ill. 1996); *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853 (Ill. 2005).

*1.      Newman sufficiently alleges a deceptive act or practice*

Newman alleges a deceptive act or practice. "Under the [ICFA], a statement is deceptive if it creates a likelihood of deception or has the capacity to deceive." *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001). In determining whether the allegations in a plaintiff's ICFA complaint state a claim for relief that satisfies the requirements of Rule 12(b)(6), courts "ask whether the allegedly false and misleading statements on which [the plaintiff] based his [I]CFA claim can be read to create a likelihood of deception or to have the capacity to deceive." *Id.* "When analyzing a claim under the ICFA, the allegedly deceptive act must be looked upon in

light of the totality of the information made available to the plaintiff." *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 884 (7th Cir. 2005). "Under the [ICFA], deceptive practices include advertising goods with the intent not to sell them as advertised, and engaging in conduct that creates the likelihood of confusion or misunderstanding." *Aliano v. Ferriss*, 988 N.E.2d 168, 176 (Ill. App. Ct. 2013).

Newman alleges MetLife made the following statement in the "Long-Term Care (LTC) Facts" brochure MetLife used to market long-term care insurance to prospective buyers:

> Premium Payment Options[:] You can choose how you want to pay for your Policy. In addition to standard premium payment methods, we offer 4 premium payment options which help you pay off your policy sooner and/or ease financial obligations down the road, when you might be on a fixed income.
> **Reduced Pay at 65 Option:** By paying more than the regular premium amount you would pay each year up to the Policy Anniversary on or after your 65th birthday, you pay half the amount of your pre-age 65 premiums **thereafter**.

First Am. Compl. at ¶¶ 5, 44 (**emphasis added**).

MetLife's use of the word "thereafter" (defined as "afterward" and "after that" in Black's Law Dictionary and Merriam-Webster Online Dictionary, respectively) and discussion of easing financial obligations when purchasers will be retired and on fixed incomes implies that "Reduced-Pay at 65 Option" purchasers' premiums would be permanently cut in half once they turned 65 years old. *See* THEREAFTER, Black's Law Dictionary (10th ed. 2014) (defining "thereafter" to mean "afterward"); Thereafter, Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/thereafter (defining thereafter to mean "after that"). Moreover, it is hard to believe a retiree on a permanently fixed income would pay extra premiums in exchange for anything other than a permanent reduction in her premiums. Thus, the foregoing statement has the capacity to deceive consumers into thinking

their premiums would be permanently reduced once they turned 65 years old if they purchased the "Reduced-Pay at 65 Option."

In its Memorandum in Support of Its Motion to Dismiss First Amended Complaint, MetLife argues that the foregoing statement was not deceptive in light of the totality of the information made available to Newman. Specifically, MetLife points to the following language written in small print at the bottom of the "Long-Term Care (LTC) Facts" brochure page discussing the "Reduced-Pay at 65 Option":

> This brochure is intended to provide a general overview, and highlight some of the provisions and optional benefits of MetLife's Individual Long-Term Care insurance policies. All rights and obligations will be governed by the actual policy language, if and when issued.

First Am. Compl. Ex. A at 9.

According to MetLife, MetLife Policy 04856-20065 unequivocally allowed MetLife to increase Newman's premiums after she turned 65 years old. Therefore, MetLife argues, the "Long-Term Care (LTC) Facts" brochure cannot be deceptive because Newman was explicitly alerted to MetLife's right to increase Newman's post-age 65 premiums. MetLife is wrong for two reasons.

First, Newman received the "Long-Term Care (LTC) Facts" brochure and paid her initial premium before she received MetLife Policy 04856-20065. Thus, Newman relied on the "Long-Term Care (LTC) Facts" brochure's deceptive statements and suffered damages as a result of such reliance before MetLife supposedly clarified or corrected any of the "Long-Term Care (LTC) Facts" brochure's deceptive statements.

