## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MARGERY NEWMAN, and all others similarly situated,

        Plaintiff,

        v.

METROPOLITAN LIFE INSURANCE COMPANY,

        Defendant.

Case No. 1:16-cv-03530

Hon. Thomas M. Durkin

## DEFENDANT METLIFE'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT

Daniel J. Delaney
Drinker Biddle & Reath LLP
191 North Wacker Drive, Suite 3700
Chicago, IL  60606-1698
(312) 569-1175
Daniel.Delaney@dbr.com

Michael D. Rafalko, *pro hac vice*
Stephen A. Serfass, *pro hac vice*
Drinker Biddle & Reath LLP
One Logan Square, Ste. 2000
Philadelphia, PA  19103-6996
(215) 988-1186
Michael.Rafalko@dbr.com
Stephen.Serfass@dbr.com

Sheldon Eisenberg, *pro hac vice*
Drinker Biddle & Reath LLP
1800 Century Park East, Ste. 1500
Los Angeles, CA 90067
(310) 203-4035
Sheldon.Eisenberg@dbr.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................. ii

I.      INTRODUCTION ................................................................................1

II.     ARGUMENT ......................................................................................2

        A.      Newman Has Failed to State a Breach of Contract Claim.........................2

                1.      Newman's Argument that the Policy is Ambiguous is Not Pleaded
                        in the Complaint.......................................................................2

                2.      The Policy Language Taken as a Whole (as Required by the Policy
                        and Settled Law) Does not Support Newman's Construction of the
                        Words "On and After" in the Schedule of Benefits ......................3

                3.      Newman Enjoys the Full Benefit of the Reduced Pay at 65 Option...........9

                4.      Newman Cannot Use Marketing Materials to Inject Ambiguity into
                        a Fully Integrated, Unambiguous Policy ...................................11

        B.      Newman's Fraud-Based Claims Fail as a Matter of Law .......................13

                1.      Newman's Fraud Claims are Mere Breach of Contract Claims and
                        Must be Dismissed..................................................................13

                2.      MetLife's Brochure Contains No False Statement ......................14

                3.      Newman Has Not and Cannot Sufficiently Allege Intent...........16

                4.      The Policy Alerted Newman to MetLife's Right to Raise Premium
                        Rates.......................................................................................17

        C.      MetLife's Brochure is Not Deceptive Under the ICFA...........................19

        D.      MetLife's Brochure Cannot Form the Basis of an "Unfair Acts or
                Practices" Claim Under the ICFA.......................................................20

                1.      Newman has not alleged a practice that offends public policy...................21

                2.      Newman has not alleged a practice that is immoral, unethical,
                        oppressive or unscrupulous....................................................24

                3.      Newman has not alleged a practice that is immoral, unethical,
                        oppressive or unscrupulous....................................................26

        E.      Newman's Fraudulent Concealment Claim Fails as a Matter of Law ...................27

                1.      Newman Has Not Alleged a Duty to Disclose...........................27

                2.      Newman Had Notice that MetLife Could Raise Rates After Age 65.........29

III.    CONCLUSION.................................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Cases** **Page(s)**

*Alvarez v. Ins. Co. of N. Am.*,
   313 F. App'x 465 (2008) ........................................................................27

*Avery v. State Farm Mut. Auto. Ins. Co.*,
   835 N.E.2d 801 (Ill. 2005) ...............................................................13, 14

*Baker, Bourgeois & Associates, Inc. v. Taylor*,
   410 N.E.2d 55 (Ill. App. Ct. 1980) ...................................................13

*Bruder v. Country Mut. Ins. Co.*,
   620 N.E.2d 355 (Ill. 1993) .................................................................9

*Cohen v. Am. Sec. Ins. Co.*,
   735 F.3d 601 (7th Cir. 2013) .........................................................18, 19

*Cozzie v. Union Labor Life Ins. Co.*,
   1996 U.S. Dist. LEXIS 15281 (N.D. Ill. Oct. 10, 1996).................9

*Crichton v. Golden Rule Ins. Co.*,
   576 F.3d 392 (7th Cir. 2009) ..........................................................27, 28

*Cuculich v. Thomson Consumer Elecs., Inc.*,
   739 N.E.2d 934 (Ill. App. Ct. 2000) ...............................................17

*Darif v. Holder*,
   739 F.3d 329 (7th Cir.2014) ............................................................23

*Davis v. G.N. Mortg. Corp.*,
   396 F.3d 869 (7th Cir. 2005) ..........................................................12, 18

*Demitro v. GMAC*,
   902 N.E.2d 1163 (Ill. App. Ct. 2009) .............................................25, 26

*Flora Bank & Trust v. Czyzewski*,
   583 N.E.2d 720 (Ill. App. Ct. 1991) ...............................................5

*Foster v. Crum & Forster Ins. Cos.*,
   345 N.E.2d 49(Ill. App. Ct. 1976) ..................................................8

*Gainer Bank, N.A. v. Jenkins*,
   672 N.E.2d 317 (Ill. App. Ct. 1996) ...............................................21, 22

*Gallagher v. Lenart*,
   874 N.E.2d 43 (Ill. 2007) ................................................................4

*Geoquest Prods., Ltd. v. Embassy Home Entm't,*
   593 N.E.2d 727 (Ill. App. Ct. 1992) ...................................................12

*Golf v. Henderson,*
   876 N.E.2d 105 (Ill. App. Ct. 2007) ...................................................8

*Jackson v. Payday Financial, LLC,*
   79 F. Supp. 3d 779 (N.D. Ill. 2015) ...................................................23

*Nw. Podiatry Ctr., Ltd. v. Ochwat,*
   990 N.E.2d 347 (Ill. App. Ct. 2013) ...................................................4

*Old Town Pizza of Lombard, Inc. v. Corfu-Tasty Gyros, Inc.,*
   No. 11-CV-6959, 2012 WL 638765 (N.D. Ill. Feb. 23, 2012) .........................20, 24

*Palmer v. Marion Cty.,*
   327 F.3d 588 (7th Cir. 2003) ...................................................18, 21, 27

*Perlman v. Zell,*
   185 F.3d 850 (7th Cir. 1999) ...................................................13

*Phila. Indem. Ins. Co. v. Chi. Title Ins. Co.,*
   No. 09 C 7063, 2010 WL 2757542 (N.D. Ill. July 13, 2010) ...................................8

*Quinlan v. Elysian Hotel Co.,*
   916 F. Supp. 2d 843 (N.D. Ill. 2013) ...................................................18, 21, 27

*Robinson v. Toyota Motor Credit Corp.,*
   775 N.E.2d 951 (Ill. 2002) ...................................................20, 23-25

*Santiago v. RadioShack Corp.,*
   2012 U.S. Dist. LEXIS 46389 (N.D. Ill. Feb. 10, 2012) ...................................18, 21, 27

*Siegel v. Levy Organization Development Co.*
   607 N.E.2d 194 (Ill. 1992) ...................................................15

*Siegel v. Shell Oil Co.,*
   612 F.3d 932 (7th Cir. 2010) ...................................................15, 16, 27

*Smith v. Union Pac. R. Co.,*
   474 F. App'x 478 (7th Cir. 2012) ...................................................3

*Thompson v. Gordon,*
   948 N.E.2d 39 (Ill. 2011) ...................................................4

*Toulon v. Cont'l Cas. Co.,*
   No. 15 CV 138, 2015 WL 4932255 (N.D. Ill. Aug. 18, 2015) (*Toulon I*)............18, 19, 25, 28

*Toulon v. Continental Cas. Co.*,
    No. 15 CV 138, 2016 WL 561909 (N.D. Ill. Feb. 12, 2016) ................................ 24, 25, 26, 28

*W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*,
    794 F.3d 666 (7th Cir. 2015) ..................................................................................... 12

### STATUTES, RULES & REGULATIONS

Ill. Admin. Code Title 50, § 926.10 *et seq.* ....................................................................... 22

