UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARGERY NEWMAN, AND ALL OTHERS SIMILARLY SITUATED, | ) ) ) | No. 16 C 3530 |
| PLAINTIFFS, | ) ) | |
| v. | ) ) | Judge Thomas M. Durkin |
| METROPOLITAN LIFE INSURANCE COMPANY, | ) ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OPINION & ORDER

This case arises from a long–term care insurance policy that Plaintiff Margery Newman purchased from Defendant Metropolitan Life Insurance Company. In connection with the policy, Plaintiff purchased a premium–payment option titled the "Reduced–Pay at 65 Option." As set forth more fully below, the option didn't function as Ms. Newman anticipated it would. She therefore sues on behalf of herself and others similarly situated for breach of contract, common law fraud and fraudulent concealment, and unfair and deceptive practices under the Illinois Consumer Fraud Act. This Court has jurisdiction under 28 U.S.C. § 1332 as modified by the Class Action Fairness Act. Defendant moves to dismiss the complaint. For the reasons set forth below, Defendant's motion is granted and the case is dismissed without prejudice.

## Standard

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the–defendant–unlawfully–harmed–me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well–pleaded facts as true and draws all reasonable inferences in favor of the non–moving party. *Mann*, 707 F.3d at 877.

## Background

At the age of 56, Plaintiff applied for and purchased MET LIFE Long–Term Care Policy 04856–20065. R. 22 ¶ 15. She did so after reading a 12–page marketing

brochure that covers a variety of topics, including likely expenses for common health conditions in people of advanced age, an explanation of what Medicare covers and does not cover, an array of plan benefits, benefit payment options, and optional plan features. R. 22–1 pp. 1–12. It says nothing of policy classes or the possibility of class–wide premium adjustments.

A page titled "Premium Payment Options" lists "[four] premium payment options which help you pay off your policy sooner and/or ease financial obligations down the road, when you might be on a fixed income." *Id.* at 9. One option offered is the "Reduced Pay at 65 Option," which allows an insured to "pay[ ] more than the regular premium amount you would pay each year up to the Policy Anniversary on or after your 65th birthday, [in order to] pay half the amount of your pre–age 65 premiums thereafter." *Id.* ¶ 17. In a note at the bottom of the "Premium Payment Options" page, it reads: "This brochure is intended to provide a general overview, and highlight some of the provisions and optional benefits of MetLife's Individual Long–Term Care insurance policies. All rights and obligations will be governed by the actual policy language, if and when issued." R. 22–1 at 9.

Plaintiff opted to purchase a long–term care policy, including the Reduced Pay at 65 Option, based on the information contained in the brochure. *Id.* ¶ 16. She received the actual policy shortly thereafter. With respect to the Reduced Pay at 65 Option, the policy says only that "on and after Policy Anniversary at age 65," premiums will be reduced by half. *Id.* at 15. Plaintiff alleges that the statement in the brochure and seemingly consistent language in the policy caused her to

reasonably expect that her premiums would be locked–in at a particular amount on the policy anniversary after she turned 65. R. 36 at 1.

Also in the policy, however, in the very first clause on the very first page, there is a bold, all–caps header: "**PREMIUM RATES ARE SUBJECT TO CHANGE**." R. 22–1 at 13. The header is followed by a plainly–written provision that reads, in relevant part, "[Defendant] may change the premium rates subject to applicable state Insurance Department approval. Any such change in premium rates will apply to all policies in the same class as yours where the policy was issued." *Id.* A similarly–worded provision appears on page 14 of the policy in a section titled "Premiums," indicating that Defendant "reserve[s] the right to change premium rates on a class basis," *id.* at 30, a phrase which appears again, verbatim, in bold text in the 5% Automatic Compound Inflation Protection Rider ("Inflation Protection Rider"), an optional feature Plaintiff elected to purchase, *id.* at 37. Another rider, the "Contingent Benefits Upon Lapse Rider" ("Lapse Rider"), sets forth the parties' rights and obligations in the event of a "substantial premium increase" during the life of the policy. *Id.*

At the conclusion of the policy, in a list titled "General Provisions," a clause titled, "The Contract," reads: "This policy, with any Riders, endorsements and written application attached, make up the entire contract." *Id.* at 34. Bolded on the first page of the policy is the following advisory clause:

> **30–Day Right to Examine Policy. Please read this policy carefully. It is a legal contract between You and MetLife. If You are not satisfied for any reason, You may return this policy to Us or to the sales representative from whom You bought it within thirty (30) days from**

**the date You receive it. If you return it within the thirty (30) day period, this policy will be void . . .**

*Id.* at 13. Plaintiff did not exercise her right to void the policy. It became effective on September 1, 2004. R. 22 ¶ 15.

For eight years, Plaintiff paid larger than regular premiums in anticipation of a 50% reduction in her premium at age 65. R. 22 ¶ 21. In September 2012, the policy anniversary after Plaintiff's 65th birthday, her premium was increased by 18% as part of a class–wide premium adjustment. R. 22–1 at 57. However, because the adjustment became effective once Plaintiff was already 65 years old, she paid only half of the adjusted amount, and did so without objection. *Id.* ¶ 23. Two years later, premiums were adjusted on a class basis again. *Id.* ¶ 24. This time, however, they more than doubled. *Id.* The result was that in 2015, when Plaintiff was 67 years old, her semi–annual premiums were higher than they were when she purchased the policy at age 56. *Id.* ¶¶ 24–25.