Second, MetLife Policy 04856-20065 is at best ambiguous about whether MetLife reserved the right to increase Newman's premiums after she turned 65 years old. Therefore,

MetLife Policy 04856-20065 failed to correct or otherwise contradict the "Long-Term Care (LTC) Facts" brochure's deceptive statement. MetLife Policy 04856-20065's "Schedule of Benefits" states the following:

> **In addition, you have selected the following flexible premium payment option: Reduced Pay at 65**
> **Semi-Annual Premium Amount*:**
> Before Policy Anniversary at age 65        $3231.93
> <u>On and after</u> Policy Anniversary at age 65        $1615.97
>
> *If you pay premiums more frequently than annually, an additional cost has been included.

First Am. Compl., Ex. B.

The phrase "[o]n and after" suggests a permanent decrease. MetLife Policy 04856-20065 contains no further discussion of the "Reduced-Pay at 65 Option." MetLife Policy 04856-20065 generally states, "We cannot change any of the terms of this policy without Your consent, except that We may change the premium rates, subject to applicable state Insurance Department approval" and "We reserve the right to change premium rates on a class basis" in other sections of the Policy. First Am. Compl., Ex. B. Thus, in light of the "Long-Term Care (LTC) Facts" brochure and MetLife Policy 04856-20065 itself, a consumer could reasonably reach one of the following alternative conclusions: (1) MetLife had no contractual right to increase Newman's premiums after she turned 65 years old; or (2) MetLife had a contractual obligation to decrease Newman's premiums by 50% once she turned 65 years old, but could increase her premiums after Newman turned 65 as long as the increase was part of a "class-wide" rate increase. Because MetLife Policy 04856-20065 is susceptible to more than one meaning, it is ambiguous. *See Doctors Direct Ins., Inc. v. Bochenek*, 38 N.E.3d 116, 123 (Ill App. Ct. 2015) ("A term is ambiguous, and construed against the drafter of the policy, if it is subject to more than one reasonable interpretation within the context in which it appears").

Given the "Long-Term Care (LTC) Facts" brochure's promise of a permanent premium reduction and MetLife's failure to unambiguously correct that misrepresentation, Newman was never "explicitly alerted to" the possibility of a post-age 65 premium rate increase. *Toulon v. Cont'l Cas. Co.*, No. 15 CV 138, 2016 WL 561909, at *5 (N.D. Ill. Feb. 12, 2016). At the very least, the foregoing representations in the "Long-Term Care (LTC) Facts" brochure and MetLife Policy 04856-20065 created a likelihood of confusion or misunderstanding regarding MetLife's ability to increase Newman's premiums after she turned 65 years old. Therefore, the "Long-Term Care (LTC) Facts" brochure's "Reduced-Pay at 65 Option" representations remained deceptive in light of the totality of the information made available to Newman.

MetLife contends that MetLife Policy 04856-20065's "Contingent Benefits Upon Lapse Rider" somehow gave Newman notice that her premiums could increase after she turned 65 years old. However, the "Contingent Benefits Upon Lapse Rider" says nothing about MetLife's right to increase premiums after Newman turned 65 years old. The "Contingent Benefits Upon Lapse Rider" merely defines "substantial premium increase" for the purpose of that specific rider. Whether a premium increase constitutes a "substantial premium increase" depends on the age at which the policyholder bought the policy. The "Contingent Benefits Upon Lapse Rider" says nothing about the "Reduced Pay at 65 Option." At most, the "Contingent Benefits Upon Lapse Rider" indicates that a policyholder's premiums can increase. Thus, the "Contingent Benefits Upon Lapse Rider" does nothing to resolve the "Reduced Pay at 65 Option" ambiguity.

Because MetLife Policy 04856-20065 is ambiguous, MetLife Policy 04856-20065's "30-Day Right to Examine Policy"—upon which MetLife bases part of its defense—is not helpful. If an insurance policy does not unambiguously contradict a plaintiff's misunderstanding (created by extra-contractual misrepresentations), "an examination of the policy for ten days or a hundred

days would not convince plaintiffs that they did not receive what they believed that they were promised." *Nepomonceno v. Knights of Columbus*, No. CIV. A. 96 C 4789, 1999 WL 66570, at *8 (N.D. Ill. Feb. 8, 1999).