ILL. ADMIN. CODE Title 50, § 2002.180 (2014) ................................................................. 22

ILL. ADMIN. CODE Title 50, § 2012.60(a) (2014) .............................................................. 7, 8

ILL. ADMIN. CODE Title 50, § 2012.122(b)(4) ................................................................. 21, 22

ILL. ADMIN. CODE Title 50, § 2012.150 (2014) ................................................................. 22

Illinois Consumer Fraud and Deceptive Business Practices Act,

815 ILCS § 505/1 *et seq.* ................................................................................................... 2

Illinois Motor Vehicle Retail Installment Sales Act, 810 815 ILCS 375/1 *et seq.* ........................ 22

MVRISA ....................................................................................................................... 22

Newman Had Notice that MetLife Could Raise Rates After Age 65 ............................................. 29

Required by the Policy and Settled Law ..................................................................................... 3

Rule 9(b) ...................................................................................................................... 16

I.     <u>**INTRODUCTION**</u>

Plaintiff Margery Newman's ("Newman") response to MetLife's Motion to Dismiss (the "Motion to Dismiss") addresses a theory of liability not pleaded in her First Amended Complain (the "Complaint").  She contends, for the very first time, that the Policy's Schedule of Benefits, read in isolation from all other terms of the Policy, required MetLife to lock in her premium rate at age 65.  This is the polar opposite of what she alleged in the Complaint – that MetLife's marketing brochure somehow "modified" the Policy, thereby requiring MetLife to lock in her rate at age 65.  Plaintiff's new theory can be rejected not only on the basis that it is not supported by allegations in the Complaint, but, more fundamentally, it also fails as a matter of law because it ignores a basic tenet of contract interpretation:  contracts must be read as a whole and plaintiffs cannot view language in isolation to support a breach of contract claim.  Newman also argues, for the very first time in her Response, that the Policy is ambiguous—likely realizing that her original theory that MetLife's marketing brochure "modified" the Policy is unsupported and untenable.  Again, even if this argument were supported by allegations in the Complaint, it would still fail as a matter of law.  The Policy, when read as a whole, has only one reasonable interpretation—MetLife is entitled to raise premium rates on a class-wide basis, regardless of age or any other unfounded limitation, and Newman was alerted to that right four times throughout the Policy.

Newman's reliance on her novel breach of contract arguments permeates all of her fraud claims.  The trouble for Newman, of course, is that her fraud claims are impermissibly premised on alleged contract breaches, a position Illinois courts have uniformly rejected.  In any event, as discussed below, Newman also fails to allege the key elements of falsity and intent in any cognizable fraud claim.

1

Finally, Newman not only fails to show why MetLife's conduct here could be subject to the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), but also completely ignores several arguments raised by MetLife in its opening brief. Notably, Newman (1) does not explain why her general reference to "Illinois common law doctrines governing insurance policies and breach of contract" is sufficient to allege that MetLife has violated the public policy prong of the *Robinson* test for purposes of her ICFA claim; (2) does not refute the principle that a defendant's conduct cannot be deceptive under the ICFA if the plaintiff was explicitly advised of the complained of result; and (3) does not dispute that MetLife, for purposes of alleged fraudulent concealment, does not owe Newman a duty as a matter of law or by way of its supposed position of influence and superiority. Newman has conceded these arguments by failing to respond.

Newman has, and continues to enjoy, the benefit of her bargain—premium rates that are fifty percent of that which she would have paid if she had not selected the Reduced Pay at 65 Option. At bottom, as shown in MetLife's Motion to Dismiss and below, Newman asks the Court to read a contractual provision in complete isolation and ignore MetLife's unambiguous right to raise premium rates on a class-wide basis (with DOI approval)—in order that Ms. Newman might pay less than what she bargained for. The Court should dismiss Newman's Complaint in its entirety.

## II.    ARGUMENT

### A.    Newman Has Failed to State a Breach of Contract Claim.

#### 1.    Newman's Argument that the Policy is Ambiguous is Not Pleaded in the Complaint.

In her Response, Newman argues, for the first time, that the Policy's Schedule of Benefits creates an ambiguity and permits her to claim that MetLife breached language in the

2

Schedule of Benefits that purportedly promises to permanently fix her premium "on and after Policy Anniversary at age 65." Response at 5–9. Newman's newly-minted theory of liability is not pleaded in the Complaint and, therefore, should be disregarded by the Court. *See, e.g.*, *Smith v. Union Pac. R. Co.*, 474 F. App'x 478, 480–81 (7th Cir. 2012) (holding the district court properly disregarded allegations of deception as applied to an equitable estoppel claim because the "paint[ed] a narrative different than that alleged in [the] complaint."). The Court should disregard Newman's attempt to salvage her defective pleading through the assertion of a theory of liability not pleaded in the Complaint.

2. **The Policy Language Taken as a Whole (as Required by the Policy and Settled Law) Does not Support Newman's Construction of the Words "On and After" in the Schedule of Benefits.**

Newman argues that a single phrase from the Schedule of Benefits alone supports Newman's breach of contract claim. Response at 5. Specifically, Newman points to the Reduced Pay at 65 Option outlined in the Policy's Schedule of Benefits. *See* First Am. Compl., Ex. B. The Reduced Pay Option sets forth the premium in effect as of the effective date of the Schedule of Benefits. The Schedule of Benefits attached to the Policy at the time of issuance, effective September 1, 2004, provides as follows:

**[Y]ou have selected the following flexible premium payment option: Reduced Pay at 65**

| Semi-Annual | Premium | Amount | []: |
|---|---|---|---|
| Before Policy Anniversary at age 65: | | $3,231.93 | |
| On and after Policy Anniversary at age 65: | | $1,615.97 | |

*See id.* Newman argues that the words "on and after" mean that Newman's premium rates would be permanently fixed "on and after" Newman reached age 65. Response at 5. Newman's argument fails because it ignores unambiguous language throughout the Policy and elsewhere in

3

the Schedule of Benefits that, when read together as a whole, demonstrates that the premium

rates reported in the Schedule of Benefits are subject to change.

### a. Newman's Attempt to Read "On and After" in Isolation is Contrary to Well Settled Principles of Contract Interpretation.

Newman's new interpretation of the Policy hinges entirely on her argument that

MetLife's right to increase premium rates does not apply to the premium rates listed under the

Reduced Pay at 65 Option because (1) MetLife did not provide a disclaimer next to the Reduced

Pay at 65 Option and (2) MetLife's right to raise premium is found "nowhere near" the Reduced

Pay at 65 Option. Policy at 3; Response at 7. As discussed below, the physical proximity of

language in the Policy that preserved MetLife's right to raise rates to the Schedule of Benefits is

irrelevant because settled rules of construction require the Policy to be read as a whole.

Newman's attempt to read the Schedule of Benefits in isolation is prohibited under both

well-settled principles of contract interpretation and the Policy itself. *Thompson v. Gordon*, 948

N.E.2d 39, 48 (Ill. 2011) (holding that terms that are subject to different meanings when read in

isolation do not render the contract ambiguous when the meaning is otherwise clear in the

contract when read as a whole); *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007) ("The intent

of the parties is not to be gathered from detached portions of a contract or from any clause or

provision standing by itself."); *Nw. Podiatry Ctr., Ltd. v. Ochwat*, 990 N.E.2d 347, 358 (Ill. App.

Ct. 2013) ("It is improper to determine the parties' intent by looking at a contract clause or

provision in isolation"). Moreover, the Policy itself requires that "provisions of [the] [P]olicy be

read as a whole." Policy at 18. Newman's singular focus on a phrase from the Schedule of

Benefits is improper and does not change the fact that, when read as a whole, the Policy

unambiguously affords MetLife the right to change the premium rates described in the Schedule

of Benefits.

4

### b.    The Policy is Not Ambiguous.

Newman argues that the terms "and after" and "class" are ambiguous and, therefore, the court should consider extrinsic evidence to interpret the Policy. Response at 8–11. A policy term is ambiguous only where the term is susceptible to more than one reasonable interpretation. *Flora Bank & Trust v. Czyzewski*, 583 N.E.2d 720, 725 (Ill. App. Ct. 1991).