According to Plaintiff, this class–wide premium adjustment breached the "Reduced Pay at 65 Option," which she understood entitled her to premiums "permanently fixed at 50% of her pre–age 65 premium." *Id.* ¶ 26. In addition, or perhaps in the alternative, she claims that the marketing materials for the "Reduced Pay at 65 Option" were fraudulent, deceptive and unfair, and that they concealed that "MetLife would be unable fulfill its promise to lock–in Plaintiff's premium" after her 65th birthday. *Id.* ¶ 73. Defendant moves to dismiss Plaintiff's class suit arguing that under the plain and conspicuous language of the fully–integrated contract, Defendant was entitled to levy the class–wide premium

increase and thus did not breach the contract by doing so. The Court addresses the parties' arguments below.

## Discussion

### I. Breach of Contract

The rules of contract interpretation apply when considering the terms of an insurance policy. *See United Nat'l Ins. Co. v. Fasteel, Inc.*, 550 F. Supp. 2d 814, 821 (N.D. Ill. 2008) (citing *Nat'l Fid. Life Ins. Co. v. Karaganis*, 811 F.2d 357, 361–63 (7th Cir. 1987). "Under Illinois law, an insurance policy that contains no ambiguity is to be construed according to the plain and ordinary meaning of its terms, just as would any other contract." *Id.* (citing *Karaganis*, 811 F.2d at 361). "Contracts are to be interpreted as a whole, giving meaning and effect to each provision." *Id.* (internal quotation marks and citation omitted). To plead a cause of action for breach of contract, a plaintiff must allege (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff. *Gonzalzes v. Am. Exp. Credit Corp.*, 733 N.E.2d 345, 351 (Ill. App. Ct. 2000) (citation omitted). A defendant's failure to comply with a duty imposed by the contract gives rise to the breach. *Id.* (citation omitted). Only the third element of the claim—the defendant's alleged breach—is at issue here. In pleading her claim for breach, Plaintiff alleges simply that "MetLife breached its contract with Plaintiff by increasing Plaintiff's annual premiums 102% (to an amount greater than Plaintiff's pre–age 65 annual premiums) in March 2015, when Plaintiff was 67 years old." R. 22 ¶ 39.

The only contractual language regarding the Reduced Pay at 65 Option appears in the Schedule of Benefits. It reads as follows:

> **[Y]ou have selected the following flexible premium payment option**: **Reduced Pay at 65 Semi–Annual Premium Amount\***:
>
> Before Policy Anniversary at age 65:                    $3231.93
>
> On and after Policy Anniversary at age 65:            $1615.97
>
> \*If you pay premiums more frequently than annually, an additional cost has been included.

R. 22–1 at 15 (amounts drawn from the original Schedule of Benefits). Plaintiff argues that the unqualified use of the phrase "[o]n and after" prohibited Defendant from raising the premium on her policy following the Policy Anniversary after she turned 65, and required Defendant to permanently fix her obligation at half of the amount of her pre–age 65 obligation. R. 36 at 12. The Court agrees that considered in a vacuum, the language in this provision could plausibly be read to require a permanent premium reduction to a fixed amount. But contract terms are not to be interpreted in isolation. *See Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011) ("A contract must be construed as a whole, viewing each provision in light of the other provisions.") *Id.* Considered in the context of the entire policy, which the Court examines below, the implication Plaintiff asks the Court to draw from the "on and after" clause is unreasonable.

On the policy's cover page, even before the Schedule of Benefits listing Plaintiff's payment obligations, it reads:

> "**PREMIUM RATES ARE SUBJECT TO CHANGE** . . . [Defendant] may change the premium rates subject to applicable state Insurance

Department approval. Any such change in premium rates will apply to all policies in the same class as yours where the policy was issued."

R. 22–1 at 13. Then, on page 14 of the policy, under the header "Premiums," it states, "We reserve the right to change premium rates on a class basis." Defendant argues, and the Court agrees, that these generally written provisions apply on their face to the entire policy, including the Schedule of Benefits.[1] R. 31 at 19; R. 44 at 10. Plaintiff counters that these provisions cannot apply to the Reduced Pay at 65 Option because they are "located nowhere near [it]." *id.* at 14. The Court is unpersuaded by this argument for two reasons: (1) Plaintiff cites no authority for the novel proposition that a contract provision that is generally applicable on its face applies only to terms and conditions in its immediate proximity, *see, e.g., Beverly v. Abbott Labs.*, 817 F.3d 328, 334 (7th Cir. 2016) (failure "to cite a single case" in support of legal contention "amounts to forfeiture"); and (2) neither the general warnings about class–wide premium hikes nor any language in the Schedule of Benefits indicates that the Reduced Pay at 65 Option is somehow carved out or not subject to the generally applicable terms and conditions of the policy.

A third warning about possible premium rate increases appears in the Inflation Protection Rider, which Plaintiff purchased in connection with the policy.