Despite MetLife's claims to the contrary, the fact that Newman is an attorney in no way bolsters MetLife's defense. A statement is deceptive under the ICFA if it creates a likelihood of deception or has the capacity to deceive "**a reasonable consumer**." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 673 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1161 (2016) (**emphasis added**). *See also Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 926 (Ill. 2007). Thus, any enhanced comprehension or reasoning abilities Newman has on account of her chosen profession are irrelevant to whether Newman adequately plead a deceptive statement under the ICFA. Newman merely had to plead a statement that had the capacity to deceive a "reasonable consumer." For the reasons mentioned above, Newman adequately alleged a statement having the capacity to deceive a "reasonable consumer."

Furthermore, MetLife Policy 04856-20065's supposed integration clause provides no defense to Newman's ICFA claim. "[A]n integration clause does not bar a claim of fraud based on statements not contained in the contract." *Vigortone AG Products, Inc. v. PM AG Products, Inc.*, 316 F.3d 641, 644 (7th Cir. 2002). *See also PharMerica Chicago, Inc. v. Meisels*, 772 F. Supp. 2d 938, 951 (N.D. Ill. 2011).

Because Newman's First Amended Complaint alleges a statement that had the capacity to deceive and/or confuse a reasonable consumer in light of all of the information available to Newman, Newman sufficiently alleged a deceptive statement under the ICFA.

2.      *Newman sufficiently alleges MetLife's intent that Newman rely on the deception*

Newman alleges that MetLife intended that Newman rely on the deceptive statement contained in the "Long-Term Care (LTC) Facts" brochure. "In alleging fraud or mistake, a party

20

must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "**Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally**." *Id.* (**emphasis added**). "The 'intent' required by the [ICFA] is only the intent that the plaintiff in the primary action rely on the information that the defendant gave him, as opposed to any intent on the defendant's part to deceive." *Cuculich v. Thomson Consumer Elecs., Inc.*, 739 N.E.2d 934, 939 (Ill. App. Ct. 2000). *See also Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 12 (Ill. App. Ct. 2001), *as modified on denial of reh'g* (Nov. 27, 2001). Courts generally assume when a defendant makes a deceptive statement in a marketing or sales brochure, the defendant intended that consumers rely on said deceptive statements. *See, e.g., Capiccioni v. Brennan Naperville, Inc.*, 791 N.E.2d 553, 561 (Ill. App. Ct. 2003). *See also Connick*, 675 N.E.2d at 594–95 (defendant car manufacturer intended that consumers rely on statements it made to a magazine publishing a review of one of its vehicles when it knew the magazine would include such statements in the review and many prospective purchasers would read the review).

In her First Amended Complaint, Newman alleges MetLife made a deceptive statement in a "Long-Term Care (LTC) Facts" brochure MetLife distributed to prospective long-term care insurance purchasers. First Am. Compl. at ¶¶ 5-7. The "Long-Term Care (LTC) Facts" brochure's sole purpose was to help prospective long-term care insurance buyers decide which long-term care insurance policies they wanted to purchase. Furthermore, MetLife long-term care insurance purchasers did not receive copies of their actual policies until after they purchased them and paid their initial premiums. *See Id.* at ¶¶ 5, 18; First Am. Compl., Ex. B. Thus, long-term care insurance purchasers had to rely on representations in the "Long-Term Care (LTC) Facts" brochure to even know what they were purchasing. In addition, MetLife explicitly advised

21

prospective long-term care insurance purchasers to rely on the "Long-Term Care (LTC) Facts" brochure's representations when making purchasing decisions. *See, e.g.,* First Am. Compl., Ex. A at 5 ("Use this handy chart to compare key benefits and choose the plan that fits your needs and budget"). Under these circumstances, one must conclude that MetLife intended prospective long-term care insurance purchasers rely on the "Long-Term Care (LTC) Facts" brochure representations.

3.    *Newman alleges the deception occurred in the course of conduct involving trade or commerce*

Because Newman alleges that MetLife made the aforementioned deceptive statement while marketing long-term care insurance policies, Newman alleges the deception occurred in the course of conduct involving trade or commerce. *See* First Am. Compl. at ¶¶ 5, 18.