### (1)    "On and After" is Clear and Unambiguous.

Newman argues that the words "on and after," when "combined with a specific premium amount and no other qualifying language," are ambiguous. Again, Newman asks this Court to look at a single line in the Schedule of Benefits in isolation and ignores entirely that the "specific premium amount" to which she refers is a premium rate listed in the Schedule of Benefits that is subject to change under the plain terms of the Policy. This is evident not only from the four instances in the Policy where MetLife reserves its right to increase premium rates but also in the Schedule of Benefits and Premium Payment provisions of the Policy, which clarify that the Schedule of Benefits is subject to change.

The Policy's terms afford MetLife the right to increase premium on a class-wide basis and with approval of the Illinois Department of Insurance, without further limitation—a right that Newman was reminded of <u>four times</u> in the Policy, the first of which was prominently placed on the first page. Policy at 1; 14; 5% Automatic Compound Inflation Protection Rider; Contingent Benefits Upon Lapse Rider. Newman attempts to characterize these clear provisions as "general admonitions of class-wide rate increases," highlighting that they do not specifically mention the Reduced-Pay at 65 Option. Response at 9. But MetLife's "right to change premium rates on a class basis" means exactly that—MetLife has the right to change <u>all</u> premium rates in the Policy, including rates pertaining to the Reduced-Pay at 65 Option, so long as the change is made on a class-wide basis. *See* Policy at 14.

5

Other terms of the Policy also make clear that the current premiums listed in the Schedule of Benefits are subject to change. For example, the Schedule of Benefits contains an effective date and provides that the current Schedule of Benefits replaces any prior Schedule of Benefits. *See* Compl., Ex. A, Schedule of Benefits attached to Policy; Compl., Ex. C (same); Compl., Ex. D (same). The premium payment provision requires insureds to pay premiums according to the Premium Schedule that is in effect for the Policy, further alerting Newman that the premiums reported under the Schedule of Benefits are subject to change. Policy at 14.[1] Finally, Newman was placed on further notice that the premium due "on and after Policy Anniversary age 65" was subject to change when she was provided the 2012 Schedule of Benefits—MetLife had increased the premium due on and after age 65 from $1,615.97 to $1,906.84. *See* Compl., Ex. B. ($1,615.97 as of September 1, 2004); Compl., Ex. C. ($1,906.84 as of September 1, 2012). Premiums before Newman reached 65 also increased. *Id.*[2] Indeed, not only was Newman placed on notice that premiums due on and after she turned 65 and premiums before she turned 65 could (and did) increase, Newman continued to make such increased premium payments after receiving the 2012 Schedule of Benefits with no objection.

Given the subject's prominent and repeated mention in the Policy, Newman's contention that MetLife did not adequately advise her of the possibility of a rate increase after age 65 cannot be taken seriously. How many times does MetLife need to notify policyholders that the premium rates listed in the Schedule of Benefits are subject to class-wide increases? The answer, legally speaking, is just once. *See* ILL. ADMIN. CODE tit. 50, § 2012.60(a) (2014) (providing that "a

---

[1] There are numerous circumstances where a new Schedule of Benefits would be placed in effect—many of which would result in the premium listed for Newman after age 65 being changed (*e.g.*, if Newman decided to reduce her total lifetime benefit, her required premium (both before and after age 65) would decrease).

[2] This is apparent from the face of the 2004 Schedule of Benefits and 2012 Schedule of Benefits, which Newman attached to the Complaint.

86579349.1

long-term care insurance policy or certificate . . . shall include a statement that premium rates may change" in the renewability provision on the first page of the policy); *see* Policy at 1. Yet, MetLife notified Newman four times. Policy at 1; 14; 5% Automatic Compound Inflation Protection Rider; Contingent Benefits Upon Lapse Rider.[3] MetLife had no obligation to repeat this reservation of rights further to preserve its contractual right to raise class-wide premiums at any time.

Newman's suggestion that an insured might not appreciate that MetLife had the right to raise the premium rates listed in the Schedule of Benefits because MetLife did not reserve that right in a place in the Policy where she would have preferred to see it is without legal significance. (Newman suggests it should be located directly adjacent to the premium amounts in the Schedule of Benefits.) Not surprisingly, Newman fails to cite any authority to support this contention because the law is to the contrary. The law presumes that an insured has read the entire contract.[4] And the Policy's integration clause requires that the provisions of the entire Policy be read as a whole. Policy at 18. The integration clause provides an example—stating that benefit limitations apply to <u>all</u> benefits. *Id.* Similarly, provisions addressing premium rate increases apply to <u>all</u> premium rates; there is no need to remind Newman—for a fifth time or

---

[3]    Newman argues that the 5% Automatic Compound Inflation Protection Rider is "wholly in line with Newman's belief that an insured could limit or eliminate exposure to future rate increases by purchasing Riders." Response at 6. Not so. The 5% Automatic Compound Inflation Protection Rider states, "Your benefit amounts will automatically increase each year with no corresponding increase in premium." The inflation rider limits MetLife's right to raise premium rates on the inflated daily benefit amount. Although Newman strains to interpret this language in favor of her argument in opposition to the Motion to Dismiss, to the contrary, the Inflation Rider illustrates that MetLife understood how to limit its right to increase premium—and did so explicitly. Newman apparently fails to recognize that, unlike the Inflation Rider, the Policy's Reduced Pay at 65 provisions contain no terms that would limit MetLife's right to raise rates on the amount listed under the Reduced Pay at 65 Option.

[4]    Even if insureds do not read the policy, they are deemed to know the information the policy contains. *Foster v. Crum & Forster Ins. Cos.*, 345 N.E.2d 49, 51(Ill. App. Ct. 1976). Indeed, insureds "ha[ve] an affirmative duty to review the terms of a new policy issued to [them]." *Golf v. Henderson*, 876 N.E.2d 105, 111 (Ill. App. Ct. 2007).

7

more—that the Reduced Pay at 65 premium rates, like all the rates addressed by the Policy, are subject to change.

Finally, Newman's construction would produce the absurd outcome of nullifying MetLife's right to raise premium rates altogether, as it would arguably apply equally to the amount Newman was required to pay "Before Policy Anniversary at age 65." In other words, if "on and after" is interpreted to override the Policy's premium rate increase provisions, then "Before" should arguably operate in the same manner by requiring MetLife to lock in Newman's Premium rate "Before Policy Anniversary at age 65" as well. Such a reading would eviscerate MetLife's right under the Policy to raise premium rates at all—before or after age 65—rendering the provisions meaningless. "It is a basic tenet of contract construction that a court should not construe a contract in a way that would render other parts of it superfluous or meaningless." *Phila. Indem. Ins. Co. v. Chi. Title Ins. Co.*, No. 09 C 7063, 2010 WL 2757542, at *5 (N.D. Ill. July 13, 2010). Newman's argument is particularly unavailing in this case considering MetLife raised Newman's rates "Before Policy Anniversary at age 65" and Newman has never challenged MetLife's right to do so. *See* Compl., ¶¶ 20–22; Compl., Ex. B; Compl., Ex. C.

        (2)     Newman's Argument that "Class" is Ambiguous is a Red Herring.

Newman argues that the term "class," as used in the Policy's rate increase provisions, is undefined and, therefore, ambiguous. Response at 2–3, 6–7, 10–-11, 33. Specifically, Newman contends that she could not have known that her premium rates were subject to increases because "class" is undefined. *Id.* at 33. Therefore, Newman contends that she believed she had "self-segregated" herself into a "class" that was immune from future rate increases. *Id.* at 8.

However, the Policy provides that MetLife has the right to raise premium rates on "all policies in the same class as <u>Yours</u>." Policy at 1. Newman's argument that she self-segregated

8
86579349.1

herself (whatever that might mean) into a special class that was immune from rate increases

contradicts the plain terms of the Policy, which states that "all policies in the same class as

[Newman's]" are subject to rate increases. Whether or not class is defined or ambiguous[5] is a

red herring because the Policy is clear that MetLife may raise rates on <u>Newman's</u> class, and there

is no allegation in the Complaint that Newman was treated any differently from other members

of her class. Even if class were defined as a class of policyholders who selected the Reduced

Pay at 65 Option—which is the best Newman could reasonably argue—the Policy still provides

that MetLife can raise Newman's rates on a class-wide basis on all policies that had the Reduced

Pay at 65 Option.