---

[1]     Indeed, the Schedule of Benefits is subject to replacement for precisely this reason. Each schedule issued to Plaintiff sets forth "Current Coverage" and "replaces any previous schedule of benefits." *See* R. 22–1 at 15. The Schedule of Benefits is not static, like the rest of the agreement. It is subject to annual adjustment on the basis of Plaintiff's benefits elections and Defendant's approved rate adjustments.

The rider provides for automatic annual benefit increases in order to keep pace with inflation. For the purposes of this motion, it reads in relevant part:

> **Your premium is not expected to increase as a result of the benefit amount increases provided by this Rider. However, we reserve the right to adjust premiums on a class basis.**

R. 22–1 at 37 (emphasis in original). Plaintiff contends that she could not possibly have understood this warning to apply to the possibility of rate increases on her policy, because (1) it "falsely implied that there was a correlation between purchasing this Rider and limiting the likelihood of future rate increases," and (2) "is wholly in line with Newman's belief that an insured could limit or eliminate exposure to future rate increases by Purchasing Riders or premium payment options." R. 36 at 12. The Court does not agree with Plaintiff's argument. The warning states that Plaintiff should not expect her premiums to increase because of the automatically compounding benefits provided by the rider (though they could), but it specifically warns that her premiums may nevertheless increase because the policy as a whole is subject to class–wide rate adjustments. The warning does not read, "We reserve the right to adjust premiums on a class basis *unless you purchased The Reduced Pay at 65 Option.*" Nor, for that matter, does it provide that after the age of 65, Plaintiff is guaranteed not to see her premium increase as a result of benefits increasing (although they are not "expected" to). Nothing about the language in the Inflation Protection Rider should have assured Plaintiff that she had eliminated her exposure to future rate increases. Quite to the contrary, it plainly warned, without any time limitation, that premium increases—for multiple reasons—were possible.

In a fourth location, the Lapse Rider, the policy sets forth an insured's rights and obligations in the event of a "substantial increase" in premium rates.[2] Defendant argues that this rider, too, should have put Plaintiff on notice that her premium was subject to adjustment, even after the policy anniversary following her 65th birthday. Plaintiff's response, summed up, is that "[t]he Contingent Benefits Upon Lapse Rider says nothing about the Reduced Pay at 65 Option." R. 36 at 14, 26. This is unhelpful to Plaintiff. Without explicitly carving out policies including the Reduced Pay at 65 Option, the Lapse Rider must be taken to mean what it says: "This Rider is part of the policy to which it is attached if it is referred to on page 3 of the policy." R. 22–1 at 39. Page 3 of the policy is the Schedule of Benefits. All Schedules of Benefits issued to Plaintiff during the relevant time period—including the one issued in 2015 when Plaintiff was 67 years old—refer to the Contingent Benefits Upon Lapse Rider. *See* R. 22–1 at 15, 57–58. Accordingly, the provisions set forth therein must be read as applying to substantial rate increases on Plaintiff's policy.[3]

In a final effort to save her breach of contract claim, Plaintiff asks the Court to consider whether the contract is ambiguous as to the operation of the Reduced

---

[2] Specifically, and as set forth more fully below, the Lapse Rider provides that in the event of a "substantial premium increase," an insured who chooses not to pay the higher premium may reduce her benefits without providing proof of good health or receive "Contingent Nonforfeiture Coverage" upon lapse or cancellation. R. 22–1 at 40.

[3] The Inflation Protection Rider contains the same provision. R. 22–1 at 37. It, too, is listed on all three Schedules of Benefits issued to Plaintiff.

Pay at 65 Option. A contract is ambiguous if it is subject to more than one reasonable interpretation. *See Fasteel*, 550 F. Supp. 2d at 821 (citing *Karaganis*, 811 F.2d at 361. "Mere disagreement between the parties as to the interpretation of an insurance contract does not render it ambiguous." *River v. Commercial Life Ins. Co.*, 160 F.3d 1164, 1169 (7th Cir. 1998) (citation omitted). Indeed, if "one interpretation is reasonable and the other is not, there is no ambiguity to resolve." *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1037 (7th Cir. 1998). Plaintiff posits that her belief that she had self–segregated into a policy class immune from post–age 65 premium increases was reasonable. R. 36 at 15. In support, she notes that "[h]ad MetLife simply stated on the 'Schedule of Benefits' that "On and after Policy Anniversary at age 65, *subject to class–wide rate increases*[,]' it would have succinctly and unambiguously informed Newman (and other purchasers) of the limits of the bargain they were making." *Id.* at 16 (emphasis in original). The Court agrees that this construction would have been clearer. But the failure of a contract to employ the clearest possible language does not render it ambiguous, particularly where, as here, the conduct claimed as a breach is clearly set forth as permissible not once, but four times throughout the contract. The Court will "not search for ambiguity where none exists." *River*, 160 F.3d at 1169 (citing *General Ins. Co. of Am. v. Robert B. McManus, Inc.*, 650 N.E.2d 1080, 1083 (Ill. App. Ct. 1995)). Because the Court finds no ambiguity in the contract, it will adhere to the Illinois four corners rule, interpreting the contract on its language alone, without reference to extrinsic evidence. *Bourke*, 159 F.3d at 1036–37 ("Illinois uses in general a four

corners rule in the interpretation of contracts, holding, as we have previously remarked, that if the language of a contract appears to admit of only one interpretation, the case is indeed over.") (internal quotation marks and citation omitted).[4]