4.    *Newman alleges that she suffered actual damage proximately caused by MetLife's conduct*

Because Newman alleges that she would not have purchased the "Reduced-Pay at 65 Option" but for MetLife's misrepresentations and that she suffered actual damages in the form of additional premiums paid for the worthless "Reduced-Pay at 65 Option" and premiums paid in excess of the promised post-age 65 premium, Newman alleges that she suffered actual damage proximately caused by MetLife's conduct. *Id.* at ¶¶53-54.

ii.    Newman alleges that MetLife's actions are unfair under Section 2 of the Illinois Consumer Fraud Act

Newman alleges that MetLife's actions are unfair under Section 2 of the ICFA. "A plaintiff may allege that conduct is unfair under [the ICFA] without alleging that the conduct is deceptive." *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 830 (7th Cir. 2014). "Whether a defendant's conduct is unfair under the [ICFA] is determined on a case-by-case basis." *Demitro v. Gen. Motors Acceptance Corp.*, 902 N.E.2d 1163, 1168 (Ill. App. Ct. 2009). "When measuring

unfairness, courts consider three factors: '(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers.'" *Galvan v. Nw. Mem'l Hosp.*, 888 N.E.2d 529, 535-36 (Ill. App. Ct. 2008) (quoting *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417-18 (Ill. 2002)). "All three criteria do not need to be satisfied to support a finding of unfairness." *Robinson*, 201 Ill. 2d at 418 (internal citations and quotations omitted). "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id. See also Batson*, 746 F.3d at 830.

"Because neither fraud nor mistake is an element of unfair conduct under Illinois' Consumer Fraud Act, a cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b)." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008). "Therefore, under federal notice pleading standards, the complaint need only provide a short and plain statement of the claim that shows, through its allegations, that recovery is plausible rather than merely speculative." *Id.*

1. *Newman alleges that MetLife's misrepresentations regarding MetLife Policy 04856-20065 offend public policy.*

Regarding the first factor, "[a] practice which has not previously been held to be unlawful can offend public policy if it violates a standard of conduct set out by an existing statute or common law doctrine that typically governs such situations." *W. Ry. Devices Corp. v. Lusida Rubber Products, Inc.*, No. 06 C 0052, 2006 WL 1697119, at *4 (N.D. Ill. June 13, 2006). Illinois has a strong public policy against misrepresenting the terms of an insurance policy as set out by various statutes, regulations and common law doctrines. *See, e.g.,* 215 ILCS 5/149(1) ("No company doing business in this State … shall make, issue or circulate or cause or

knowingly permit to be made, issued or circulated any estimate, illustration, circular, or verbal or written statement of any sort misrepresenting the terms of any [insurance] policy issued or to be issued by it or any other company or the benefits or advantages promised thereby or any misleading estimate of the dividends or share of the surplus to be received thereon, or shall by the use of any name or title of any policy or class of policies misrepresent the nature thereof"); Ill. Admin. Code tit. 50, § 2012.122(b)(4) (prohibiting the misrepresentation of a material fact in selling or offering to sell a long-term care insurance policy).

Newman alleges that MetLife violated said public policy when marketing MetLife Policy 04856-20065 and other long-term care insurance policies. First Am. Compl. at ¶ 55. MetLife argues that a practice cannot offend public policy if it violates a standard of conduct set out by statutes that do not provide private rights of action. Mem. Supp. Mot. Dismiss First Am. Compl. at 29. Neither 215 ILCS 5/149(1) nor Ill. Admin. Code tit. 50, § 2012.122(b)(4) provides a private right of action. MetLife is wrong. *See Gainer Bank, N.A. v. Jenkins*, 672 N.E.2d 317, 319 (Ill. App. Ct. 1996) (allowing an unfairness claim to proceed based on policies embodied in another statute that itself did not provide a private right of action because the plaintiff was not suing under the other statute, but invoking it merely to prove violations of the ICFA). To constitute an unfair practice under Section 2 of the ICFA, a practice need not violate another statute, much less a statute providing a private right of action. *See Jackson v. Payday Fin., LLC*, 79 F. Supp. 3d 779, 788 (N.D. Ill. 2015). Rather, the practice must violate Illinois public policy.