### 3. Newman Enjoys the Full Benefit of the Reduced Pay at 65 Option.

Although not actually material to the Court's interpretation of the Policy or the outcome

of MetLife's Motion to Dismiss, Newman attempts to make an "unfairness" argument that the

2014 rate increase breached the Reduced Pay at 65 Option by limiting its duration or otherwise

nullifying its benefit to Newman. That the Policy allows for premium rate increases does not, as

Newman argues, "take away all meaning from MetLife's inclusion of the words 'and after.'" *Id.*

Newman ignores that she continued to enjoy the benefit of the Reduced Pay at 65 Option even

after the 2014 rate increase. Indeed, after the 2014 rate increase, Newman continued to pay and

will always pay half of what she would have paid if she were not yet 65 years old.[6] In other

---

[5]   Notably, "[t]he absence of a definition in an insurance policy does not make the policy ambiguous." *Cozzie v. Union Labor Life Ins. Co.*, 1996 U.S. Dist. LEXIS 15281 at *8–9 (N.D. Ill. Oct. 10, 1996) (emphasis added) (citing *Bruder v. Country Mut. Ins. Co.*, 620 N.E.2d 355 (Ill. 1993)). Rather, "[t]he touchstone in determining whether ambiguity exists regarding an insurance policy [] is whether the relevant portion is subject to more than one reasonable interpretation, not whether creative possibilities can be suggested. Reasonableness is the key." *Bruder*, 620 N.E.2d at 362 (citation omitted).

[6]   In 2004, Newman's premium was $3,231.93. Compl., Ex. A. Prior to age 65, Newman experienced a rate increase that increased her premium from $3,231.93 to $3,813.67, as is apparent in the 2012 Schedule of Benefits attached to the Complaint. Compl., Ex. C. In 2012, the Policy Anniversary at age 65, her premiums were reduced by fifty percent to $1,904.84, as provided under the Reduced Pay at

words, the benefit was not "limited in duration," as Newman suggests. *See* Response at 5–6. Rather, MetLife charged the appropriately reduced premium on and after Policy Anniversary at age 65. Newman's analysis on this issue is simply wrong.

While Newman will always enjoy a reduced premium under the Reduced Pay at 65 Option, the reduced premium amount is subject to class-wide rate increases under the unambiguous terms of the Policy. The Policy expressly reserves MetLife's right to change the rates—plural—under the Schedule of Benefits. Policy at 1.[7] This language is displayed prominently in the very first provision on the very first page of the Policy and is repeated in three other places throughout the Policy. *See* Policy at 1; 14; 5% Automatic Compound Inflation Protection Rider; Contingent Benefits Upon Lapse Rider. Simply put, Newman asks this Court to read limitations into clear and unambiguous terms of the Policy.[8] Instead of rendering meaningless the words "on or after," this reading of the Policy is the only one that properly gives meaning to both the Reduced Pay at 65 Option (*i.e.*, by permanently reducing Newman's

---

65 Option. When she experienced the 102% rate increase in 2014, that increase was applied to the already reduced premium. Thus, after the 102% rate increase was implemented, she owed $3,851.80— not 102% more than her pre-age 65 premium (*i.e.*, $7,703.60), which is what she would have been obligated to pay but for the Reduced Pay at 65 Option. Compl., Ex. D. Future rate increases, if any, will continue to be applied to that reduced rate.

[7]     The Policy provides:

> **RENEWABILITY: THIS POLICY IS GUARANTEED RENEWABLE FOR LIFE.**
> ***PREMIUM RATES ARE SUBJECT TO CHANGE.*** This means You have the right, subject to the terms of the policy, to continue this policy as long as You pay Your premium on time. We cannot change any of the terms of this policy without Your consent, except that We may change the premium rates, subject to applicable state Insurance Department approval. Any such change in premium rates will apply to all policies in the same class as Yours in the state where this policy was issued.

Policy at 1 (bold in original; underlining added).

[8]     Finally, Newman argues that the premium amount listed in the Schedule of Benefits for the Reduced Pay at 65 Option is a "more specific" provision that should be given priority over the "general provision regarding rate increases." Response at 9. The Reduced Pay at 65 Option is not a more specific rate increase provision—it has nothing to do with rate increases.

10

premium by half the amount she would otherwise pay) and MetLife's contractually reserved right to raise premiums on a class-wide basis.

### 4. Newman Cannot Use Marketing Materials to Inject Ambiguity into a Fully Integrated, Unambiguous Policy.

Newman admits that extrinsic evidence cannot be introduced to create ambiguity in an otherwise unambiguous, fully-integrated contract. *See* Response at 10–11. Thus, if this Court agrees that the Policy is clear and unambiguous, it must dismiss Newman's breach of contract claim if the Policy is a fully integrated contract. It is well established that an insurance contract that contains an integration clause limiting the terms of the contract to those contained in the policy is fully-integrated. *W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co.,* 794 F.3d 666, 673–75 (7th Cir. 2015). Importantly, "only the subject writing may be considered to determine the integration question." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 879 (7th Cir. 2005) (internal citation omitted). In other words, "[u]nder the four corners test, the court must find from the contract itself that the document is incomplete before it will allow the admission of extrinsic evidence." *Geoquest Prods., Ltd. v. Embassy Home Entm't*, 593 N.E.2d 727, 730 (Ill. App. Ct. 1992).

Although Newman admits, as she must, that the Policy contains an integration clause, she argues that the Policy is not fully integrated because only the Reduced-Pay at 65 Option is "left wholly undefined" and "unexplained" in the Policy.[9] *See* Response at 10. Yet, the Schedule of Benefits on which Newman relies pertains to the Reduced Pay at 65 Option. Policy at 3. Thus,

---

[9] The bulk of Newman's integration argument puts the cart before the horse, asking the Court to look outside the terms of the contract to determine the question of integration. *See, e.g.*, Response at 10 (alleging that Newman reviewed the marketing materials and made a decision based on that review; the marketing materials are "part and parcel" to the negotiations). Extrinsic facts regarding the parties' negotiations have no bearing whatsoever on the question of integration. *Davis*, 396 F.3d at 879 ("[O]nly the subject writing may be considered to determine the integration question.").

11

Newman's argument that the Policy leaves the Reduced Pay at 65 Option "wholly undefined" and "unexplained" is meritless.  Indeed, the operation of the Reduced Pay at 65 Option is set forth in the Schedule of Benefits and is not susceptible to more than one meaning—when Newman turned 65, the Schedule of Benefits illustrates that her premium rate would be reduced by half.  That is exactly what happened—in 2012, the Policy Anniversary at age 65, her premiums were reduced by fifty percent from $3,813.67 to $1,904.84.  Compl., Ex. C; Compl., Compl., Ex. D.  And Newman admits that MetLife complied with its obligation to reduce the premium by fifty percent at that time.  *See* Complaint ¶ 19.

### B. Newman's Fraud-Based Claims Fail as a Matter of Law.

Newman's common law and consumer fraud claims fail because (1) Newman's Fraud Claim is a mere breach of contract claim characterized as fraud, which is legally impermissible; (2) MetLife's brochure does not contain a false statement of fact; (3) MetLife did not intend for Newman to rely on the language in its brochure; and (4) MetLife gave Newman notice that her premium rate could go up at any time and without regard to age.

#### 1. Newman's Fraud Claims are Mere Breach of Contract Claims and Must be Dismissed

Newman's fraud claims are nothing more than rehashed breach of contract claims and are, therefore, not actionable as fraud claims under Illinois law.  Under Illinois law, even if the contracting party never intended to perform a contractual promise—which is, in effect, at the root of all of the allegations in the Complaint—the remedy is a breach of contract claim, not a fraud claim.  *Baker, Bourgeois & Associates, Inc. v. Taylor*, 410 N.E.2d 55, 59  (Ill. App. Ct. 1980) ("a promise to perform an act, even though made without a present intention to perform, is insufficient to constitute fraud."); *see also*, *e.g.*, *Perlman v. Zell*, 185 F.3d 850, 853 (7th Cir. 1999) (stating that a "[b]reach of contract is not fraud") (construing Illinois law).  This doctrine

12

also applies to ICFA claims premised on alleged contractual promises. *See, e.g.*, *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 843–44 (Ill. 2005) (dismissing consumer fraud claim impermissibly premised on alleged contract breaches, despite plaintiffs' contention that their claim was more than the breach of a contractual promise).