In summary, the policy provides in three places that MetLife may raise premiums on the policy on a class basis. In a fourth location, it sets forth an insured's rights and obligations in the event that a "substantial premium increase" occurs. Yet Plaintiff argues that rate increases after the policy anniversary following her 65th birthday were prohibited because the Reduced Pay at 65 Option permanently locked–in her premium obligation from that date onward. Were the Court to accept Plaintiff's interpretation of the contract, it would render meaningless the clearly worded, twice bold–faced warnings indicating that the opposite is true. The only reasonable reading of the "on and after" clause in light of

---

[4]     Under certain, limited circumstances, courts construing unambiguous contracts under Illinois law have provisionally admitted parol evidence to show extrinsic ambiguity in an otherwise clearly written contract. *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884–85 (Ill. 1999) (citations omitted) (setting forth a limited exception to the four corners rule "when someone who knows the context of the contract would know if the contract actually means something other than what it seems to mean"); *see also Burke*, 159 F.3d at 1036 ("extrinsic ambiguities arise when the terms are clear taken by themselves, but the surrounding circumstances create inconsistent circumstances"). But where, as here, "parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence." *Id.* Moreover, nothing in the circumstances alleged suggests the possibility that the contract means anything other than what it says—that all policies in the class, including Plaintiff's, are subject to premium increases on a class basis. Thus, the provisional admission approach does not apply here.

the consistent warnings throughout the policy is that on and after the policy anniversary following Plaintiff's 65th birthday, she is to be responsible for half of the amount of total policy premium, which is subject to class–wide adjustment. Since the policy anniversary after Plaintiff turned 65, she has been charged this reduced rate. Though her premium is higher than she'd anticipated it would be given the substantial nature of the class–wide rate increase,[5] because Plaintiff purchased the Reduced Pay at 65 Option and paid larger than normal premiums up front, she limited the impact of the substantial premium increase on her bottom line. Plaintiff has at all times enjoyed the benefit of her bargain. In the absence of a breach by Defendant, Plaintiff's breach of contract claim must be dismissed. *See Flint v. Metlife Ins. Co. of Connecticut*, 2011 WL 1575364, at *2 (finding no breach under similar circumstances).

## II.     Common Law Fraud

Plaintiff also asserts a claim for common law fraud. "Fraud has been said to comprise anything calculated to deceive and may consist of a single act, a single suppression of truth, suggestion of falsity, or direct falsehood, innuendo or gesture."[6] *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 6–7 (Ill. App. Ct.

---

[5]     Plaintiff does not contend that the increase in premiums was not approved by state regulators or that it was made on anything other than a class basis.

[6]     Under the heightened federal pleading standard, Rule 9(b) of the Federal Rules of Civil Procedure, a plaintiff alleging fraud must state with particularity the circumstances constituting fraud–the who, what, when, where, and how of the alleged misconduct. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012) (citations omitted). Plaintiff's complaint satisfies that standard, and

2001) (citation omitted). In order to plead common law fraud, a plaintiff must allege (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance. *Connick v. Suzuki Motor Co., Ltd.,* 675 N.E.2d 584, 591 (Ill. 1996).[7]

With respect to the first element, Plaintiff alleges that Defendant made the following statement in its informational brochure, which it knew to be false:

> **Reduced Pay at 65 Option:** By paying more than the regular premium amount you would pay each year up to the Policy Anniversary on or after your 65th birthday, you pay half the amount of your pre–age 65 premiums thereafter.

---

Defendant makes no argument to the contrary as to this or any of Plaintiff's other fraud claims. Accordingly, the fraud claims are reviewed not for want of specificity, but for whether the facts alleged are sufficient to support a cause of action.

[7] In its reply, Defendant advances for the first time the argument that Plaintiff's fraud claims are "nothing more than rehashed contract claims." The Court will not engage this argument for two reasons. First, "[a]rguments raised for the first time in a reply brief are waived." *Wigod*, 673 F.3d at 571. Second, even if the Court were to overlook waiver, "where the plaintiff's damages are [alleged to be] proximately caused by a defendant's intentional, false representation, *i.e.*, fraud," recovery in tort for failure to perform a contractual obligations is allowed. *Id.* at 567–69 (discussing exceptions to the doctrine set forth in *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 448–49 (Ill. 1982)). Plaintiff does not allege merely that Defendant failed to keep its contractual promise, she alleges, albeit unsuccessfully, that Defendant was not truthful about the nature of the underlying promise in the first place. That lack of truthfulness, even if associated with a contractual promise, is actionable in fraud. *See id.* at 569. None of the authority Defendant cites requires a contrary conclusion. *See Perlman v. Zell*, 185 F.3d 850, 852 (7th Cir. 1999) ("Breach of contract is not fraud; only making a promise with the intent not to keep it deserves that epithet."); *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 844 (Ill. 2005) ("breach of contractual promise, without more, is not actionable under the Consumer Fraud Act").