Regulations and statutes like Ill. Admin. Code tit. 50, § 2012.122(b)(4) and 215 ILCS 5/149(1) demonstrate that Illinois has a public policy against insurers misrepresenting the terms of insurance policies. Because Newman alleges that MetLife violated a course of conduct set out by Ill. Admin. Code tit. 50, § 2012.122(b)(4) and 215 ILCS 5/149(1), Newman alleges a practice

that offends public policy.

2.    *Newman alleges a practice that is immoral, unethical, oppressive or unscrupulous*

Regarding the second factor, "[a] practice may be considered immoral, unethical, oppressive, or unscrupulous if it imposes a lack of meaningful choice or an unreasonable burden on the consumer." *Stonecrafters, Inc. v. Foxfire Printing & Packaging, Inc.*, 633 F. Supp. 2d 610, 616 (N.D. Ill. 2009). In *Demitro*, an automobile financing company wrongfully and mistakenly repossessed the plaintiff's vehicle in contravention of the terms of an extension letter giving the plaintiff seven days to pay $2,202.54 to bring his account current. 902 N.E.2d at 1166-67. Rather than return the vehicle and allow the plaintiff to bring his account current under the terms of the extension letter, the financing company decided to retain possession of the vehicle until the plaintiff paid the entire outstanding balance of $39,695.04. *Id*. The Illinois Appellate Court found the financing company's conduct was oppressive and therefore unfair because it left the plaintiff with only two options: to pay the entire outstanding balance, or lose his vehicle. *Id.* at 1169.

Like the financing company in *Demitro*, whose conduct imposed a lack of meaningful choice on the plaintiff borrower, MetLife's imposition of a 102% premium rate increase imposed a lack of meaningful choice on Newman. In response to the 102% premium rate increase, Newman had to do one of the following: (1) accept the premium increase and pay premiums that were twice as expensive as those she agreed to pay; (2) let her Policy lapse; or (3) accept reduced benefits. First Am. Compl. at ¶ 56. If Newman let her Policy lapse, she would have been unable to secure a new long-term care insurance policy from another insurer at a price remotely close to the one MetLife promised. *Id.* at ¶ 57. Thus, Newman had no choice but to submit to MetLife's rate increase if she wanted to maintain her existing long-term care insurance coverage. Therefore, Newman alleges that MetLife's misrepresentations and subsequent 102% premium

rate increase were immoral, unethical, oppressive, or unscrupulous.

3.    *Newman alleges a practice that causes substantial injury to consumers*

Regarding the third factor, "[a] practice causes substantial injury to consumers if it causes *significant* harm to the plaintiff and has the potential to cause injury to a large number of consumers." *Stonecrafters*, 633 F. Supp. 2d at 617 (internal citations and quotation marks omitted). Newman alleges that MetLife's class-wide premium increase significantly harmed her by forcing her to pay a premium that is more than twice as much as the premium Newman agreed to pay—thereby costing her thousands of dollars. *See* First Am. Compl. at ¶¶ 24-25, 58. Furthermore, MetLife likely sold thousands of long-term care insurance policies containing the "Reduced-Pay at 65 Option." Thus, MetLife's conduct has the potential to injure thousands of consumers.

MetLife argues that Newman could not have been injured by MetLife's class-wide premium increase because MetLife had a contractual right to increase Newman's premiums after she turned 65 years old. As discussed above, MetLife had no such right. MetLife Policy 04856-20065 is ambiguous. One could reasonably interpret MetLife Policy 04856-20065 to mean: (1) MetLife had no contractual right to increase Newman's premiums after she turned 65 years old; or (2) MetLife had a contractual obligation to decrease Newman's premiums by 50% once she turned 65 years old, but could increase her premiums after Newman turned 65 as long as the increase was part of a "class-wide" rate increase. "Upon finding an ambiguity [in an insurance policy], [courts] construe the policy against the insurer and in favor of the insured." *Nautilus Ins. Co. v. Vuk Builders, Inc.*, 406 F. Supp. 2d 899, 903 (N.D. Ill. 2005). Given the ambiguity, the Court should interpret MetLife Policy 04856-20065 in favor of Newman—finding that MetLife lacked a contractual right to increase Newman's premiums after she turned 65 years old. Furthermore, because MetLife Policy 04856-20065 was ambiguous about MetLife's ability to

increase Newman's premiums after Newman turned 65 years old, Newman was never alerted to the possibility of a post-age 65 rate increase and could not have avoided the injury. Because MetLife's misrepresentations and class-wide premium rate increase have caused significant harm to Newman and have the potential to harm a large number of consumers, Newman has sufficiently alleged a practice that causes substantial injury to consumers.