In support of her fraud claims, Newman simply rests on her new "on and after" argument, arguing that the alleged ambiguity in the Policy fails to unambiguously "correct" alleged misrepresentations in the brochure. Response at 29. Newman argues that MetLife failed to live up to its supposed "promise[] to permanently reduce Newman's premium," citing to an alleged misrepresentation of fact in the Schedule of Benefits. Response at 28. In essence, Newman's fraud claim wholly depends on whether this Court finds that the Policy is ambiguous or that MetLife breached the terms of the Policy. *See* Response at 28–29, 31–32. By acknowledging in this way that her fraud claims are nothing more than her repackaged breach of contract claims, those claims fail under the principle rejecting the "tortification" of contract claims uniformly adopted by Illinois courts. Response at 3, 5–11.

Further, in her Complaint, Newman similarly pleads that the Brochure amended the Policy and, therefore, that the language of the Brochure controls. Compl. ¶ 37. Boiled down, this aspect of Newman's fraud claims is nothing more than the allegation that she did not receive what she contends was the benefit of her bargain. In Illinois, again, that kind of claim sounds only in contract, not tort. *Avery*, 835 N.E.2d at 843–44 (holding that plaintiffs' consumer fraud claim cannot be based on a breach of a promise contained in their insurance policies, highlighting that, in plaintiffs' "brief, before this court, plaintiffs repeatedly point to State Farm's contractual promises to define the consumer fraud."). Plaintiff's fraud claims here are similarly defective and must be dismissed.

13

### 2.    MetLife's Brochure Contains No False Statement.

MetLife's brochure contains no false statement of fact.  The brochure does not promise to permanently fix Newman's post-age 65 premium.  Rather, it says only that Newman's premium rates would be reduced by fifty percent at age 65 and thereafter—it says nothing about MetLife's concurrent right to increase premium on the reduced rate.  The brochure also specifically discloses that it contains only "general information" about the Reduced-Pay at 65 Option, reminding the reader that the Policy will govern the rights and obligations of the parties, and that the Policy prominently explains that MetLife has the right to change the premium rates with approval from the Department of Insurance.  Brochure at 9.  Simply put, nothing in the brochure or the Policy is false.

Newman's reliance on *Siegel v. Levy Organization Development Co.* is unpersuasive. 607 N.E.2d 194 (Ill. 1992); Response at 29.[10]  In *Siegel*, a developer showed a prospective condo buyer a scale model of a condo which depicted a 500-foot, unobstructed terrace and informed the buyers that they could "have a band there and have tables and chairs and people dancing on it." *Id.* at 196.  The developer later showed the buyers a sales brochure and a property report also depicting an unobstructed terrace.  *Id.*  Meanwhile, the prospective buyers had informed the developer that they intended to use the condo to entertain guests with lavish parties and that the terrace made the unit "particularly attractive."  *Id.*  When it was built, the condo's terrace was obstructed by large munnions (or posts) that stretched the length of the terrace.  *Id.*

---

[10]     Newman's Response distorts MetLife's argument to fit the facts of *Siegel*.  MetLife did not argue "that any misrepresentations MetLife made in the [] brochure were subsequently corrected in the MetLife Policy."  *See* Response at 29.  Rather, MetLife simply pointed out that if the brochure is considered at all in light of the disclaimer (and it should not be) it should be considered along with the Policy.  The Policy does not correct a misrepresentation of fact in the brochure (because there was none)—it simply precludes the inference Newman attempts to establish from the brochure, which is a promise to permanently fix her premium and render it immune from rate increases.  This is critical because Newman's reliance on *Siegel* is founded on the notion that MetLife's argument turns on an attempt to "correct" a misrepresentation that does not exist.

14

The buyers alleged breach of contract and fraud causes of action.  *Id.* at 197.  The court held that there was no breach of contract because the architectural drawings attached to the purchase agreement showed the posts.  *Id.* at 199–200.  However, because the scale models and floor plans depicted a terrace without obstructions, and the posts in architectural drawings were not in a form that the average person would understand, the Illinois Supreme Court upheld the reversal of summary judgment, which had been granted in favor of the developer.  *Id.*

*Siegel* is easily distinguished.  Unlike the patently false model and floor plans provided to the buyers in *Siegel*, which purported to show the layout and floor plan but did not show a series of large obstructions running through the middle of the terrace, MetLife's brochure does not purport to explain premium rate increases or the interplay between premium rate increases and the Reduced Pay at 65 Option.  Further, in *Siegel*, the developer promised an unobstructed terrace suitable for "lavish parties," bands, and dancing—the buyer received a terrace divided by posts.  The brochure states only that Newman's premium would be cut in half after age 65—and, since she turned 65, Newman's premium has been and continues to be half of what she would have paid if she had not yet reached age 65.  In other words, unlike the false model and floor plans in *Siegel*, the brochure does not contain a false statement of fact.

### 3.     Newman Has Not and Cannot Sufficiently Allege Intent.

While Plaintiff correctly notes that she may aver intent generally under Rule 9(b) in the fraud context, Rule 9(b) does not allow for intent to be inferred where documents attached to the Complaint conclusively establish the absence of intent as a matter of law.  The brochure, which is attached to the Complaint, disproves Plaintiff's conclusory allegation that "MetLife intended to induce a false belief in Plaintiff that Plaintiff's premiums would be permanently cut in half once Plaintiff turned 65 years old."  Compl. at ¶ 74.  The brochure states that its purpose was only "to provide a general overview, and highlight some of the provisions and optional benefits

15

of MetLife's Individual Long-Term Care insurance policies" and, more importantly, that "[a]ll rights and obligations [would] be governed by the actual policy language, if and when issued." Compl., Ex. A at 9. The brochure, therefore, demonstrates the absence of fraudulent intent—MetLife *did not* intend for Plaintiff to rely on the brochure to explain the rights afforded under the Policy. Rather, MetLife instructed Plaintiff to refer to the Policy, if and when it was issued. *Id.*

Similarly, with respect to her ICFA claims, Newman correctly notes that she need only allege MetLife's intent for Newman to rely on the brochure, but need not allege an intent to deceive. Response at 21; *Cuculich v. Thomson Consumer Elecs., Inc.*, 739 N.E.2d 934, 939 (Ill. App. Ct. 2000). However, Newman's allegations of intent for purposes of this claim are, again, disposed of by the brochure itself. As discussed, the brochure specifically discloses that it contains only "general information" and reminds the reader that the Policy will govern the rights and obligations of the parties. Brochure at 9. MetLife thus did not intend for Newman to rely on the brochure for issues related to premium rate increases; instead it expressly directed Newman to the Policy.

Newman argues that the disclaimer should not operate to dispose of any alleged intent because Newman did not receive the Policy until after she reviewed the brochure. This assertion ignores the fact that Newman had 30 days to review the Policy—and could return it for a full refund of the initial premium—under the "free look" provision. *See* Policy at 1. To be sure, Newman also had to wait to review the Policy to receive all of the rights and obligations related to all other aspects of the Policy not covered in detail by the brochure. That is why the brochure informs applicants that the brochure contains only general information—to remind applicants that the Policy controls and will contain detailed information regarding the rights and obligations

16

under the Policy. Having had 30 days to review its terms—and to unconditionally return the Policy, if desired—it is absurd for her to argue, as she has, that the disclaimer in the brochure was ineffective.

### 4. The Policy Alerted Newman to MetLife's Right to Raise Premium Rates.

When analyzing a deceptive practices claim under the ICFA, "the allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff." *Davis*, 396 F.3d at 884. In her Response, Newman does not challenge MetLife's argument that a defendant's conduct will not be found to be deceptive if the plaintiff was explicitly advised of the complained of result;[11] nor does Newman make any attempt to distinguish the case law cited and discussed in MetLife's moving papers. *See id.*; *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 608–09 (7th Cir. 2013); *Toulon v. Cont'l Cas. Co.*, No. 15 CV 138, 2015 WL 4932255, at *5 (N.D. Ill. Aug. 18, 2015) (*Toulon I*) ("An act will not be said to be deceptive when the plaintiff is explicitly alerted to the complained of result."). Rather, Newman argues that she was not sufficiently alerted to MetLife's right to raise premium because (1) the Policy is ambiguous;[12] and (2) Newman received and relied on the brochure before she received the Policy. Both arguments lack merit.