R. 22 ¶ 61. Plaintiff alleges that this statement was false, because use of the word "thereafter" "promised or guaranteed a post–65 premium that was locked–in at 50% of the pre–65 premium." *Id.* ¶ 62. Plaintiff alleges that Defendant knew the statement was false because it was aware that if a class–wide rate increase were implemented after Plaintiff turned 65 years old, then her premium would go up. *Id.* ¶ 63. False promises can be fraudulent. *See Toulon v. Cont'l Cas. Co.* (*Toulon I*), 2015 WL 4932255, at *2 (N.D. Ill. Aug. 18, 2015) (citing *HPI Health Care Servs. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 682 (Ill. 1989)). To be fraudulent, a promise must affirmatively misrepresent a material fact. *See Miller*, 762 N.E.2d at 7.

The "thereafter" statement was not a false promise. The fact to which it refers is an insured's obligation to pay half of her pre–age 65 premium from the policy anniversary after her 65th birthday onward. Plaintiff inferred that the "thereafter" clause modified the *specific amount* of her obligation, rather than the *percentage of the amount* of her obligation. This does not render the statement fraudulent, however, for two reasons: (1) the brochure expressly warned Plaintiff that it was intended to provide a general overview of the Reduced Pay at 65 Option only and that the complete rights and obligations of the parties would be governed by the actual policy language; and (2) the policy itself unambiguously advised Plaintiff that her premiums were subject to adjustment on a class basis. *See, e.g., Toulon I*, 2015 WL 4932255, at *2 (holding that a hypothetical statement in an insurance application worksheet about the possibility of a 20% premium increase did not amount to a false promise that to cap increases at 20% despite the inference

plaintiff took from the statement because the worksheet also advised the plaintiff that the defendant had the right to raise premiums without qualification). The inference, even if reasonable upon review of the brochure, became unreasonable when Plaintiff had the policy in hand. *See Rakes v. Life Investors Inc. Co. of Am.*, 582 F.3d 886, 894–95 (8th Cir. 2009) (finding no actual fraud in a long–term care insurance policy as to the possibility of price adjustments, despite insureds' mistaken belief about the likelihood of those adjustments, where the insurer "disclosed its right to change premium rates on the first page of its policies, in boldface, capital letters").

Which leads to the second reason Plaintiff's fraud claim fails: even if the "thereafter" clause misrepresented Plaintiff's premium obligations under the Reduced Pay at 65 Option, which it did not, Plaintiff would not have been justified in relying upon the brochure once she received the actual policy. "When addressing the issue of justified reliance, Illinois courts have long recognized that 'a party is not justified in relying on representations made when [s]he has ample opportunity to ascertain the truth of the representations before [s]he acts. When [s]he is afforded the opportunity of knowing the truth[,] [s]he cannot be heard to say [s]he was deceived by misrepresentations." *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 882 (7th Cir. 2005) (quoting *Elipas Enter., Inc. v. Silverstein*, 612 N.E.2d 9, 13 (Ill. App. Ct. 1993) (internal ellipses omitted); *see also Miller*, 762 N.E.2d at 9 ("One of the most important of the surrounding circumstances is timing. A plaintiff may not generally rely on representations made when the plaintiff has ample opportunity to

ascertain the truth of the matter *before* acting.") (emphasis in original, citation omitted); *Flint*, 2011 WL 1575364, at *2 ("[Plaintiff] cannot plausibly claim that he reasonably held any belief that his premiums would remain at the same level as long as he held the Policy.").

The policy afforded Plaintiff a 30–day examination period to review its terms and conditions before accepting them. It permitted Plaintiff to cancel the policy without penalty during that examination period if she were unsatisfied. Plaintiff therefore had an opportunity to read the policy and discern the truth about the possibility of increased annual premium rates before becoming bound by the policy's terms. Even before the Schedule of Benefits setting forth her payment obligations, the policy states on its cover that "**PREMIUM RATES ARE SUBJECT TO CHANGE**," and goes on to explain that "[w]e may change the premium rates, subject to applicable state Insurance Department approval." (emphasis in original). A similar warning appears later in the policy in the section titled "Premiums," is repeated again in the Inflation Protection Rider, and the possibility of steep premium hikes is expressly contemplated in the Lapse Rider. If Plaintiff were unclear regarding how the Reduced Pay at 65 Option worked in light of the numerous references throughout the policy to the possibility of class–wide premium increases, she could have conferred with someone knowledgeable about long–term care health insurance policies or with the Defendant or one of its agents. Indeed, she would have been well–advised to do so. *See Davis*, 396 F.3d at 883 (explaining that where a substantial transaction subject to numerous terms and conditions is at

issue, the non–drafting party should take measures to ensure her understanding of all material terms and conditions). In the absence of a false promise by Defendant, Plaintiff's confusion does not render the Defendant's conduct fraudulent.

Because Plaintiff fails to allege a false statement knowingly made by Defendant, and because the facts pled preclude a finding of reasonable reliance on Plaintiff's mistaken inference, Plaintiff's fraud claim must also be dismissed.