**C.     The First Amended Complaint adequately alleges a cause of action for common law fraud**

Newman alleges a cause of action for common law fraud. "The elements of the tort of fraudulent misrepresentation are: (1) [a] false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in [justifiable] reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 538 N.E.2d 530, 536 (Ill. 1989) (internal citation and quotation marks omitted. *See also Petrakopoulou v. DHR Int'l, Inc.*, 626 F. Supp. 2d 866, 870 (N.D. Ill. 2009). "[I]t is well established that a misrepresentation is fraudulent either where a party makes the representation knowing it is false *or* where the misrepresentation was made with a reckless disregard for its truth or falsity." *Gerill Corp.,* 538 N.E.2d at 536.

MetLife argues that Newman fails to adequately allege a false statement of material fact and that MetLife intended to induce Newman to act. Mem. Supp. Mot. Dismiss First Am. Compl. at 16-18. MetLife does not contend (nor could it) that Newman failed to adequately allege the second, fourth and fifth elements of common law fraud. Despite MetLife's claims to the contrary, Newman adequately alleges a false statement of material fact and that MetLife intended Newman to act based on that false statement.

i. <u>Newman alleges a false statement of material fact</u>

"This element encompasses three requirements: the defendant must (1) make a misrepresentation, (2) it must involve a fact and (3) the misrepresentation must be material." *Miller*, 762 N.E.2d at 7. A "misrepresentation is 'material' if the plaintiff would have acted differently had he been aware of it, or if it concerned the type of information upon which he would be expected to rely when making his decision to act." *Id.*

Newman alleges the following misrepresentation of fact appeared in MetLife's "Long-Term Care (LTC) Facts" brochure:

> **Reduced Pay at 65 Option:** By paying more than the regular premium amount you would pay each year up to the Policy Anniversary on or after your 65th birthday, you pay half the amount of your pre-age 65 premiums <u>thereafter</u>.

First Am. Compl. at ¶ 9 (<u>emphasis added</u>).

In addition, Newman alleges the following misrepresentation of fact appeared in MetLife Policy 04856-20065:

> **In addition, you have selected the following flexible premium payment option: Reduced Pay at 65**
> **Semi-Annual Premium Amount\*:**
> Before Policy Anniversary at age 65          $3231.93
> <u>On and after</u> Policy Anniversary at age 65      $1615.97

> \*If you pay premiums more frequently than annually, an additional cost has been included.

First Am. Compl., Ex. B (<u>emphasis added</u>).

As discussed above, MetLife promised to permanently reduce Newman's premiums after Newman turned 65 years old. The statements are false because MetLife increased Newman's premiums two years after Newman turned 65 years old. First Am. Compl. at ¶¶ 23-24. Newman alleges that she would not have purchased the "Reduced-Pay at 65 Option" had she known her

premiums were subject to increase after she turned 65 years old. *Id.* at ¶66. Thus, Newman sufficiently alleges that the misrepresentations were material.

MetLife argues that Newman failed to allege a false representation of material fact. Specifically, MetLife argues that any misrepresentations MetLife made in the "Long-Term Care (LTC) Facts" brochure were subsequently corrected in MetLife Policy 04856-20065. *See* Mem. Supp. Mot. Dismiss First Am. Compl. at 16-22. In *Siegel v. Levy Org. Dev. Co.*, a condominium developer gave a prospective condominium buyer (wanting to purchase a condominium unit with an unobstructed terrace) a marketing brochure and property report depicting a yet-to-be-completed condominium unit with an unobstructed terrace. 607 N.E.2d 194, 196 (Ill. 1992). The parties subsequently executed a purchase agreement for the unfinished condominium unit. *Id.* Although the purchase agreement contained architectural drawings of the condominium depicting an obstructed terrace, the Illinois Supreme Court held a reasonable jury could find the representations in the brochure and property report to be false statements of material fact because the obstructions on the architectural drawing "appear[ed] insignificant to anyone but an architect." *Id.* at 199.