As previously discussed, in arguing that the Policy is ambiguous based on her focus on three words read in isolation from the rest of the Policy, Newman simply ignores that the Policy

---

[11] Any objections to MetLife's arguments on this point are deemed to be waived by Newman's failure to respond. *Palmer v. Marion Cty.*, 327 F.3d 588, 597–98 (7th Cir. 2003) (holding that claims not addressed in brief opposing dispositive motion are waived); *Quinlan v. Elysian Hotel Co.*, 916 F. Supp. 2d 843, 854 (N.D. Ill. 2013) (plaintiff's "failure to develop her claim with argument and citations to the record constitutes a waiver of the claim."); *Santiago v. RadioShack Corp.*, 2012 U.S. Dist. LEXIS 46389 at *7 (N.D. Ill. Feb. 10, 2012) ("The issue was not addressed by the plaintiffs in their response, and they have waived any objection.").

[12] This contention is, of course, wrong. *See* Section II.A.2.b., above.

17

repeatedly alerted Newman to MetLife's right to increase premium rates. Read as a whole, the Policy's clear terms afford MetLife the right to increase premiums on Newman's class with approval from the Illinois Department of Insurance, and this right is without regard to age or other limitations. Moreover, Newman was reminded of this right four times in the Policy, the first of which was prominently placed on the first page.

Similarly, provisions addressing premium rate increases apply to all rates. The premium payment provision requires that insureds pay premiums according to the Premium Schedule that is in effect for the policy, further alerting Newman that the premiums reported under the Schedule of Benefits are subject to change. Policy at 14. Further, the Policy is a fully-integrated contract with an integration clause. Policy at 18. The integration clause provides an example stating that benefit limitations should apply to all benefits. *Id.*

Newman's purported receipt of and alleged reliance on the brochure prior to her receipt of the Policy is another red herring. Again, the brochure advised her to review the terms of the Policy because it provided only a general overview and the Policy would govern the rights and obligations of the parties. Brochure at 9. If she was dissatisfied with the absence of language requiring MetLife to permanently fix her premium rate at age 65, she had the right to void the Policy *ab initio* and to receive a full return of premiums. Policy at 1. She never did so and should now be held to the terms of the contract she entered and had a full 30 days to review. As explained in Footnote 3, above, insureds have an affirmative duty to review the terms of an insurance policy and are deemed to know the information the policy contains regardless of whether they actually read it. Newman's ICFA claims must be dismissed. *See Cohen*, 735 F.3d at 608–09 (7th Cir. 2013) (holding that plaintiff failed to demonstrate that defendant's conduct was deceptive within the meaning of the ICFA, where defendant's "agreement[,] . . . disclosures,

notices and correspondence conclusively defeat any claim of fraud, false promise, concealment, or misrepresentation.").

### C. MetLife's Brochure is Not Deceptive Under the ICFA.

Most fundamentally, the brochure cannot be deceptive under the ICFA because the statements contained in the brochure are true. Newman argues that the brochure is deceptive because it has the "capacity to deceive consumers into thinking their premiums would be permanently reduced once they turned 65 years old if they purchased the 'Reduced Pay at 65 Option.'" Response at 16. Newman argues the language called for a permanent reduction in premium, and suggests that "no senior would have paid extra premiums in exchange for anything less than a permanent reduction in premiums." *Id.* But Newman fails to acknowledge that her premiums <u>were</u> permanently reduced once she turned 65 years old, meaning she will forever pay just fifty percent of the rate she would be required to pay if her rate had not been reduced by half at age 65. *See* Exs. C, D.[13] The Reduced Pay at 65 Option benefits consumers in precisely the way Newman argues consumers expected it to operate—by permanently reducing premium. The brochure is true—not deceptive—and Newman fails to plausibly plead or argue otherwise.

### D. MetLife's Brochure Cannot Form the Basis of an "Unfair Acts or Practices" Claim Under the ICFA.

An unfair acts or practices claim requires this Court to consider the so-called *Robinson* factors: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers." *Old*

---

[13]     In 2004, Newman's premium was $3,231.93. Compl., Ex. A. Prior to age 65, Newman experienced a rate increase that increased her premium from $3,231.93 to $3,813.67. Compl., Ex. C. In 2012, the Policy Anniversary at age 65, her premiums were reduced by fifty percent to $1,904.84, as provided under the Reduced Pay at 65 Option. When she experienced the 102% rate increase in 2014, that increase was applied to the reduced premium. Thus, in 2014, she owed $3,851.80—not $7,703.60. Compl., Ex. D. And future rate increases will continue to be applied to the reduced rate, meaning Newman will continue to enjoy vastly reduced rates as compared to the rates she would have paid if she had not chosen the Reduced Pay at 65 Option.

86579349.1

*Town Pizza of Lombard, Inc. v. Corfu-Tasty Gyros, Inc.*, No. 11-CV-6959, 2012 WL 638765, at *4 (N.D. Ill. Feb. 23, 2012) (citing *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 959–61 (Ill. 2002)). "A practice may be unfair because of the degree to which it meets one of these three criteria or because to a lesser extent it meets all three." *Robinson*, 775 N.E.2d at 961. In this case, all three factors weigh decisively in favor of MetLife.

### 1.    Newman has not alleged a practice that offends public policy.

Newman fails to dispute MetLife's argument that her general reference to "Illinois common law doctrines governing insurance policies and breach of contract" is an insufficient basis for her allegation that MetLife violated the public policy prong of the *Robinson* test. *See* Complaint at ¶ 55; Def.'s Mem. at 23–24. Newman also fails to address MetLife's argument that any misrepresentation in the brochure could not have been a material misrepresentation because the brochure stated that only the Policy governed the rights and obligations of the parties, and the Policy states in four places that MetLife could raise Newman's premium rate without regard to age. *Id.* Newman knew or should have known she could not rely on the specific wording of the brochure as though it were part of her Policy. By failing to respond to MetLife's arguments on this point, Newman has waived any ability to challenge these defenses. *Palmer*, 327 F.3d. at 597–98 (holding that claims not addressed in brief opposing dispositive motion are waived); *Quinlan.*, 916 F. Supp. 2d at 854 (A plaintiff's "failure to develop her claim with argument and citations to the record constitutes a waiver of the claim."); *Santiago*, 2012 U.S. Dist. LEXIS 46389 at *7 (N.D. Ill. Feb. 10, 2012) ("The issue was not addressed by the plaintiffs in their response, and they have waived any objection.").

Newman asks the Court to adopt the holding of a non-binding Illinois Appellate Court decision on an issue that the Illinois Supreme Court has not addressed, which Newman claims supports her misconceived notion that an alleged violation of ILL. ADMIN. CODE tit. 50, §

20

86579349.1

2012.122(b)(4) somehow offends Illinois public policy. *See Gainer Bank, N.A. v. Jenkins*, 672 N.E.2d 317 (Ill. App. Ct. 1996). The Court should decline Newman's invitation to do so. Newman relies on *Gainer Bank, N.A. v. Jenkins*, which holds, in part, that a plaintiff bringing an unfairness claim under the ICFA may invoke another statute that does not provide a private right of action to prove violations of the ICFA. *Id.* However, the statute relied on in *Gainer Bank*, the Illinois Motor Vehicle Retail Installment Sales Act, 810 815 ILCS 375/1 *et seq.* (the "MVRISA"), is a consumer protection statute that is wholly distinguishable from ILL. ADMIN. CODE tit. 50, § 2012.122(b)(4). Specifically, the MVRISA is designed "to protect the unsophisticated motor vehicle consumer from the oppressive and unscrupulous practices of the installment seller." *Id.* at 318. Where an installment seller fails to comply with the provisions of the MVRISA, the statute provides *consumers* with direct remedies. *Id.* ("Where the holder fails to comply with the requirements of section 20, the buyer of the car is not liable for any finance, delinquency, collection, or refinancing charges connected with the contract.").