## III.   Deceptive Acts and Practices

The Illinois Consumer Fraud Act (ICFA) affords greater protection to consumers than the common law, and is to be interpreted broadly by the courts.[8] *See Muehlbauer v. Gen. Motors Corp.*, 431 F. Supp. 2d 847, 867 (N.D. Ill. 2006) ("Consumers raising ICFA claims are afforded "far broader" protection than those who bring common law fraud claims. Moreover, courts are to liberally construe the ICFA.") (citations omitted); *see also Miller*, 762 N.E.2d at 11 ("The Act offers a clear mandate to the Illinois courts to utilize the Act to the greatest extent possible to eliminate all forms of deceptive or unfair business practices and provide appropriate relief to consumers.") (internal quotation marks and citation omitted). To state a deceptive acts and practices claim under the ICFA, a plaintiff must allege (1) a

---

[8]   The Illinois Consumer Fraud act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce." 815 ILCS 505/2.

deceptive act or practice by the defendant; (2) the defendant's intent that she rely on the deception; (3) that the deception occurred in the course of conduct involving trade and commerce; (4) actual damage to the plaintiff occurred; and (5) the damage complained of was proximately caused by the deception. *See Muehlbauer*, 431 F. Supp. 2d at 867 (citing authority). Unlike the common law, the ICFA does not require a plaintiff to show actual reliance or diligence in ascertaining the accuracy of deceptive statements. *See Davis*, 396 F.3d at 883. Rather, under the ICFA, it is the intentionally deceptive nature of the commercial act or practice that gives rise to a claim for damages.

Again, the Plaintiff claims as the basis of her ICFA deceptive acts and practices claim the "thereafter" statement about the Reduced Pay at 65 Option in Defendant's marketing brochure. While on its own, the statement may have confused Plaintiff, "[t]he allegedly deceptive act must be looked upon in light of the totality of the information made available to [her]." *Davis*, 396 F.3d at 884. In *Davis*, the plaintiffs were alleged to have been told by a bank officer at the closing on their mortgage that they could repay their entire mortgage without penalty after two–years. *Id.* However, the agreement they signed had a five–year penalty provision. *Id.* After being assessed a penalty for early repayment of the loan, the plaintiffs brought suit under the ICFA, alleging that the statement made by the bank officer at the closing was deceptive. *Id.* The Seventh Circuit affirmed the

dismissal of the claim[9] because the plaintiffs were alerted "in a number of ways" to the fact that they were agreeing to a five–year penalty period. *Id.* For example, the loan agreement contained three separate references to a "sixty month/five year penalty period." *Id.* A separate disclosure form was also provided to plaintiffs informing them that a prepayment penalty would be charged and directing them to the terms set forth in the contract for further details. *Id.* Also, the plaintiffs were given a three–day grace period to review the agreement and rescind if they so decided. *Id.* Explaining why dismissal of the ICFA claim was proper, the court held that "[e]ven if there was some confusion on the [plaintiffs]' part during the closing (and there may well have been), at no time during the closing nor at any time within the three day grace period did the [plaintiffs] ever question, much less challenge the documents they had signed." *Id.* The circumstances here are analogous. Even if Plaintiff were confused by the "thereafter" statement in the brochure, the policy itself warned her not once, but four times of the possibility of future rate increases. She had thirty days to review the policy and to cancel it if for any reason she was unsatisfied with its terms. She did not. This is fatal to her deceptive acts and practices claim.

---

[9]     The claim was dismissed at summary judgment, not on a motion to dismiss. The case is nevertheless controlling here insofar as the analogous facts requiring dismissal were all pled in the complaint or incorporated by reference from the policy. *McCready v. eBay, Inc.,* 453 F.3d 882, 888 (7th Cir. 2006) ("[I]f a plaintiff pleads facts which show [s]he has no claim, then [s]he has pled [her]self out of court.").

Nor can it be said that Defendant intended Plaintiff to rely on the brochure for the totality of her understanding regarding the premium payment terms. As previously noted, the brochure specified that it was only intended to provide an overview of alternative premium payment options and it directed potential customers to the "actual policy language" for complete information regarding the parties' rights and obligations. Furthermore, that Defendant gave Plaintiff a 30–day grace period to review the policy belies any reasonable inference that Defendant intended to Plaintiff to agree to the option without first having a reasonable opportunity to review and consider its complete terms. Accordingly, the deceptive acts and practices claim is also dismissed.

IV.    <u>Fraudulent Concealment</u>

Plaintiff's theory of fraudulent concealment differs from that of her fraud and deceptive acts and practices claims. Plaintiff alleges that "MetLife failed to define 'class' as it relates to a class–wide premium increase" and that "Plaintiff [thus] could not have discovered that she was potentially subject to premium increases once she turned 65 years old through reasonable inquiry or inspection" of the policy. R 22 ¶¶ 75, 77. To plead fraudulent concealment, "a plaintiff must allege that the defendant intentionally omitted or concealed a material fact that it was under a duty to disclose to the plaintiff." *Wigod*, 673 F.3d at 571 (citation omitted). "A duty to disclose would arise if plaintiff and defendant are in a fiduciary or confidential relationship or in a situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over

plaintiff." *Id.* (internal quotation marks and citation omitted). Courts have also recognized that a duty to disclose "arises when a defendant presents a half–truth as the full truth." *See Toulon I*, 2015 WL 4932255 at *3.