Like the defendant condominium developer in *Siegel*—who made a false statement of material fact in a pre-contract brochure that it failed to unambiguously correct in a subsequent sales contract—MetLife made a false statement of material fact in its "Long-Term Care (LTC) Facts" marketing brochure that it failed to unambiguously correct in MetLife Policy 04856-20065. Therefore, the above-mentioned statement constitutes a false statement of material fact.

ii.     <u>Newman alleges MetLife intended to induce Newman to act</u>

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "**Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally**." *Id.* (**emphasis added**). Newman

alleges MetLife intended Newman rely on the aforementioned false statement of material fact when deciding to purchase MetLife Policy 04856-20065 and/or the "Reduced-Pay at 65 Option." First Am. Compl. at ¶ 64. Because Newman generally alleged MetLife made the aforementioned false statement of material fact with the requisite intent, Newman sufficiently plead intent under Federal Rule of Civil Procedure 9(b).

MetLife argues that it lacked the requisite intent as a matter of law. MetLife is wrong. As discussed above, Newman alleges MetLife made the false statement of material fact in a "Long-Term Care (LTC) Facts" brochure MetLife distributed to prospective long-term care insurance purchasers. *Id.* at ¶¶ 5-7. The "Long-Term Care (LTC) Facts" brochure's sole purpose was to aid prospective long-term care insurance buyers in deciding which long-term care insurance policies they wanted to purchase. In fact, MetLife advised prospective buyers to rely on the "Long-Term Care (LTC) Facts" brochure's representations. *See* First Am. Compl., Ex. A at 5 ("Use this handy chart to compare key benefits and choose the plan that fits your needs and budget"). Furthermore, MetLife long-term care insurance purchasers did not receive copies of their actual policies until after they purchased them and paid their initial premiums. *See* First Am. Compl. at ¶¶ 5, 18; First Am. Compl., Ex. B. Thus, long-term care insurance purchasers had to rely on representations in the "Long-Term Care (LTC) Facts" brochure to even know what they were purchasing. Under these circumstances, one must conclude that MetLife intended prospective long-term care insurance purchasers rely on the "Long-Term Care (LTC) Facts" brochure representations.

Because Newman has sufficiently alleged a false statement of material fact and that MetLife intended to induce Newman to act, the Court should refuse to dismiss Count III of Newman's First Amended Complaint.

30

**D.    The First Amended Complaint adequately alleges a cause of action for fraudulent concealment**

Newman sufficiently alleges a claim for fraudulent concealment. "To prove fraudulent concealment, a plaintiff must establish that (1) the defendant concealed a material fact under circumstances that created a duty to speak; (2) the defendant intended to induce a false belief; (3) the plaintiff could not have discovered the truth through reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and justifiably relied upon the defendant's silence as a representation that the fact did not exist; (4) the concealed information was such that the plaintiff would have acted differently had he or she been aware of it; and (5) the plaintiff's reliance resulted in damages." *Bauer v. Giannis*, 834 N.E.2d 952, 957–58 (Ill. App. Ct. 2005) (internal citations omitted). MetLife argues Newman has failed to plausibly allege the first, second and third elements of fraudulent concealment.

i.    <u>Newman alleges MetLife concealed a material fact when it was under a duty to disclose</u>

"Where … there is no fiduciary relationship between the parties, a duty to disclose may arise under Illinois law if the defendant makes an affirmative statement that it passes off as the whole truth while omitting material facts that render the statement a misleading 'half-truth.'" *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 397–98 (7th Cir. 2009) (internal citations omitted). *See also Gen. Motors Acceptance Corp. v. Cent. Nat. Bank of Mattoon*, 773 F.2d 771, 778 (7th Cir. 1985) ("Even in the absence of a confidential relationship, fraud may be based on a failure to disclose, which together with an affirmative statement or act is misleading, although a statement may be technically true, it may nevertheless be fraudulent where it omits necessary qualifying material") (internal citations omitted); *Buechin v. Ogden Chrysler-Plymouth, Inc.*, 511 N.E.2d 1330, 1336 (Ill. App. Ct. 1987).