Here, to the contrary, ILL. ADMIN. CODE tit. 50, § 2012.122(b)(4) is a regulation that provides the *Department of Insurance*, not consumers, with remedies—the authority to impose fines on insurance companies that fail to comply with its provisions. *See* ILL. ADMIN. CODE tit. 50, § 2012.150 (2014). Unlike the MVRISA, the Legislature never intended for consumers to invoke Section 2012.122(b)(4), either directly or indirectly; nor did it intend for it to be used as a basis for plaintiffs to raise public policy violations. Rather, Section 2012.122(b)(4) is one provision of a well-established regulatory scheme related to advertising in the business of long-term care insurance. *See* ILL. ADMIN. CODE tit. 50, § 2002.180 (2014) (imposing obligations on long-term care insurers to maintain a file, subject to regular and periodic inspection by the Department of Insurance, containing every printed, published or prepared advertisement and the

21

extent of its distribution). If consumers have a complaint regarding the advertising practices of an insurer, or regarding the content of a particular advertisement, they may file a complaint with the Department of Insurance, and the Department of Insurance can determine whether action against the insurer is warranted. *See* Ill. Admin. Code tit. 50, § 926.10 *et seq.* (establishing procedures for the Department of Insurance's handling of consumer complaints). Even assuming that the Brochure violates Section 2002.180, which it does not, for reasons discussed at length in Section II.A, above, such violation would not rise to the level of offending public policy when the regulatory scheme at issue is designed to manage insurers' advertising through a system of regular inspections and record keeping.

Further, Newman's reliance on *Jackson v. Payday Financial, LLC* ,79 F. Supp. 3d 779 (N.D. Ill. 2015), is misplaced. Newman relies on *Payday Financial* for the proposition that "a practice need not violate another statute, much less a statute providing a private right of action" to constitute an unfair practice under the ICFA. *See* Response at 24.[14] Importantly, the court's holding in *Payday Financial* had nothing to do with whether a violation of public policy may be predicated on an alleged violation of a statute (or, in this case, a regulation). Rather, the court in *Payday Financial* allowed the plaintiffs' ICFA claim to proceed because it found the defendants' conduct—charging an interest rate over 100 percent—to be unscrupulous and oppressive based on the fact that the same conduct was prohibited by several Illinois consumer protection statutes, which did grant consumers a private right of action. *See id*. at 788 ("In light of Illinois' enactment of several consumer protection statutes limiting the permissible interest charged to

---

[14]     To be clear, although Newman need not necessarily point to a violation of a statute to demonstrate a violation of public policy, it is Newman who has hinged her unfairness claim on Section 2002.180. As discussed earlier in this Section, Newman failed to address MetLife's arguments in opposition to Newman's other public policy allegations in her Response and has waived any objections to those arguments. *See Darif v. Holder*, 739 F.3d 329, 336–37 (7th Cir.2014) ("[A]rguments raised for the first time in a reply brief are waived.").

Illinois residents, the Court finds that the alleged assessment of interest over 100% is unscrupulous and oppressive and sufficiently constitutes an unfair practice."). *Payday Financial* does not support Newman's public policy argument.

Further, Newman does not allege that MetLife has violated multiple consumer protection statutes; and Newman's disagreement with MetLife regarding the meaning of the brochure simply does not rise to the level of offending public policy. Indeed, even if, *arguendo*, the Court were to find that a violation of Section 2012.122(b)(4) would offend public policy and that Newman could rely on it in support of her ICFA unfairness claim, the *Robinson* factors are to be weighed in comparison to each other and, because Newman has failed to adequately allege the other factors, the balance tips heavily in MetLife's favor. *See Old Town Pizza*, 11-CV-6959, 2012 WL 638765, at *6 (N.D. Ill. Feb. 23, 2012) (dismissing ICFA unfairness claim despite finding a clear violation of public policy, holding that "[w]hile the public policy factor weighs in favor of Plaintiff's claim, the oppressiveness and substantial injury factors enumerated in *Robinson* weigh heavily in favor of Defendant's argument for dismissal.").

### 2. Newman has not alleged a practice that is immoral, unethical, oppressive or unscrupulous.

Newman failed to address MetLife's argument that this Court has already considered and rejected the very same allegations raised in Newman's Complaint regarding the immoral, unethical, oppressive or unscrupulous *Robinson* factor. *Toulon v. Continental Cas. Co.*, No. 15 CV 138, 2016 WL 561909 at *7 (N.D. Ill. Feb. 12, 2016) ("*Toulon II*"). Newman has pleaded that:

> MetLife's misrepresentations regarding the benefits provided by the 'Reduced Pay at 65 Option' were 'immoral, unethical, oppressive, or unscrupulous' because it forced Plaintiff to do one of the following: (1) pay a premium more than two times greater than the premium Plaintiff originally agreed to pay; (2) reduce the coverage for which she had previously contracted; or (3) cancel her coverage altogether.

> Plaintiff suffered a substantial injury because she was forced to pay a premium
> more than two times greater than the premium Plaintiff initially agreed to pay.

Complaint at ¶¶ 56–58.  In *Toulon II*, plaintiff alleged that Continental's decision to raise

premiums on a class-wide basis "imposed the unreasonable burden of having to choose between

three options:  (1) pay a substantially higher premium; (2) accept diminished benefits; or (3) lose

her coverage.  She adds that these choices constitute her injury, as well, although she cites to no

allegation under this count." *Toulon II*, at *7.  This Court rejected the very same arguments in

*Toulon* that Newman raises now when it dismissed the plaintiff's ICFA claim.  *Id*.  Rather than

respond to MetLife's argument, and address a case with which Newman's counsel is familiar and

is directly on point, Newman points to a case that is inapposite, *Demitro v. GMAC*, 902 N.E.2d

1163 (Ill. App. Ct. 2009).

     *Demitro* involves an automobile financing company that wrongfully repossessed the

plaintiff's vehicle and, in violation of the terms of an extension letter, retained possession until

the plaintiff paid the entire balance.  902 N.E.2d at 1169.  The court held that "GMAC's conduct

rose to the level of consumer fraud where after plaintiff's vehicle was wrongly repossessed—

GMAC prevented plaintiff from paying the $2,202.54 to bring his account current as set forth

under the terms of the seven-day extension letter and instead retained possession of the vehicle

until after he paid off the entire outstanding balance of $39,695.04." *Id*.  *Demitro* involved a

situation where a lender wrongfully repossessed plaintiff's vehicle and, rather than correcting its

error, wrongfully accelerated the loan in violation of an extension letter.  MetLife did not

wrongfully raise premium rates—it exercised its contractual right to raise premium rates on a

class-wide basis as permitted by the Policy.  When MetLife sent Newman a letter notifying her

of the rate increase and offering her alternatives to mitigate the effects of that rate increase, *see*

Compl. ¶¶ 56–58, that offer was not in violation of the Policy (directly contrary to *Demitro*,

24

where GMAC accelerated the loan in violation of an extension letter). Newman's reliance on *Demitro* is therefore unavailing.

Newman cannot otherwise argue that MetLife's conduct was immoral, unethical, oppressive, or unscrupulous because (1) MetLife was contractually entitled under the Policy to raise premiums on a class-wide basis, (2) MetLife alerted Newman to this fact repeatedly throughout the fully integrated Policy, and (3) Newman was afforded a 30-day "free look" period within which she could have rejected the Policy and taken her business elsewhere. *See Robinson*, 775 N.E. 2d at 961–62 (rejecting plaintiff's claim of unfairness under ICFA, where "there was a total absence of the type of oppressiveness and lack of meaningful choice necessary to establish unfairness [because] plaintiffs could have gone elsewhere to lease a car."); *Toulon II*, at *7 ("there is nothing oppressive or unscrupulous about giving a counterparty the choice to fulfill his contractual duties or be declared in default for failing to do so.").