As a threshold matter, the fraudulent concealment claim fails for the fundamental reason that Defendant did not conceal from Plaintiff that her premiums were subject to change. Indeed, the information Plaintiff alleges she was unable to discover was written in bold, capital letters on the very first page of her policy, repeated in other key contractual provisions, and previewed in a rider laying out her options in the event the policy suddenly become substantially more expensive. Simply, the information Plaintiff claims was unknowable was actually clear "upon reasonable inquiry or inspection."

To avoid the obvious impact of the contractual warnings about rate adjustments, Plaintiff alleges that she believed that by purchasing the Reduced Pay at 65 Option, she had "self–segregated" into a "class of policyholders that had extinguished the possibility of post–age 65 rate increases." R. 36 at 15. On that basis, she argues that it was reasonable for her to believe that the contractual warnings did not apply to her. She contends that had Defendant disclosed that the class into which her policy fell "included all purchasers of the 'LTC–IDEAL' policy–line, regardless of whether an insured purchased the 'Reduced–Pay at 65 Option' or any other rider," R. 36 at 9, her confusion would have been ameliorated. It is this alleged failure that Plaintiff contends created a duty to disclose.

Even at this early stage in the proceedings, drawing all inferences in Plaintiff's favor, the Court disagrees that disclosure of the details regarding Plaintiff's policy class was required. Plaintiff does not identify any language in the brochure or policy beyond the "thereafter" and "on and after" language to support her belief that she had "self–segregated" from the class subject to class–wide adjustments. As previously noted, those phrases of permanence considered in context of the totality of the contract do not permit the inference that Plaintiff urges the Court to accept as reasonable—that the Reduced Pay at 65 Option immunized her from generally applicable rate increases after she turned 65. Accordingly, Plaintiff has not identified a "half–truth" advanced by Defendant plausibly suggesting that her policy was somehow exempt from the class–wide premium adjustments warned of throughout the policy. Accordingly, Defendant had no duty to disclose the nature of or further details about Plaintiff's policy class. *See Saunders v. Michigan Ave. Nat'l Bank*, 662 N.E.2d 602, 608 (Ill. App. Ct. 1996); *see also Toulon I*, 2015 WL 4932255, at *3. The fraudulent concealment claim is also dismissed.

V.    <u>Unfair Acts and Practices</u>

Plaintiff also claims that even if not deceptive, Defendant's conduct was unfair under Section 2 of the ICFA. The misconduct upon which she premises her claim are (1) the alleged misrepresentations and omissions identified above, R. 22 at ¶ 55, and (2) the 102% premium rate increase after her 65th birthday, *id.* ¶ 58.

Accordingly the Court considers both facts as potential bases of her unfair acts and practices claim.

To plead a claim of unfairness under the ICFA, a plaintiff must allege a practice that (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. *See Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 830 (7th Cir. 2014) (citations omitted). The Illinois Supreme Court has held that all three of the criteria do not need to be satisfied to support a finding of unfairness. *Id.* (citing *Robinson v. Toyota Motor Credit Corp.,* 775 N.E.2d 951 (Ill. 2002). Rather, "[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson,* 775 N.E.2d at 961. Plaintiff's claim must therefore satisfy at least one of the three criteria to survive.

Plaintiff contends that the "thereafter" and "on and after" statements, coupled with the Defendant's decision not to disclose details regarding Plaintiff's policy class, violate the public policy underlying Illinois Insurance Code provision 215 ILCS 5/149, which prohibits the "issu[ance] or circulat[ion] of any estimate, illustration, circular, or verbal or written statement of any sort misrepresenting the terms of any policy issued or to be issued by it." R. 52 ¶ 55. She also contends that the marketing materials violate the policy set forth in Illinois Administrative Code Title 50, Section 2012.122(b)(4), which prohibits misrepresentations of any material fact in selling or offering to sell a long–term care insurance policy. *Id.* Despite Defendant's arguments to the contrary, Plaintiff is correct that even though these

statutes do not create a private right of action, they nevertheless impose a duty on Defendant, the breach of which can form the basis of a claim for unfairness under the ICFA.[10] *See, e.g., Boyd v. U.S. Bank, N.A., ex rel. Sasco Aames Mortg. Loan Trust, Series 2003–1*, 787 F. Supp. 2d 747, 752 (N.D. Ill. 2011) ("[A] plaintiff may predicate an ICFA unfairness claim on violations of other statutes or regulations . . . that themselves do not allow for private enforcement.") (internal citations omitted) (collecting authority); *see also In re Dorsey*, 162 B.R. 150, 158 (N.D. Ill. Bankr. 1993) ("even though a private cause of action does not exist under [the Illinois Insurance Code] . . . it imposes a duty not to misrepresent policy coverage and terms," and thus is actionable under the ICFA). Even so, for all of the reasons stated above, Plaintiff has not shown that the "thereafter" statement in the brochure or the "on and after" language in the policy misrepresented Plaintiff's premium obligations or Defendant's right to adjust rates, particularly in light of all of the information available to Plaintiff. Accordingly, Plaintiff has failed to allege conduct that violates public policy. If Defendant did not misrepresent the parties' respective rights and obligations, it necessarily follows that the "thereafter" and "on and after" language and the omission of detail regarding Plaintiff's policy class were neither oppressive nor the cause of any damages Plaintiff suffered. In this aspect, the unfairness claim fails.