In her First Amended Complaint, Newman alleges MetLife told Newman her premiums

31

would be permanently reduced once she turned 65 years old. First Am. Compl. at ¶¶ 70-71. As discussed above, MetLife Policy 04856-20065 did nothing to modify or qualify the foregoing representation. At the time MetLife made the foregoing representation, MetLife knew that that if it had to implement a "class-wide" premium increase, it would have to do so on all policies in Illinois regardless of the premium payment options any individual insured might have purchased. *See Id.* at ¶ 72. MetLife failed to tell Newman that if a class-wide premium increase was implemented after Newman turned 65 years old, MetLife would be unable to fulfill its promise to permanently reduce Newman's annual premium by 50%. *Id.* The affirmative representation and simultaneous omission misled Newman into thinking she would receive an immutable premium reduction at age 65. Thus, MetLife had a duty to inform Newman that she could be subject to class-wide premium increases after she turned 65 years old.

MetLife argues that following statement on page one of MetLife Policy 04856-20065 alerted Newman to the possibility of post-age 65 premium rate increases: "We may change the premium rates, subject to applicable state Insurance Department approval. Any such change in premium rates will apply to all policies in the same class as Yours in the state where this policy was issued." Mem. Supp. Mot. Dismiss First Am. Compl. at 30. *See also* First Am. Compl. Ex. B. However, the foregoing statement does not clarify the ambiguities previously noted in MetLife Policy 04856-20065. Therefore, it failed to notify Newman that her premiums could increase after she turned 65 years old. The First Amended Complaint alleges that MetLife concealed the possibility of a post-age 65 premium increase despite its obligation to disclose it.

ii.     Newman sufficiently alleges MetLife intended to induce a false belief

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "**Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally**." *Id.* (**emphasis added**). Newman

32

alleges that MetLife intended to induce a false belief in Newman that her premiums would be permanently cut in half once she turned 65 years old. First Am. Compl. at ¶ 74. Thus, Newman has pleaded intent generally in accordance with Federal Rule of Civil Procedure 9(b).

iii.    <u>Newman alleges that she could not have discovered the truth through reasonable inquiry or inspection</u>

Newman alleges that MetLife Policy 04856-20065 and Illinois law fail to define "class" as it relates to "class-wide" premium rate increases. First Am. Compl. at ¶ 75-76. Additionally, as discussed above, MetLife Policy 04856-20065 was at best ambiguous about MetLife's contractual right to increase Newman's premiums after she turned 65 years old. It is difficult to imagine where else Newman could have looked to determine whether she was subject to post-age 65 premium increases. Therefore, Newman could not have discovered that she was subject to post-age 65 premium increases through reasonable inquiry or inspection. Because Newman adequately alleges the elements of fraudulent concealment, the Court should refuse to dismiss Count IV of the First Amended Complaint.

## IV.    <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiff, Margery Newman, respectfully requests that this Court deny Defendant, Metropolitan Life Insurance Company's motion to dismiss and provide all other appropriate relief.


Dated: August 31, 2016                    Respectfully submitted,

                                          **MARGERY NEWMAN**
                                          **and all others similarly situated,**

                                          By: /s/ Robert R. Duncan
                                          One of her Attorneys

Robert R. Duncan
DUNCAN LAW GROUP, LLC
161 North Clark Street
Suite 2550
Chicago, IL 60601
T:  312.202.3283
F:  312.202.3284

Thomas C. Cronin
CRONIN & CO., LTD.
161 North Clark Street
Suite 2550
Chicago, Illinois 60601
T: 312.201.7100
F: 312.201.7101

Frank H. Tomlinson
TOMLINSON LAW, LLC
2100 First Avenue North
Suite 600
Birmingham, Alabama
T: 205.328.9445
F: 800.856.9028