### 3. Newman has not alleged a practice that is immoral, unethical, oppressive or unscrupulous.

Newman again fails to rebut MetLife's arguments that she was not injured by the premium rate increase or, in the alternative, that she could have avoided her injury. *See* Def.'s Mem. at 25–26. Instead, Newman reiterates that the Policy is ambiguous and that MetLife breached the terms of the Policy by raising rates on Newman's Policy after she turned 65 years old. Of course, as discussed above, these allegations do not appear in the Complaint. As discussed in more detail in MetLife's moving papers, Newman has failed to demonstrate she has suffered an injury, let alone a substantial injury, because, among other reasons, MetLife was entitled to raise rates under the Policy and Newman, in fact, received the benefit of her bargain— she is currently and will continue to pay half the premium she would otherwise pay. *See Toulon II*, at *7 (finding that the plaintiff was not injured by her insurer's decision to raise premiums as

25

it was contractually entitled to do); *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (holding that plaintiff could not establish that he suffered substantial injury because he could have avoided the injury by taking his business elsewhere).

>    **E.**    **Newman's Fraudulent Concealment Claim Fails as a Matter of Law.**

>       **1.**    **Newman Has Not Alleged a Duty to Disclose.**

Newman has not pleaded that MetLife owes Newman a duty and, therefore, Newman's fraudulent concealment claim must be dismissed. In her Response, Newman fails to point to a single allegation in the Complaint where any such duty is alleged. Despite having failed to allege a duty in her Complaint, which is claim-dispositive in and of itself, Newman contends for the very first time that MetLife owes Newman a duty because the brochure constitutes a "half-truth" regarding the possibility of a post-age 65 premium rate increase that MetLife inappropriately presented to Newman as the full truth. *See* Response at 31–32.

Under Illinois law, a duty may arise in one of three ways: (1) as a matter of law; (2) from a relationship in which the defendant is placed in a position of influence and superiority over [the] plaintiff by reason of friendship, agency, or experience; or (3) when a defendant presents half-truths as the full truth. *Toulon I*, at *3.[15] Even if Newman had pleaded a "half-truth", Newman's attempt to establish a duty supported by a half-truth falls flat.[16] In *Crichton v.*

---

[15]    In her Response, Newman does not (and cannot) dispute MetLife's argument that it does not owe a duty as a matter of law or by way of a position of influence and superiority. Because Newman failed to address these arguments in her Response, any challenge to these arguments is deemed to be waived. *Palmer*, 327 F.3d at 597–98; *Quinlan*, 916 F. Supp. 2d at 854; *Santiago*, 2012 U.S. Dist. LEXIS 46389 at *7.

[16]    Several courts have rejected attempts to establish a half-truth in the rate increase context. *See, e.g.*, *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009) (rejecting argument that an insurer's rate increase letters contained "half-truths" because they failed to disclose that the insurer had ceased selling policies to new enrollees); *Alvarez v. Ins. Co. of N. Am.*, 313 F. App'x 465, 468 (2008) (rejecting argument that representations that the policy was "guaranteed renewable" and that premiums may change were half-truths, reasoning that the representations were not misleading and that the insurer "did not have any duty to disclose the possibility of future premium increases or the underlying actuarial

*Golden Rule Insurance Co.*, the court reasoned that a statement is not a "half-truth" when the defendant did not, through the alleged "half-truth," purport to explain the "whole truth" now sought by the plaintiff. 576 F.3d 392, 398 (7th Cir. 2009). The Seventh Circuit held that statements in rate increase letters were not half-truths because the letters "[did] not remotely suggest that any of [the insurer's communications] purported to be an explanation of all of the underwriting factors that might affect [Plaintiff's] insurance premiums." *Crichton,* 576 F.3d at 398. In *Toulon*, the plaintiff argued that the insurer's statement, "'The Company has a right to increase premiums in the future'" was a half-truth because, among other things, it failed to disclose that it would increase future premium rates far in excess of 20%." Toulon 2d Am. Compl. ¶¶ 120–122 (attached as Exhibit A). The court rejected the plaintiff's argument, reasoning that "[t]he statements cannot be read to be a comprehensive, whole-truth representation of how Continental prices its premiums." *Toulon II*, No. 15 CV 138, 2016 WL 561909, at *4.

Remarkably, Newman's Response does not address the law cited by MetLife on the issue of half-truths, instead restating arguments related to the ambiguity of the Policy and issues unrelated to duty, let alone half-truth. The statements in the brochure do not purport to provide the whole truth about the interplay between premium rate increases and the Reduced Pay Option—in fact, the brochure does not address rate increases at all. Instead, the brochure specifically discloses that it contains only a general overview and reminds the reader that the Policy will govern the rights and obligations of the parties. Brochure at 9. Having alleged no duty, Newman's fraudulent concealment claim must be dismissed. *See Crichton*, 576 F.3d at

assumptions for that possibility"); *see also Toulon II*, No. 15 CV 138, 2016 WL 561909, at *4 (rejecting plaintiff's argument that the Policy and other statements contained half-truths because it omitted that premium increases were likely to be substantial).

86579349.1

398 (dismissing a fraudulent omission claim where, as here, the allegations "[did] not remotely suggest that any of [the insurer's communications] purported to be an explanation of all of the…factors that might affect [the insured's] insurance premiums.").

**2.      Newman Had Notice that MetLife Could Raise Rates After Age 65.**

Finally, Newman argues that she could not have discovered the truth through reasonable inquiry by reviewing the Policy because the Policy was ambiguous, particularly with respect to the meaning of the term "class."  Response at 33.  The Policy states:

> We cannot change any of the terms of this policy without Your consent, <u>except that We may change the premium rates</u>, subject to applicable state Insurance Department approval.  Any such change in premium rates will apply to all policies in <u>the same class as Yours</u> in the state where this policy was issued.

Policy at 1 (emphasis added).  Newman's class, no matter how that term is defined, was subject to rate increases.  There is no allegation that Newman was treated any differently from other members of her class. And, as demonstrated above, MetLife's right to change the premium rates was unambiguous and disclosed prominently on the first page of the Policy and in three other places.  *See* Section A.2.b., above.  Newman was on notice and could (and should) have understood the parties' rights and obligations under the Policy.

**III.      <u>CONCLUSION</u>**

For the reasons set forth in MetLife's Motion to Dismiss and this Reply, the Court should enter an Order dismissing the action with prejudice and without leave to amend.

[Signature of filing attorney located on following page.]

28

Dated:  September 21, 2016

        */s/ Daniel J. Delaney*
        One of its Attorneys

        Daniel J. Delaney
        Drinker Biddle & Reath LLP
        191 North Wacker Drive, Suite 3700
        Chicago, IL  60606-1698
        (312) 569-1175
        Daniel.Delaney@dbr.com

        Michael D. Rafalko (admitted *pro hac vice*)
        Stephen A. Serfass (admitted *pro hac vice*)
        One Logan Square, Ste. 2000
        Philadelphia, PA  19103-6996
        Phone:  (215) 988-2700
        Email:  Michael.Rafalko@dbr.com
        E-mail:  Stephen.Serfass@dbr.com

        Sheldon Eisenberg (admitted *pro hac vice*)
        Drinker Biddle & Reath LLP
        1800 Century Park East, Ste. 1500
        Los Angeles, CA  90067
        (310) 203-4035
        Sheldon.Eisenberg@dbr.com

        *Attorneys for Defendant The Metropolitan Life*
        *Insurance Company*

86579349.1

<u>**CERTIFICATE OF SERVICE**</u>

I, Daniel J. Delaney, hereby certify that on September 21, 2016, I provided service to the

person or persons listed below by filing the same with the Court's ECF system:

**Robert R. Duncan**
Duncan Law Group, LLC
161 N. Clark, Suite 2550
Chicago, IL  60601
(312) 202-3283
Email:  rrd@duncanlawgroup.com
*Lead Attorney for Plaintiff*

**Thomas Cusack Cronin**
Cronin & Co., Ltd.
161 N. Clark Street
Suite 2550
Chicago, IL  60606
(312) 201-7100
Email:  tcc@cronincoltd.com
*Attorney for Plaintiff*

**Frank H Tomlinson**
Tomlinson Law, LLC
2100 First Avenue North, Suite 600
Birmingham, AL  35203
(205) 326-6626
Email:  Hilton@tomlawllc.com
*Attorney for Plaintiff*

/s/ *Daniel J. Delaney*