---

[10] Because these are the only statutes Plaintiff pleads as the basis of her claim, the Court does not consider the applicability of any other provisions of the Illinois Insurance Code or Title 50, Section 2012 of the Illinois Administrative Code.

The Court next considers whether the more–than–doubling of Plaintiff's pre–age 65 premium could be considered "unfair" within the meaning of the ICFA. *See Rockford Mem'l Hosp. v. Havrilesko*, 858 N.E.2d 56, 62 (Ill. App. Ct. 2006) ("Issues involving excessive fees are generally treated as unfairness cases."). Generally, charging an unconscionably high price is insufficient to establish an unfairness claim. *Crichton v. Golden Rule Ins. Co.*, 832 N.E.2d 843, 852 (Ill. App. Ct. 2005) (citation omitted). To be unfair, excessive fees must "violate public policy, be so oppressive that [they] leave[ ] the consumer with little alternative except to submit to [them], and injure the consumer." *Id.* Plaintiff does not allege in the complaint or her motion papers a specific public policy offended by the substantial increase in her premium. The Court will not search for one and the issue is therefore waived. Plaintiff does allege, however, that the increase was oppressive because it left her with three undesirable options: "(1) accept the premium increase and pay premiums that were twice as expensive as those she agreed to pay; (2) let her Policy lapse; or (3) accept reduced benefits." R. 22 ¶ 56. Plaintiff may not like any of these options, but they are expressly set forth in the Lapse Rider, which Plaintiff had 30–days to review before her acceptance of the policy was complete.[11]

---

[11]  The Contingent Benefits Upon Lapse Rider, reads, in relevant part:

**Eligibility for Contingent Benefits Upon Lapse**[:] We will provide You with written notice of a Substantial Premium Increase at least forty–five (45) days prior to the date on which such premium increase will take effect. In this notice, we will: 1. offer to reduce Your benefits, without Your providing proof of good health, so that Your premium will not increase; and 2. offer You the ability to receive **Contingent**

To the extent Plaintiff found these options oppressive, she could have canceled the contract during the examination period and shopped for a different long–term care policy. *See Saunders*, 662 N.E.2d at 608–09 (holding that unconscionably high overdraft fees were not so oppressive as to be unfair where the plaintiff had a meaningful choice in selecting a bank). The options she now faces, and the injury she consequently suffers, were contingencies she agreed to when she accepted the terms of the policy.[12] Accordingly, they are not unfair within the meaning of the ICFA. *See Toulon v. Cont'l Cas. Co.* (*Toulon II*), 2016 WL 561909, at *6–7 (N.D. Ill. Feb. 12, 2016) (finding no unfairness under the ICFA where a class–wide premium

---

**Nonforfeiture Coverage**, as defined below; and 3. advise you that a **Lapse** at any time during the 120–day period following the due date of the increased premium will be deemed to be an election to receive **Contingent Nonforfeiture Coverage.**

R. 22–1 at 40.

[12]     It is this critical point that distinguishes the instant case from *Demitro v. General Motors Acceptance Corporation*, 902 N.E.2d 1163, 1168–69 (Ill. App. Ct. 2009)—the case upon which Plaintiff primarily relies to support her unfair acts and practices claim. In *Demitro*, the defendant's allegedly unfair conduct involved the contravention of promises made to the plaintiff regarding whether his car would be repossessed and how much time he had to bring his account current. On that basis, the conduct was found to be oppressive within the meaning of the ICFA. *Id.* ("In this case, plaintiff alleges that GMAC's conduct in retaining possession of the wrongfully repossessed vehicle until after he paid off the entire outstanding balance . . . in contravention of the terms set forth in GMAC's seven–day extension letter, amounted to oppressive conduct.") Here, Defendant was at all times acting within its contractual and legal authority—Defendant provided Plaintiff with the options it promised in the lapse rider in light of the substantial premium increase, and there is no allegation that it failed to receive the required authorization from the Department of Insurance to raise premiums on all policies in Plaintiff's policy class. In the absence of any wrongful or unauthorized act, Defendant's conduct cannot be considered oppressive.

increase on a long–term care insurance policy was permitted by the contract and where disclosures made to the plaintiff about the possibility of a premium increase comported with state regulations); *see also Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 610 (7th Cir. 2013) ("there is nothing oppressive or unscrupulous about giving a counterparty the choice to fulfill his contractual duties or be declared in default for failing to do so"). The unfair acts and practices claim is dismissed, as well.

## Conclusion

For the reasons stated above, Plaintiff's complaint is dismissed. The dismissal is without prejudice, however, and Plaintiff may move to amend her complaint within 30 days of the date of this Order. Any such motion should attach a proposed amended complaint and be supported by a brief of no more than five pages describing how the proposed amendments cure the deficiencies in the current complaint. Defendant should not respond to the motion to amend unless ordered to do so by the Court. If after 30 days no motion to amend is filed, this dismissal will be converted into a dismissal with prejudice.

ENTERED:

Thomas M Durkin

Honorable Thomas M. Durkin
United States District Judge

Dated: March 9, 2017